**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 17-250 |
| | ) | |
| JAMAL BROOKS, | ) | |
| | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CONTI, Chief District Judge

### I.     Introduction

A federal grand jury returned a one-count indictment against defendant Jamal Brooks ("Brooks") for possessing a firearm and ammunition while being a convicted felon, in violation of 18 U.S.C. § 922(g)(1). (ECF No. 15.) Brooks filed a motion to dismiss[1] arguing, among other things, that 18 U.S.C. § 922(g)(1) is unconstitutional as applied to him because his disqualifying conviction, a misdemeanor conviction for carrying a firearm without a license in violation of 18 PA. CONS. STAT. § 6106(a)(2), was not for a serious offense. (ECF No. 39 at 10.)

---

[1]     On the same day Brooks filed the motion to dismiss, he filed: (a) a motion for discovery (ECF No. 36); (b) a motion to produce evidence that the government intends to use under Federal Rules of Evidence 404(b) and 609 (ECF No. 37); and (c) a motion to suppress evidence and statements (ECF No. 38). The government filed an omnibus response in opposition to Brooks' motions. (ECF No. 43.) Brooks filed a supplement to the motion for discovery and motion to suppress. (ECF No. 44.) On February 28, 2018, the court held a hearing on Brooks' pretrial motions. The court after hearing from the parties denied without prejudice the motion for discovery and denied as premature the motion to produce evidence.

The court denied the motion to dismiss the indictment with respect to Brooks' argument that § 922(g)(1) exceeds Congress' authority under the commerce clause. (ECF No. 48 at 10-11 (citing United States v. Singletary, 268 F.3d 196 (3d Cir. 2001); United States v. Penn, 870 F.3d 164 (3d Cir. 2017)). The only issue remaining to be decided by the court with respect to the motion to dismiss is whether § 922(g)(1) is unconstitutional as applied to Brooks.

## II.    Case Background

On February 28, 2018, the court held a hearing with respect to Brooks' motion to dismiss and other pretrial motions. The court at the hearing explained that it would apply the two-step analysis set forth by the Third Circuit Court of Appeals in <u>Binderup v. Attorney General</u>, 836 F.3d 336 (3d Cir. 2016) (en banc) to analyze Brooks' as-applied constitutional attack on § 922(g)(1). That two-step analysis requires the court to consider evidence and legal argument presented by the parties to determine (1) whether § 922(g)(1), a presumptively lawful regulation, burdens Brooks' Second Amendment rights, and, if so, (2) whether § 922(g)(1) satisfies intermediate scrutiny. <u>Binderup</u>, 836 F.3d at 355. The court permitted the parties to file supplemental briefing to address the parties' burdens of proof and whether the Federal Rules of Evidence applied to the court's consideration of evidence submitted with respect to the two-part <u>Binderup</u> analysis.

On May 24, 2018, this court issued an opinion on procedural matters and explained that at step one of its <u>Binderup</u> analysis, the court would find the facts and determine whether Brooks satisfied his burden to make a strong showing that his disqualifying conviction was not for a serious offense, i.e., his circumstances are distinguished from the class of persons historically barred from exercising their Second Amendment rights and he can overcome the presumptive lawfulness of § 922(g)(1). If Brooks satisfied his burden, the burden would shift under step two to the government. At step two, the court would find the facts and determine whether the government met its burden to show that prohibiting persons like Brooks from bearing arms under § 922(g)(1) is substantially related to its important interest of promoting public safety and preventing armed mayhem. If Brooks satisfies step one, the government's evidence at step two must be meaningful to strip him of his Second Amendment rights. The court explained that it

would not strictly apply the Federal Rules of Evidence to its consideration of the evidence and may consider hearsay evidence. (ECF No. 60 at 25-26.)

On June 25, 2018, and July 10, 2018, the court held a hearing for the parties to present evidence to satisfy their respective burdens under Binderup. Both parties entered into evidence exhibits, and the government presented the testimony of seven witnesses. On August 20, 2018, the parties filed their proposed findings of fact and conclusions of law.

Upon consideration of the parties' submissions, the testimony and documentary evidence presented at the hearing held on June 25, 2018, and July 10, 2018, and the arguments made by counsel, the court makes the following findings of fact and conclusions of law:

### III.    Findings of Fact[2]

---

[2]    Both steps of the framework set forth in United States v. Marzzarella, 614 F.3d 85 (3d Cir. 2010), require the court to act as the fact finder to determine whether § 922(g)(1) is unconstitutional as applied to Brooks. As the court explained in its opinion on procedural matters, neither the parties nor the court located any authority that directly addresses whether the Federal Rules of Evidence apply to the court's consideration of the evidence under the Marzzarella framework. This court reasoned that the evidentiary hearing on Brooks' motion to dismiss the indictment based upon his as-applied constitutional attack on § 922(g)(2) is akin to an evidentiary hearing with respect to a suppression motion, in which the court does not strictly apply the Federal Rules of Evidence and may consider hearsay evidence. 3A CHARLES ALAN WRIGHT, ANDREW D. LEIPOLD, PETER J. HENNING, SARAH N. WELLING, FEDERAL PRACTICE & PROCEDURE § 689 (4th ed. 2010) ("The rules of evidence do not apply in a suppression hearing and hearsay is admissible.") (citing United States v. Matlock, 415 U.S. 164, 172-73 (1974); United States v. Raddatz, 447 U.S. 667, 679 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial.")); Brosiuis v. Warden, 278 F.3d 239, 246 n.4 (3d Cir. 2002) ("Hearsay may be considered in a suppression hearing in a federal court.").
    The Supreme Court of the United States in Raddatz noted that while "the resolution of a suppression motion can and often does determine the outcome of the case[,]…the interests at stake in a suppression hearing are of a lesser magnitude than those in the criminal trial itself." Raddatz, 447 U.S. at 679. The Court held that under those circumstances, a "court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial." Id. Similarly, here, although the outcome of the court's hearing on Brooks' as-applied attack on § 922(g)(1) may be outcome determinative if the court agrees with him, the hearing is not of the same magnitude as a trial during which Brooks' guilt or innocence is determined. Under those circumstances, the Federal Rules of Evidence will not be formally applied and hearsay evidence may be considered.

**A. Brooks' Relevant Juvenile Conviction**

1.     On January 22, 2008, Brooks—at the age of fifteen years old—was adjudicated delinquent for possession of heroin, possession of ecstasy, and possession of a small amount of marijuana. (Ex. 1 at 1-2.)

**B. The Vehicle Shooting on April 19, 2015**

2.     Joi Clark ("Clark") and Felicia Johnson ("Johnson") testified with respect to a shooting that occurred on April 19, 2015. (H.T. 6/25/2018 (ECF No. 65) at 32, 42.)

3.     Clark and Johnson in the early morning hours of April 19, 2015, were at 5406 Columbo Street, Pittsburgh, Pennsylvania, which was a "row house" amongst three other row houses ("Johnson's row house"). (Id. at 32-33, 44.) Johnson's row house was in the middle of two of the four row houses. (Id. at 44.) Johnson's three minor children also lived at the row house. (Id. at 42.) As of April 19, 2015, Johnson had lived at her row house for two to three years. (Id. at 44.)

4.     On April 18, 2015, at about 11:00 p.m., Johnson drove Clark to her row house in Clark's sister's vehicle, a white 2012 Ford Fusion (the "Ford Fusion"), which they parked near Johnson's row house. (Id. at 33, 38.)

---

This approach is supported by the court of appeals' consideration in Binderup of the empirical studies offered by the government and Federal Rule of Evidence 1101(d), which provides that the Rules of Evidence—"except for those on privilege"—do not apply to "a preliminary examination in a criminal case." FED. R. EVID. 1101(d). A court—like any other finder of fact—must assess the evidence for its reliability and discount any evidence it finds to be less reliable. United States v. Tussell, 441 F.Supp. 1092, 1096 (M.D. Pa. 1977) ("The testimony heard often contained elements of hearsay which might have been excluded at trial but which I allowed for whatever probative value that testimony had. This is permissible at a suppression hearing without regard to the matter in issue, although the court remains obligated to weigh the evidence and discount that which is less reliable."); United States v. Low, 257 F.Supp. 606, 610 n.2 (W.D. Pa. 1966) ("Hearsay evidence derived from an informer is competent evidence on which to show probable cause for an arrest, though the weight to be given it is a matter for the sound discretion of the court.").

5.      Shortly after Johnson's and Clark's arrival at Johnson's row house, a neighbor who lived in a row house next to Johnson's row house banged on the door. (H.T. 6/25/2018 (ECF No. 65) at 34-35, 45-46.) Johnson recognized the neighbor; she had seen him "often" prior to April 19, 2015. (Id. at 46.)

6.      The following exchange took place between Johnson and the government during the June 25, 2018 hearing with respect to whether Brooks was the neighbor involved in the incident with Clark and Johnson on April 19, 2015:

> Q. Do you see that individual here in the courtroom today?
> A. You are standing in front of him.
> Q. Excuse me?
> A. I don't know.
> Q. It's okay.
> A. He got a haircut and he didn't have a beard.
> Q. Are you indicating that the defendant is that person but appeared differently? Do you need some additional time?
> A. He just looks different. I don't remember him having a lot of hair or that beard.
> Q. The person that you saw at your door that night, what do you recall him looking like?
> A. He's like probably two inches taller than me.
> Q. How tall are you?
> A. I'm only about 5'5".
> Q. Do you recall anything else about him?
> A. He was little. He wasn't big. He wasn't a big guy. Like the build seems him. He just looks different with the hair and the beard.

(H.T. 6/25/2018 (ECF No. 65) at 46-47.)

7.      Clark was in the living room of Johnson's row house and there were children present in Johnson's row house at the time the neighbor knocked on the door. (Id. at 34-35.)

8.      According to Clark, when Johnson opened the door, the neighbor said: "I'm tired of you expletives, dealing with you and this parking[.]" (Id. at 35.) The neighbor drew a firearm from his right pocket, pointed it at Johnson's face, turned around, and shot the Ford Fusion. (Id. at 35, 37, 48.) Clark testified that the firearm was "no more than two feet" from Johnson's face. (Id. at 37.) Johnson testified that the neighbor pointed the gun at her before he shot the Ford Fusion. (Id. at 48.) Clark testified the neighbor "seemed aggressive, angry, upset" and "already enraged[.]" (H.T. 6/25/2018 (ECF No. 65) at 36-37.)

9.      Johnson testified that the neighbor previously on other occasions asked that she move the car because the neighbor wanted to park his vehicle directly in front of his row house. (H.T. 6/25/2018 (ECF No. 65) at 47.) She testified as follows with respect to her recollection of her interaction with the neighbor on April 19, 2015: "We were getting dressed. I was upstairs. They said someone was knocking on the door and it was the neighbor asking to move the car. By the time I got downstairs, I was saying we're not moving the car until we leave, because we're about to leave." (H.T. 6/25/2018 (ECF No. 65) at 45.) Johnson described the neighbor's demeanor as "very aggressive." (Id.)

10.     The Ford Fusion was parked six to ten feet away from Johnson's row house, and bullets from the neighbor's firearm struck the Ford Fusion. (H.T. 6/25/2018 (ECF No. 65) at 38.) Clark testified that the right front headlight and tires "were shot[,]" and there was a total of "about six…holes in the car." (Id.)

11.     Clark could see the neighbor, who was a short male, from her position in the living room. (Id. at 35-36.) Clark testified that the neighbor "looked African American" but maybe "was mixed." (Id.) Clark could not remember whether Johnson moved onto the porch to speak with the neighbor or stood in the doorway of her row house during the altercation. (Id. at

37.) Johnson testified: "Like, he was inside the doorway, so I pushed him outside, and then I shut the screen and he was talking, saying I need to move the car. Went to the grass. I need to move the car, and he shot the car." (H.T. 6/25/2018 (ECF No. 65) at 45.)

12.     Johnson called 9-1-1. (H.T. 6/25/2018 (ECF No. 65) at 39.)[3] Police officers with the Pittsburgh Police responded to the scene. (Id. at 40.)

13.     Specifically, Pittsburgh Police Officer Aaron Obsenica ("Obsenica") and his partner Gregory Livesey ("Livesey") were dispatched to Johnson's row house at approximately 1:15 a.m. on April 19, 2015. (Id. at 55.) Obsenica was the lead officer at the scene, i.e., "other officers…performed different tasks and reported" to Obsenica at the scene. (Id. at 57.)

14.     The officers received "a report of a male shooting the complainant's car." (Id.) The officers arrived at the scene within three minutes. (Id.) All other officers that were available at the time were dispatched to Johnson's row house. (Id.)

15.     Obsenica was informed by a fellow officer that Johnson stated Brooks fired three shots into the Ford Fusion and he may have entered his row house. (H.T. 6/25/2018 (ECF No. 65) at 56.)

16.     Obsenica observed that the Ford Fusion had two bullet holes below the passenger side headlight and one bullet hold through the headlight. (Id. at 58.)

17.     Other officers questioned Clark and Johnson, Clark identified the neighbor as the actor, and the officers searched the area for him. (Id. at 40, 50, 57.) According to Obsenica,

---

[3]     Clark testified that Johnson also called 9-1-1. (H.T. 6/25/2018 (ECF No. 65) at 39.) Johnson testified that only Clark called 9-1-1. (Id. at 50.)

Johnson reported that Brooks used one silver pistol to shoot the Ford Fusion and pointed a second black pistol at her. (Id. at 58.)

18.     The police officers hailed Brooks' girlfriend, R'Vaenita Squires ("Squires") and five or six small children from the row house next to Johnson's row house. (Id. at 56.) The police officers searched that row house, but did not find Brooks at that location. (Id.)  Squires told the officers that Brooks fled from the scene in a white Chevy Tahoe. (Id.)

19.     The police officers later determined that Brooks fled in a white Chevy Tahoe. (H.T. 6/25/2018 (ECF No. 65) at 65.) A few minutes after the officers searched Brooks' row house, another Pittsburgh Police Officer recovered Brooks' Chevy Tahoe "[a] couple blocks" away from the scene in the area of "Hillcrest and North Aiken Avenue[.]" (H.T. 6/25/2018 (ECF No. 65) at 58-59.) Obsenica determined the Chevy Tahoe was registered to Brooks. (Id.)

20.     The Pittsburgh Police did not locate Brooks on April 19, 2015. (Id. at 60.) Obsenica filed a criminal complaint charging him with, among other felony crimes, "two counts of firearm not to be carried without a license in violation of 6106 of the Pennsylvania Crimes Code" because Brooks did not have a license to carry a firearm on April 19, 2015. (Id.) Brooks was also charged with aggravated assault because he pointed a gun at Johnson and fired a gun into the vehicle and criminal mischief in light of the damage done to the vehicle by the shots fired. (Id. at 62.) Obsenica obtained an arrest warrant for Brooks at the time he filed the criminal complaint. (Id.) Brooks was eventually apprehended on the charges filed by Obsenica. (Id.)

21.     Clark became aware that the Pittsburgh Police charged an individual with crimes with respect to the incident that took place on April 19, 2015.  (Id. at 40.) Clark testified at the preliminary hearing with respect to those charges. (Id.) Clark was informed that the case was

"sent to court[.]" (Id. at 41.) Clark, however, did not appear to testify at the trial of the charges. (Id.)

22.      Johnson was summoned to appear in court to testify with respect to the incident. (H.T. 6/25/2018 (ECF No. 65 at 51-52.) She, however, did not appear because she was scared; the neighbor and his girlfriend "were practically still living there." (Id. at 52.)

23.      Obsenica testified at the preliminary hearing.[4] (H.T. 6/25/2018 (ECF No. 65) at 63.) The case was held for trial, but the charges were nolle prossed because—despite Obsenica calling Johnson and Clark on the telephone and informing them about the trial—neither Johnson nor Clark attended the trial. (Id.)

24.      Johnson testified that the neighbor typically drove a large Chevy truck "SUV." (H.T. 6/25/2018 (EC No. 65) at 52.)

25.      Based upon the circumstantial evidence presented by the government, the court finds that on April 19, 2015, Brooks was the neighbor who approached Johnson's row house, pointed a gun at her, fired shots into the Ford Fusion, and fled the scene in a white Chevy Tahoe.

C.  **May 5, 2015 Incident at Club Taboo**

26.      On May 5, 2015, Obsenica and Pittsburgh Police Officers Geno Macioce ("Macioce"), Timothy Matson ("Matson"), and Dustin Rummel ("Rummel"), among others, were dispatched to a bar called Club Taboo located in the Homewood area of Pittsburgh, Pennsylvania, in response to a report of an armed robbery in progress. (H.T. 6/25/2018 (ECF No. 65) at 64, 70.)

---

[4]      Obsenica testified that Johnson appeared at the preliminary hearing, which contradicts Clark's and Johnson's testimony with respect to whether each of them testified at the preliminary hearing. (H.T. 6/25/2018 (ECF No. 65) at 63.)

27.     When Macioce arrived on scene, he spoke to a male named Malcom Hill ("Hill"). (<u>Id.</u> at 71.) Hill informed Macioce that he was the disc jockey ("D.J.") at Club Taboo that night. (<u>Id.</u>) While Hill loaded his D.J. equipment into his car, which was parked directly in front of Club Taboo, he was approached by a short black male wearing a ski mask who brandished a silver revolver and demanded Hill's backpack containing $1,300.00. (<u>Id.</u>) Hill gave the male the backpack, and the male took off running on Bennett Street toward Conemaugh Street. (<u>Id.</u>)

28.     The actor was a black male, had a beard, and was about five foot, five inches tall. (<u>Id.</u> at 72, 79.) The actor's description was put out over the radio to the responding officers. (<u>Id.</u> at 78.)

29.     In the direction in which the actor ran, there was a parking lot in which school buses were parked. (H.T. 6/25/2018 (ECF No. 65) at 74.) Matson and Rummel observed a short male with a beard wearing a mask and all dark clothing coming from the area in which the school buses were located. (<u>Id.</u> at 75, 90.) Rummel exited his patrol vehicle to "get closer to the male without him noticing" Rummel.[5] (<u>Id.</u> at 90.) The male, however, saw Rummel and started to flee from his direction. (<u>Id.</u>) Rummel engaged in a foot pursuit of the actor, i.e., in a "full-out sprint[,]" when they were about fifty to one hundred feet away[6] from each other. (<u>Id.</u> at 91-93.)

30.     Matson and Rummel reported on the radio and later directly to Macioce that "they observed a male fitting the description near the school buses." (<u>Id.</u> at 75.) The man fled through a backyard and the parking lot and onto to Conemaugh Street. (<u>Id.</u> at 75, 92.) At that point,

---

[5]     Rummel testified that he was "trying to be discreet" when he approached the male because in his experience, "males that have been involved in an armed robbery or some kind of violence usually run when…[the police] ask them to stop, so…[he] was trying to close the gap…in case that would happen." (H.T. 6/25/2018 (ECF No. 65) at 92.)

[6]     Matson testified that Rummel and he were "[m]aybe 30, 40 yards" from the actor when they first saw him." (H.T. 6/25/2018 (ECF No. 65) at 101.)

Rummel commanded "Pittsburgh Police, stop[,]" but the actor disregarded Rummel's commands. (Id. at 92.) The actor kept running through an open yard and Rummel could hear what sounded like the actor jumping over a chain link fence. (Id.) By the time Rummel arrived at Frankstown Avenue, he could no longer see the actor. (Id. at 93.) The area in which Rummel chased the actor was dark. (Id. at 92.)

31.     The police officers eventually searched the school buses for other actors, firearms, other weapons, and evidence of a crime. (Id. at 75.) A ski mask was retrieved from the officers' search of the school buses. (Id.) The ski mask was submitted for "DNA testing" and "no conclusions could be drawn regarding whether…Brooks was a contributor to the DNA on the ski mask[.]" (Id. at 98; Ex. I.)

32.     Rummel called out over the police radio that he lost the actor during the foot-chase. (H.T. 6/25/2018 (ECF No. 65) at 64-65.)

33.     Obsenica and Rummel canvassed the area around Club Taboo to look for the actor. (H.T. 6/25/2018 (ECF No. 65) at 65, 94.)

34.     A firearm was recovered on Conemaugh Street on the path on which the actor ran and a key[7] was recovered in between the two houses in which Rummel chased the actor. (Id.)

35.     Specifically, Matson recovered the firearm where the actor first saw Rummel and began to run to the right through a backyard. (Id. at 94.) Matson found the firearm "right on the sidewalk" on the path Rummel was following the actor. (Id. at 103.) Matson packaged the

---

[7]     Rummel testified that there was "lots of…garbage and stuff" between the houses where he found the key, and the key was "clean and shiny, where everything else was pretty dirty and it just stuck out….[i]t wasn't in place." (H.T. 6/25/2018 (ECF No. 65) at 94.)

firearm and someone else handled "further investigative work" with respect to the firearm. (Id. at 102-03.)

36.     The firearm was a black Taurus nine millimeter semiautomatic handgun loaded with ammunition. (Id. at 77-78.) The firearm recovered on Conemaugh Street was registered to Brooks. (Id. at 78.) Despite Hill's report that the actor brandished a silver firearm, a silver firearm was not recovered on May 5, 2015. (Id. at 85.) Macioce, however, determined that Brooks owned a silver firearm at that time. (Id. at 87.)

37.     Rummel determined that the set of car keys he recovered in between the two houses belonged to a white Chevy Tahoe parked next to Club Taboo. (H.T. 6/25/2018 (ECF No. 65) at 65, 80.) The vehicle was registered to Squires,[8] who Obsenica recognized as Brooks' girlfriend, and the registration provided the address at which the officers believed Brooks lived. (Id.) Obsenica recognized the white Chevy Tahoe as the vehicle Brooks used in connection with the April 19, 2015 shooting. (Id.) Macioce obtained a search warrant for the white Chevy Tahoe. (Id.)

38.     The white Chevy Tahoe was towed. Macioce obtained a search warrant to search the white Chevy Tahoe. (H.T. 6/25/2018 (ECF No. 65) at 82.) Macioce described the items recovered during the search as follows:

> I know there was like a wallet found with the initials JB on it. Inside that were several cards that had the name Jamal Brooks on it, as well the license plate was found in the map pocket of the driver's seat, so the pocket that's behind the driver's seat. That license plate was the license plate Officer Obsenica knew from

---

[8]     On or about May 5, 2015, Obsenica participated in the search of the white Chevy Tahoe. (H.T. 6/25/2018 (ECF No. 65) at 66.) He found in the pocket on the back of the driver's seat the license plate that was on the white Chevy Tahoe on April 19, 2015, i.e., the day of the shooting involving Johnson and Clark. The license plate on the white Chevy Tahoe on April 19, 2015, was registered to Brooks. (Id. at 66-67.)

his prior experience with that vehicle, and upon running the registration plate, it returned a record for Jamal Brooks at the address on, I believe, Columbo. (Id. at 82.) The officers also found a holster molded to fit a revolver and a small amount of marijuana and a smoking pipe in the white Chevy Tahoe. (Id.)

39.     Macioce charged Brooks with, among other felony crimes, robbery and firearms not to be carried without a license. (H.T. 6/25/2018 (ECF No. 65) at 83.) Brooks was eventually apprehended on the charges, and Macioce and Hill appeared at the preliminary hearing with respect to those charges. (Id.) The charges were held for court. (Id.)

40.     The charges were nolle prossed because Hill was unable to be located. (H.T. 6/25/2018 (ECF No. 65) at 84.) Macioce went to Hill's home on more than one occasion, he made several telephone calls to Hill, and he made contact with Hill's mother. (Id.) Macioce believed that Hill's telephone was eventually disconnected. (Id.)

41.     The courts finds that based upon the circumstantial evidence presented by the government, Brooks is the individual whom brandished a firearm in the presence of Hill, stole Hill's backpack containing $1,300.00, fled the scene, and engaged Matson and Rummel in a foot chase.

### D.  Brooks' Disqualifying Conviction, Which Occurred on May 15, 2015

42.     On May 15, 2015, Brian Pazak ("Pazak") worked as a patrol sergeant for Frazier Township. (H.T. 6/25/2018 (ECF No. 65) at 22-23.) On that day at around 6:00 p.m., he and fellow officer Daniel Olszewski were dispatched to a Wal-Mart to respond to a complaint of retail theft. (Id. at 23-24.)  Upon arriving on scene, Pazak encountered Wal-Mart's loss prevention officer who reported that he had one male and one female in custody for shoplifting. (Id. at 24.)

43.    The loss prevention officer informed Pazak that the male and female worked together placing items from the store into a diaper bag and large black purse. (H.T. 6/25/2018 (ECF No. 65) at 22-23.) Pazak learned twenty-seven items were recovered for a total of $114.83 in merchandise. (Id. at 30.)

44.    Pazak positively identified the female whose last name was Squires. (Id. at 25.) The male, however, gave a false name and date of birth and was combative with the officers when they asked a second time for his identification. (Id. at 25, 29.) The officers initially were unable to identify him. (Id. at 25.)

45.    Pazak spoke with Squires and asked for her cooperation to identify the male. (Id. at 26.) She told Pazak the male was "Jamal Brooks" and his birthdate was November 1, 1991. (H.T. 6/25/2018 (ECF No. 65) at 26.) Pazak confirmed with the Allegheny County dispatch the information he received from Squires. (Id.)

46.    Pazak at the hearing held on June 25, 2018, identified Brooks as the male he encountered at the Wal-Mart on June 25, 2018. (Id. at 27.)

47.    Pazak placed Brooks under arrest for retail theft and false identification. (Id. at 27.)

48.    Brooks was searched incident to arrest and a "black full sized Glock model 21C .45 caliber" was recovered from under his t-shirt in a brown leather holster from his left hip. (Id. at 28.)

49.    Pazak learned that Brooks did not have a valid license to carry a concealed firearm, and there was no indication that the firearm was registered to a particular person or was reported stolen. (H.T. 6/25/2018 (ECF No. 65) at 28.)

50.     Brooks was charged with (1) one count of carrying a firearm without a license, in violation of 18 PA. CONS. STAT. § 6106 (third-degree felony) ("count one"); (2) one count of providing false identification to law enforcement, in violation of 18 PA. CONS. STAT. § 4914 (third-degree misdemeanor) ("count two"); (3) one count of retail theft, in violation of 18 PA. CONS. STAT. § 3929(a)(1) (summary offense) ("count three"); and (4) one count of criminal conspiracy to commit retail theft, in violation of 18 PA. CONS. STAT. § 903(a)(1) (summary offense) ("count four"). (Ex. B. (ECF No. 55-2 at 1-6); H.T. 6/25/2018 (ECF No. 65) at 28-29.)

51.     On April 14, 2016, defendant in the Court of Common Pleas of Allegheny County entered into a negotiated guilty plea. (Ex. H at 7.) The presiding judge granted the Commonwealth's motion to reduce count one from a felony in the third degree to a misdemeanor in the first degree. (Id.; ECF No. 55-2 at 2 ("The Commonwealth moves to amend counts [sic] #1 to a (M1) Motion Granted By The Court").)

52.     Brooks pleaded guilty to count one, as amended, as well as to counts two through four. (Exs. A, B, H at 8.) Brooks was sentenced to a term of probation of one year at count one, which was graded as a misdemeanor in the first degree, and "[a] determination of guilty without further penalty"[9] was entered against Brooks at counts two through four. (ECF No. 55-2 at 6.)

53.     On a form entitled "Pennsylvania Commission on Sentencing" (the "sentencing form") there is a handwritten note that provides: "Ct 2,3,4—WD[.]" (Ex. B (ECF No. 55-2) at 5.)

---

[9]      The Supreme Court of Pennsylvania has explained:

In some instances, the court may decide that the needs of justice are fulfilled by a determination of guilt alone, without necessity for further penalty. The shame and trauma of public conviction may be punishment enough and there may be no need of any plan for 'reformation' or control. In such cases, the courts should be free to make such a judgment without requiring useless probation.

Commonwealth v. Rubright, 414 A.2d 106, 362 (Pa. 1980) (quoted in Frias-Camilo v. Attorney Gen., 826 F.3d 699, 705 (3d Cir. 2016)).

In the section of the sentencing form entitled "Offense Name/Description" the only offense listed is "Firearms—carried w/o license: ineligible (loaded ammo/available)." (Id.)

54.    In the same handwriting on the sentencing form there are alterations that reflect a change in the grade of the offense from "F-3" to "M1" and a change in the range of imprisonment from 42 to 84 months to 30 to 60 months. (Id.)

55.    The sentencing form also shows that a term of probation of twelve months was imposed and Brooks was convicted via a negotiated guilty plea. (Id.) The sentencing form was signed by the judge presiding over Brooks' state court criminal case. (Id.)

56.    The "Order of Sentence" issued by the Court of Common Pleas of Allegheny County provides that:

- Brooks was sentenced to a term of probation of one year at count one for the crime of "Firearm Not to be Carried W/O License-No Crim Viol (M1)[;]"

- with respect to counts two, three, and four, "[a] determination of guilty without further penalty[;]"

- with respect to count five, entitled "Firearms Not to Be Carried W/O License (M3)[,]" "Offense Disposition: Charge Changed[;]" and

- with respect to "[c]ount 9,999[,]" "Firearm Not to Be Carried W/O License-No Crim Viol ()[,]" "Offense Disposition: Withdrawn (Lower Court)."

(Ex. B. (ECF No. 55-2) at 6.)

**E.   Robbery at the Residence of Tia Collins and Cordell Collins on July 23, 2017**

57.    On July 23, 2017, at 3:28 a.m., Adam Quinn ("Quinn") and Adam Lawrence ("Lawrence"), police officers with the Penn Hills Police Department were dispatched to a residence on Leechburg Road for a reported robbery in progress during which one of the actors shot one of the victims. (H.T. 7/10/2018 (ECF No. 67) at 3-4, 18-19.)

58.     When Quinn arrived on scene, he saw Tia Collins,[10] the person who called 9-1-1, and her husband, Cordell Collins.[11] (H.T. 7/10/2018 (ECF No. 67) at 5.) Tia Collins was lying on the ground "in obvious pain" in the front yard, and Cordell Collins was kneeling next to her. (Id.)

59.     Quinn learned that Tia Collins had been struck in the head. Tia Collins was conscious but dizzy when he encountered her. (H.T. 7/10/2018 (ECF No. 67) at 6.) Quinn requested "EMS assistance" to treat Tia Collins. (Id.) Penn Hills EMS arrived on scene, rendered aide to Tia Collins, and transported her to Forbes Hospital. (Id.) Cordell Collins accompanied Tia Collins to the hospital. (Id. at 9-10.)

60.     Before Tia Collins was transported to the hospital, she spoke with Quinn for "[a]pproximately five minutes." (H.T. 7/10/2018 (ECF No. 67) at 7.) She told him that she left her husband's nightclub, i.e., Club Elegance, and parked her vehicle in her driveway. (Id. at 6.) Upon exiting her vehicle, she saw two men approach her vehicle from a van, which they parked perpendicular to her vehicle. (Id. at 7-8.) Tia Collins told Quinn that the two men were African-American and wore masks; one man was wearing a blue t-shirt and the other man wore a black hooded sweatshirt. (Id. at 7.) The men approached her, drew a pistol, and dragged her to the front porch by her throat. (Id.) She was struck in the back of the head with a pistol, which rendered her unconscious. (Id. at 7.)

---

[10]     Tia Collins is currently the target of a federal criminal investigation into Medicare fraud. (H.T. 7/10/2018 (ECF No. 67) at 80-81, 93; Ex. M.)

[11]     Jonathan Duthinh ("Duthinh"), an agent with the Bureau of Alcohol, Tobacco, and Firearms, testified: "It's alleged that Mr. Collins is involved in drug dealing[,]" and, therefore, Duthinh "had…reservations" about the reasoning Tia Collins and Cordell Collins provided for why Tia Collins was allegedly robbed on July 23, 2017. (H.T. 7/10/2018 (ECF No. 67) at 60, 80-81.) Cordell Collins has a prior criminal history, which includes drug-related convictions. (Id. at 82.)

61.     Tia Collins reported that her purse, which contained her "SIG Sauer" pistol with serial number F309749, was taken from her possession during the course of the alleged robbery. (Id. at 7, 52, 70.)

62.     At some point after July 23, 2017, Tia Collins told Jonathan Duthinh ("Duthinh"), an agent with the Bureau of Alcohol, Tobacco, and Firearms, that one of the actors was "six feet or above" and put her into a headlock and the other actor was shorter, i.e., "between 5'5" and 5'7,"" and held a pistol to her head. (H.T. 7/10/2018 (ECF No. 67) at 70.) Tia Collins told Duthinh that the shorter actor hit her on the head with the pistol. (Id.)

63.     Quinn also spoke to Cordell Collins. (H.T. 7/10/2018 (ECF No. 67) at 7-8.) Cordell Collins told Quinn that he left Club Elegance ten minutes after his wife's departure. (Id. at 8.) He reported that "[h]e returned home, parked his vehicle in the driveway, started to approach his front porch when a bright light hit him in the face, which he presumed to be a flashlight." (Id. at 8.)

64.     Cordell Collins asked the person on his porch "[w]hat do you want?" (Id. at 8.) The person responded: "[y]ou know what we want." (Id.) Cordell Collins reported to Quinn that at that point, he fled the property, tripped across the street, fell over, and one of the actors shot at him twice from about five yards away. (Id.) Cordell Collins could not provide a description of the actors because of the bright light he encountered upon exiting his vehicle. (Id.)

65.     Quinn's police report with respect to the incident on July 23, 2017, provided, in pertinent part:

> Cordell was also unable to provide a description of the actors. I observed that Cordell, who is a heavy set male, was not sweating despite the extremely high humidity causing myself and other officers to sweat. I also observed that Cordell's

clothing was not wet despite the grass where he stated he fell being wet from recent rainfall. Cordell was also calm while speaking with the PD.

(H.T. 7/10/2018 (ECF No. 67) at 15.)

66.     Tia Collins and Cordell Collins told Quinn the actors left their property in a vehicle, but they could not provide a vehicle description. (H.T. 7/10/2018 (ECF No. 67) at 8.)

67.     During the time Tia Collins was being treated by the EMS, a neighbor approached one of the other police officers on the scene and told him that he or she heard two gun shots in the area of the front yard. (Id. at 9.)

68.      After Tia Collins and Cordell Collins were transported to Forbes Hospital, Quinn and another police officer canvassed the area for shell casings, but no shell casings were located. (Id. at 9-10.) Quinn then "went to the active perimeter scene taking place in Verona." (Id. at 10.)

69.     Quinn did not personally observe the suspects and could not describe them based upon his personal observations. (Id. at 12.) Quinn did not know whether the area was processed by a mobile crime lab. (Id. at 16.) As of July 10, 2018, charges were not filed and no one had been arrested or convicted with respect to the incident. (Id.)

70.     Prior to being dispatched to the Collins' residence, Lawrence was at a gas station with other police officers. (H.T. 7/10/2018 (ECF No. 67) at 19.) Once the officers received the call with respect to the incident at the Collins' residence, they drove to the call. Lawrence's police car was the last in a line of police cars heading in the direction of the Collins' residence. (Id.)

71.     While the other police cars drove straight on Verona Road, Lawrence took an alternate route via Shannon Road to "cover more area and maybe encounter suspects fleeing[.]" (Id.)

72.     Once Lawrence turned right off Second Street onto Shannon Road, he saw a vehicle in his lane of travel, i.e., driving in the opposing lane of travel. (H.T. 7/10/2018 (ECF No. 67) at 20.) Lawrence explained:

> They just had passed a vehicle, and this is a two lane road, one lane in each direction. They just passed a vehicle coming to the end of the roadway which is a T intersection with the stop sign. The stop sign is on their end, and I had to lock up my brakes, stop to avoid a head-on collision with them, and they proceeded past me and ran the stop sign and turned left on to 2nd Street.

(Id.) The vehicle observed by Lawrence was a "newer" gray sedan with an Ohio registration plate and had two occupants, i.e., a driver and front seat passenger. (Id.) Lawrence described the driver as a "light skinned black male with black dreadlocks." (Id. at 23.) Lawrence could not describe the passenger of the vehicle. (Id.) Lawrence testified that Brooks "is not a light skinned black male[.]" (Id. at 49.)

73.     Lawrence explained that the vehicle, which almost struck his police vehicle, appeared to be "trying to quickly get away from a certain area" and was coming from the direction of the Collins' residence. (H.T. 7/10/2018 (ECF No. 67) at 24.) He suspected that the vehicle was involved in the alleged robbery that had taken place at the Collins' residence. (Id.) Lawrence, therefore, turned his police vehicle around and began to pursue the gray sedan. (Id.)

74.     Lawrence pursued the gray sedan as it drove down various streets in the area, and he observed several traffic violations[12] during the pursuit. (H.T. 7/10/2018 (ECF No. 67) at 25.)

---

[12]     Lawrence explained:

For example, the gray sedan did not have its lights on, which made it more difficult for the vehicle to be detected. (Id. at 25.) The gray sedan was travelling at a rate of forty to fifty miles per hour on side streets and residential streets, which have speed limits of twenty-five miles per hour. (Id. at 26.)

75.     Lawrence eventually lost sight of the gray sedan because he could not see the vehicle's taillights. (H.T. 7/10/2018 (ECF No. 67) at 26.)

76.     A few moments after Lawrence lost sight of the gray sedan, a police officer with the Verona Police Department located the vehicle crashed nearby at the intersection of Penn Street and Allegheny Avenue. (H.T. 7/10/2018 (ECF No. 67) at 27.) The vehicle was wrecked into a fence of a parking lot, there were no occupants inside the vehicle, the engine was running, and the vehicle was partially on the roadway. (Id. at 27.)

77.     Lawrence determined the vehicle was registered to Enterprise Rental Car. (H.T. 7/10/2018 (ECF No. 67) at 28.) The vehicle was rented by Brooks.[13] (Id. at 52, 72.)

_____

Clearly they almost hit me head on. Passing a car on a portion of a roadway that was a no passing zone, approaching an intersection with the stop sign, blew the stop sign, speeding, blew the stop sign at Allegheny River Boulevard and Wildwood Road to turn left on to Allegheny River Boulevard, and there were several stop signs at intersections on Penn Street that they went through as well.

(H.T. 7/10/2018 (ECF No. 67) at 25-26.)

[13]     Penn Hills Police Department detective Michael McGuire ("McGuire") testified that following July 23, 2017, he contacted Enterprise Rental Car and learned that Brooks rented the gray sedan but never reported that it was lost or stolen. (H.T. 7/10/2018 (ECF No. 67) at 49-50, 52-53.) Duthinh also contacted Enterprise Rental Car and learned Brooks was the renter of the gray sedan on July 23, 2017. (Id. at 72.) The crashed gray sedan was returned to Enterprise Rental Car on July 25, 2017, at 9:00 a.m. (Ex. L; H.T. 7/10/2018 (ECF No. 67) at 92-93.)

78.    Lawrence and other police officers with the assistance of two police service dogs searched the area in which the gray sedan was crashed in an attempt to locate its occupants. (Id. at 28-29.) Lawrence briefly participated in the search and inventoried the vehicle.[14] (Id.)

79.    Lawrence, while taking an inventory of the crashed gray sedan, made a list of the items that were taken out of the vehicle and a property record[15] was completed by a Penn Hills Police Department detective. (Id.)

80.    A "SIG Sauer 22 caliber pistol with the serial number of F309749" was recovered inside a blue grocery store bag on the floorboard in front of the driver's seat of the crashed gray sedan. (H.T. 7/10/2018 (ECF No. 67) at 31-32; Ex. 4 at 1.) That pistol was registered to Tia Collins. (H.T. 7/10/2018 (ECF No. 67) at 32, 73.) A magazine that corresponds to the "SIG Sauer 22 caliber pistol" that had ten, twenty-two caliber cartridges in it was also found in the crashed gray sedan. (H.T. 7/10/2018 (ECF No. 67) at 32; Ex. 4 at 1.)

81.    A stainless steel "Taurus 357 caliber revolver with the serial No. GY69526" with "five 357 cartridges inside the cylinder on the revolver" was recovered from inside a red duffel bag[16] that was found in the trunk of the crashed gray sedan. (H.T. 7/10/2018 (ECF No. 67) at 32-

---

[14]    When asked whether he or "any of the officers" took photographs of the crashed gray sedan prior to its search, Lawrence responded: "I don't believe we did….I personally didn't. I don't believe anyone else did." (H.T. 7/10/2018 (ECF No. 67) at 46.)

    A police officer with the Verona Police Department stayed with the crashed gray sedan "the whole time" until Lawrence returned to inventory the vehicle. (H.T. 7/10/2018 (ECF No. 67) at 29.)

[15]    The property record form was a form that is used in the course of business by the Penn Hills Police Department. (H.T. 7/10/2018 (ECF No. 67) at 30.)

[16]    Lawrence could not remember whether he found the duffel bag closed or open. (H.T. 7/10/2018 (ECF No. 67) at 48.)

33; Ex. 4 at 1.) The "Taurus 357 caliber revolver with the serial No. GY69526" was registered to Brooks. (H.T. 7/10/2018 (ECF No. 67) at 73.)

82.     A "Ruger .22 Pistol 36521861"[17] was found in the center console of the crashed gray sedan. (H.T. 7/10/2018 (ECF No. 67) at 33; Ex. 4 at 1.) A magazine containing .22 caliber ammunition was located inside the "Ruger .22 Pistol" and one round was chambered in the firearm. (H.T. 7/10/2018 (ECF No. 67) at 34-35.) Another magazine containing .22 caliber ammunition was recovered from inside a red and black bag found in the backseat of the crashed gray sedan. (Id. at 35.)

83.     A "Taurus 9mm Pistol" with serial number "TJN07656"[18] and a corresponding magazine with eight nine millimeter cartridges was located in a blue grocery store bag on the floorboard in front of the driver's seat. (H.T. 7/10/2018 (ECF No. 67) at 34.) The Taurus 9mm Pistol" with serial number "TJN07656" was registered to Vanessa Blumming. (Id.) Duthinh did not contact Vanessa Blumming. (Id.)

84.     A "Mossberg 12 Gauge Shotgun"[19] with serial number "T738540" and four twelve-gauge shotgun shells were inside the red duffel bag that was found in the trunk of the crashed gray sedan. The red duffel bag also contained the stainless steel Taurus revolver. (H.T.

---

[17]     On the "Penn Hills Department Evidence / Property Record" next to the listing of the "Sig Sauer .22 Pistol F309749" it provides: "- Tedesco[.]" (Ex. 4 at 1.) Neither Lawrence nor McGuire knew who "Tedesco" was. (H.T. 7/10/2018 (ECF No. 67) at 47-48, 56.) Duthinh testified, however, that the original purchaser of the firearm was Anthony Tedesco. Duthinh located an "application to purchase the firearm in the name of…Squires." (Id. at 73.) A box that corresponded to this firearm was found during the search of 1204 Wade Street. (Id. at 73-74.)

[18]     The "Penn Hills Department Evidence / Property Record" next to the listing of the "Taurus 9mm Pistol" and the "Mossberg 12 Gauge Shotgun" provides: "ROS[.]" (Ex. 4 at 1.) Neither Lawrence nor McGuire could explain what was meant by "ROS[.]" (H.T. 7/10/2018 (ECF No. 67) at 48, 56.)

[19]     McGuire testified that "a latent print" from Brooks was "recovered from a shotgun that was inside the car that belonged to…Brooks." (H.T. 7/10/2018 (ECF No. 67) at 58-59.)

7/10/2018 (ECF No. 67) at 34.) The "Mossberg 12 Gauge Shotgun" with serial number "T738540" was registered to Brooks. (Id. at 74.)

85.    A nine millimeter pistol extended magazine with nine millimeter cartridge inside it was located in a black nylon backpack in the backseat of the crashed gray sedan. (H.T. 7/10/2018 (ECF No. 67) at 36.) A number of items were inside the black nylon backpack with the nine millimeter cartridge, including:

-    a bag of plastic zip ties;
-    a set of handcuffs;
-    black gloves;
-    a black face mask;
-    a red knife;
-    a silver flashlight;
-    a black tossle cap; and
-    a small black flashlight.

86.    A "knotted plastic bag containing multiple cartridge casings" and one, nine millimeter cartridge were inside a Taurus box that was found in the trunk of the crashed gray sedan. (H.T. 7/10/2018 (ECF No. 67) at 36.) The cartridge casings were empty, meaning they were not live ammunition and did not contain a projectile. (Id. at 36-37.)

87.    A "Federal Ammunition Box Containing Fifteen .22 Caliber Cartridges" was inside a black nylon small carrying bag located in the front section of the vehicle. (H.T. 7/10/2018 (ECF No. 67) at 37.) That ammunition could function with the "Ruger .22 Pistol" that was in the center console of the crashed gray sedan. (Id. at 37.)

88.    A cardboard box containing a 50-round capacity nine millimeter drum-style magazine was in the red duffel bag found in the trunk of the crashed gray sedan. (Id. at 37.)

89.     Assorted ammunition and magazines for ammunition for firearms were found throughout the crashed gray sedan. (H.T. 7/10/2018 (ECF No. 67) at 34; Ex. 4 at 1, 3, 4.)

90.     Assorted clothing, including black gloves and blue latex gloves, was also found in the crashed gray sedan. (H.T. 7/10/2018 (ECF No. 67) at 38.)

91.     Three Pennsylvania State Police records of sale, a receipt from a gun purchase, and warranty cards for Taurus firearms listed in Brooks' name were found inside the crashed gray sedan. (H.T. 7/10/2018 (ECF No. 67) at 39; Ex. 4 at 4.) A grocery store receipt[20] was also found inside the crashed gray sedan. (Id.) The documentation for the Taurus firearms contained Brooks' name and address and was consistent with the Taurus .357 caliber firearm found in the crash gray sedan. (Id. at 40.) The address provided for Brooks was "literally down the road from where the vehicle was found crashed." (Id. at 40.)

92.     The following items were also found in the crashed gray sedan:

-   Monroeville Dodge key chain;
-   Chrysler key fob;
-   handcuff key;
-   house key;
-   Giant Eagle card bearing the number 433813500113, registered to Squires;
-   Dick's Sporting Goods card bearing the number "L -- 0 or O -- 1TB22KSPTW, registered to Squires;"
-   Louis Vuitton monogram wallet with the initials JMB embroidered on it, which contained driver's license for "Jamal Martel Brooks" and two credit cards in Brooks' name;

---

[20]     The Penn Hills Police Department determined the receipt was from a grocery store on "Brownsville Road in Pittsburgh." (H.T. 7/10/2018 (ECF No. 67) at 56-57.) A detective with the Penn Hills Police Department went to the grocery store "to recover video surveillance from the store[.]" (Id. at 57.) The detective identified Isaiah Hickman ("Hickman") as the person who shopped at the grocery store and received the receipt found inside the crashed gray sedan. (Id.) Hickman is a light-skinned black male with dreadlocks. (Id.)

- Enterprise Rental Car business card[21] with a Cranberry office address on it;
- Anthony Arms membership card;
- Crown Royal bag, which contained an e-cigarette and metal grinder; and
- cellular telephone, the number for which was registered to Brooks at 1204 Wade Street.

(H.T. 7/10/2018 (ECF No. 67) at 40-41, 75-76; Ex. 4 at 4.)

93.     The court finds that based upon the evidence presented by the government, Brooks was the shorter male who pointed a firearm at Tia Collins and hit her over the head with the firearm, which knocked her unconscious. Brooks fled the scene as a passenger in the gray sedan, which was the target of Lawrence's police chase and contained numerous firearms (some of which were registered to Brooks and one of which was registered to Tia Collins), ammunition, and other indicia of Brooks being present in the vehicle.

### F.  Search Warrant Executed at 1204 Wade Street on August 22, 2017

93.     On August 22, 2017, Duthinh executed a search warrant at 1204 Wade Street in Aliquippa, Pennsylvania. (H.T. 7/10/2018 (ECF No. 67) at 60.) The search warrant was a part of the investigation of the July 23, 2017 robbery at the Collins' residence. (Id. at 69.)

94.     Duthinh believed Brooks and his girlfriend, Squires, lived at 1204 Wade Street in Aliquippa, Pennsylvania. (Id. at 60-61.)

95.     Brooks, Squires, and their two children were present at the residence when the search warrant was served. (Id. at 61.) Mail addressed to Brooks and Squires was found in the home. (Id.)

---

[21]     It was not clear whether the Enterprise Rental Car business card and Anthony Arms membership card were found inside the wallet with "JMB" embroidered on it. See (H.T. 7/10/2018 (ECF No. 67) at 41; Ex. 4 at 3).

96.     Three firearms were recovered from the home. (H.T. 7/10/2018 (ECF No. 67) at 61.) A "Glock model 26, serial No. RLE509" and a "Glock model 43, serial No. BDYW586" were found in the closet of the master bedroom of the home, and a "Smith & Wesson rifle, serial No. TF39028" was found in the basement of the home. (Id. at 61-62.) Photographs[22] were taken of the firearms in the areas in which they were initially located. (Id. at 62.)

97.     The "Glock model 26, serial No. RLE509" was registered to Brooks' mother. (H.T. 7/10/2018 (ECF No. 67) at 66.)

98.     The "Glock model 43, serial No. BDYW586" and the "Smith & Wesson rifle, serial No. TF39028" were registered to Squires. (Id.)

99.     Various caliber ammunition, a quantity of marijuana, two digital scales, and "[a] number of gun boxes" were also seized from the residence. (Id. at 66, 68.) One of the gun boxes was for a Taurus brand pistol with serial number TG043889, that was registered to Brooks and recovered on May 5, 2015, during the attempted robbery at Taboo Nightclub. (Id. at 67-68.) The Taurus pistol with serial number TG043889 was not reported stolen to law enforcement. (Id.)

100.    Law enforcement also seized "large duffel bags containing dark colored clothes, tools [they]…believe to be involved in home invasions, for instance, like saws, picks, hammers." (H.T. 7/10/2018 (ECF No. 67) at 68.) "[A] bandana, propane tanks, hammer, screwdriver, and bolt cutters in additional to ammunition" were found in one backpack inside the home. (Id. at 69.)

---

[22]     Duthinh did not take the photographs, but he recognized them and viewed the areas photographed. He testified that in the photographs the areas were depicted accurately as he saw them on August 22, 2017. (H.T. 7/10/2018 (ECF No. 67) at 62.)

101. Nine millimeter pistols, like the two recovered from the closet at 1204 Wade Street, are "popular among Americans." (H.T. 7/10/2018 (ECF No. 67) at 85; Ex. K.) For example, "4,720,075 pistols were manufactured and distributed into commerce in 2016," which includes 2,281,450 nine millimeter pistols. (Id. at 86-87; Ex. J at 1.) "Glock" was the manufacturer of 368,140 pistols in 2016, 213,751 of which were nine millimeter pistols. (Id. at 87.)

102. The "Smith & Wesson rifle, serial No. TF39028" is a semiautomatic rifle, which is sometimes referred to as a sporting rifle, and is "a popular firearm in the United States." (H.T. 7/10/2018 (ECF No. 67) at 88; Ex. K.)

IV. **Conclusions of Law**

A. **Case background of Binderup**

1. The court of appeals in Binderup consolidated two district court civil cases for the purpose of the appeals in which the plaintiffs asserted as-applied constitutional attacks against § 922(g)(1).[23] Binderup, 836 F.3d at 341.

---

[23]    It is the law of the Third Circuit that the two-step Binderup analysis "controls **all** Second Amendment challenges, including as-applied challenges, to § 922(g)(1)." Binderup, 836 F.3d at 356 (emphasis added). The decision heavily relied upon in Binderup, United States v. Marzzarella, 614 F.3d 85 (3d Cir. 2011), was a criminal case in which the defendant attacked the constitutionality of 18 U.S.C. § 922(k) which makes criminal possession of a handgun with obliterated serial numbers a felony offense. Id. at 339. The court of appeals cited decisions rendered in criminal cases in the opinion. Id. The court referred to the person challenging the constitutionality of § 922(g)(1) as a "challenger" and not "plaintiff," which could indicate that the court's decision was not limited to civil cases. See e.g., id.at 347 ("No doubt a challenger cannot prevail merely on his say-so."). Additionally, in other circuits, courts in criminal cases have applied two-prong analyses similar to the analysis in Binderup to decide the constitutionality of § 922(g) as applied to a particular defendant. See e.g., United States v. Chovan, 735 F.3d 1127, 1137 (9th Cir. 2013); United States v. Staten, 666 F.3d 154 (4th Cir. 2011); United States v. Skoien, 614 F.3d 638 (7th Cir. 2010).

2. In one of those cases, the plaintiff Daniel Binderup ("Binderup") had previously pleaded guilty in Pennsylvania state court to corrupting a minor, a misdemeanor subject to a maximum term of imprisonment of five years. Id. at 340 (citing 18 PA. CONS. STAT. §§ 1104, 6301(a)(1)(I)). Binderup received a sentence of probation for a term of three years and a $300.00 fine plus court costs and restitution. Id.

3. In the other case, the plaintiff Julio Suarez ("Suarez") had pleaded guilty in Maryland state court to the misdemeanor of unlawfully carrying a handgun without a license. Id. Suarez's crime was subject to a range of imprisonment of thirty days to three years and a fine range of $250.00 to $2,500.00. Id.

4. Binderup and Suarez (the "challengers") were disqualified under Pennsylvania law from possessing firearms in light of their convictions, but they successfully petitioned the Pennsylvania state courts to regain their eligibility. Binderup, 836 F.3d at 340.

5. Binderup and Suarez sought similar relief under federal law and each filed a lawsuit in a district court seeking declaratory and injunctive relief. Id. They claimed, among other things,[24] that §922(g)(1) was unconstitutional as applied to them. Id.

6. The district courts agreed with the challengers and granted them summary judgment. Id.

7. The district court in Binderup's case held that he "'distinguishe[d] himself from those individuals traditionally disarmed as the result of prior criminal conduct and demonstrate[d] that he poses no greater threat of future violent criminal activity than the average law-abiding citizen.'" Id. (quoting Binderup v. Holder, Civ. Action No. 13-6750, 2014 WL

---

[24] Binderup and Suarez also argued before their respective district courts and to the court of appeals "as a matter of statutory construction that § 922(g)(1)…[does] not apply to their convictions." Binderup, 836 F.3d at 340. The district courts rejected that argument and the court of appeals affirmed that rejection. Id. at 341-42.

4764424, at *1 (E.D. Pa. Sept. 25, 2014)). The district court did not analyze the fit between the government's interests and § 922(g)(1) under any means-end scrutiny. <u>Binderup</u>, 836 F.3d at 341.

8.    The district court in Suarez's case granted summary judgment to Suarez because (1) he demonstrated that "'he is no more dangerous than a typical law-abiding citizen[,]'" and (2) § 922(g)(1) failed to satisfy strict scrutiny. <u>Id.</u> (quoting <u>Suarez v. Holder</u>, 255 F.Supp.3d 573, 586 (M.D. Pa. 2015)).

9.    The government appealed both decisions. <u>Id.</u> Separate panels of the court of appeals heard the appeals, which were eventually consolidated by the appellate court for rehearing en banc. <u>Id.</u>

**B.  The varying opinions in <u>Binderup</u>**

10.    Fifteen judges on the court of appeals took part in deciding <u>Binderup</u> during the en banc appeal. "Circuit Judges Ambro, Hardiman and Fuentes authored opinions, none of which garnered a precedential majority." <u>Keyes v. Session</u>, 282 F.Supp.3d 858, 867 (M.D. Pa. 2017).

11.    As discussed below, six judges agreed with Judge Ambro who wrote the leading opinion that the two-step framework set forth in <u>United States v. Marzzarella</u>, 614 F.3d 85 (3d Cir. 2010), applied to the challengers' as-applied constitutional attack on § 922(g)(1). There were three different opinions, however, about how the two-part framework applied to the facts of each case.

12.    At one end of the spectrum, Judge Hardiman, joined by four other judges, viewed the protections afforded the challengers under the Second Amendment as more expansive than the other judges. <u>Binderup</u>, 836 F.3d at 363 (J. Hardiman, concurring in part and concurring in the judgments). He opined that if the challenger satisfied his burden at step one to show the

predicate offense is "not serious," § 922(g)(1) is unconstitutional as-applied to that challenger. Id. In his view, step two of the analysis is unnecessary. Id.

13.     At the other end of the spectrum, however, Judge Fuentes, joined by six other judges, concluded that as-applied challenges to § 922(g)(1) are "unworkable," and, therefore, not permissible. Binderup, 836 F.3d at 381 (J. Fuentes, concurring in part, dissenting in part, and dissenting from the judgments). His view of the protections afforded the challengers under the Second Amendment was more restrictive. According to Judge Fuentes, a citizen may be lawfully deprived of his Second Amendment rights under § 922(g)(1) once he or she is convicted of an offense that qualifies as a felony offense under the statute, regardless whether the state that convicted the citizen classified the offense as a felony or misdemeanor. Id. at 380-81.

14.     The position of Judge Ambro, joined by two other judges, falls somewhere between Judge Hardiman's expansive view of the protections afforded by the Second Amendment and Judge Fuentes' more restrictive view. Judge Ambro applied the facts of each of the challengers' cases to both steps of the Marzzarella framework.

15.     While Binderup does not provide clear guidance about how to apply the Marzzarella framework to decide whether § 922(g)(1) is unconstitutional as applied to Brooks, a majority of the court of agreed that as-applied challenges to § 922(g)(1) are permissible, and seven judges agreed that the two-step Marzzarella framework is applicable to as-applied constitutional challenges to § 922(g)(1); indeed, it is the "law of our Circuit." Binderup, 836 F.3d at 356.

16.     Thus, to give meaning to that law, both steps of the framework must be applied, and Judge Ambro's application of Marzzarella will be followed here.

## C.  As-applied constitutional attacks on 18 U.S.C. § 922(g)(1)

17.     Judge Ambro in <u>Binderup</u> began his analysis by recognizing the importance of the "'fundamental'" right to bear arms provided by the Second Amendment to the United States Constitution.[25] <u>Binderup</u>, 836 F.3d at 343 (quoting <u>McDonald v. City of Chicago</u>, 561 U.S. 742, 778 (2010)).

18.     The right to bear arms, however, "'is not unlimited.'" <u>Id.</u> (quoting <u>District of Columbia v. Heller</u>, 554 U.S. 570, 628 (2008)). There are a number of restrictions, e.g., § 922(g)(1)'s ban on felons possessing firearms, that "constrain" the right to bear arms and are "presumptively lawful…because they affect individuals or conduct unprotected by the right to keep and bear arms." <u>Id.</u> at 343. It is the law of the Third Circuit that those restrictions pass constitutional muster if they withstand the appropriate level of means-end scrutiny. <u>Id.</u> at 356.

19.     Because the constitutional challenges before the court of appeals in <u>Binderup</u> were as-applied challenges, the court was tasked with considering whether the "particular circumstances" of Binderup and Suarez "remove[d] them from the constitutional sweep of § 922(g)(1)." <u>Id.</u> at 346.

20.     The court recognized that its decisions in <u>United States v. Marzzarella</u>, 614 F.3d 85 (3d Cir. 2010), and <u>United States v. Barton</u>, 633 F.3d 168 (3d Cir. 2011), guided the approach to as-applied challenges asserted under the Second Amendment. <u>Binderup</u>, 836 F.3d at 345-46.

21.     In <u>Marzzarella</u>, the court of appeals "adopted a framework for deciding facial and as-applied Second Amendment challenges." <u>Id.</u> at 339 (citing <u>Marzzarella</u>, 614 F.3d at 85). The two-step approach required the district court to consider (1) "'whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee[,]'"

---

[25]     The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. AMEND. II.

and (2) whether the law survived intermediate scrutiny. <u>Id.</u> at 346 (quoting <u>Marzzarella</u>, 614 F.3d at 89).

22. In <u>Barton</u>, a criminal case, the court of appeals "held that the prohibition of § 922(g)(1) does not violate the Second Amendment on its face…but…remains subject to as-applied constitutional challenges." <u>Id.</u> (citing <u>Barton</u>, 633 F.3d at 168). With respect to the as-applied constitutional attack asserted by the defendant in <u>Barton</u>, the court held that the defendant did not have a right to bear arms under the Second Amendment because his underlying predicate offense was closely related to violent crime, which disqualified him from exercising his Second Amendment rights. <u>Barton</u>, 633 F.3d at 173. The court of appeals in <u>Barton</u> denied the defendant's as-applied constitutional attack because he failed at step one, i.e., "he presented no facts distinguishing his circumstances from those of other felons who are categorically unprotected by the Second Amendment." <u>Id.</u>

23. Judge Ambro in <u>Binderup</u>—joined by six other judges—synthesized <u>Marzzarella</u> and <u>Barton</u>, explaining:

> Read together, <u>Marzzarella</u> and <u>Barton</u> lay out a framework for deciding as-applied challenges to gun regulations. At step one of the <u>Marzzarella</u> decision tree, a challenger must prove, per <u>Barton</u>, that a presumptively lawful regulation burdens his Second Amendment rights. This requires a challenger to clear two hurdles: he must (1) identify the traditional justifications for excluding from Second Amendment protections the class of which he appears to be a member, <u>id.</u> at 173, and then (2) present facts about himself and his background that distinguish his circumstances from those of persons in the historically barred class, <u>id.</u> at 174.

> No doubt a challenger cannot prevail merely on his say-so. Courts must find the facts to determine whether he has adequately distinguished his circumstances from those of persons historically excluded from Second Amendment protections. Not only is the burden on the challenger to rebut the presumptive lawfulness of the exclusion at <u>Marzzarella's</u> step one, but the challenger's showing must also be strong. That's no small task. And in cases where a statute by its terms only burdens matters (e.g., individuals, conduct, or weapons) outside the scope of the right to arms, it is an impossible one. But if the challenger succeeds at step one,

the burden shifts to the Government to demonstrate that the regulation satisfies some form of heightened scrutiny, discussed further below, at step two of the <u>Marzzarella</u> analysis.

<u>Binderup</u>, 836 F.3d at 346-47. In other words, seven judges viewed <u>Marzzarella</u> and <u>Barton</u> as harmonious decisions that guided the court's analysis of the as-applied constitutional attack asserted against § 922(g)(1) by Binderup and Suarez. <u>Id.</u>

**D. Step one of the <u>Marzzarella</u> Framework**

24.     Judge Ambro, joined by six other judges, explained that the first step of the <u>Marzzarella</u> framework requires a challenger to "prove…that a presumptively lawful regulation burdens his Second Amendment rights." <u>Id.</u> at 347.

> This requires a challenger to clear two hurdles: he must (1) identify the traditional justifications for excluding from Second Amendment protections the class of which he appears to be a member…then (2) present facts about himself and his background that distinguish his circumstances from those of persons in the historically barred class….

<u>Id.</u>

25.     Judge Ambro explained that the "traditional justification for denying felons the right to arms" is that the government could disarm "unvirtuous citizens," and "unvirtuous citizens" are citizens who have committed serious crimes. <u>Id.</u> at 348. In other words, "persons who have committed serious crimes forfeit the right to possess firearms." <u>Binderup</u>, 836 F.3d at 349. If a challenger has committed a *serious crime* that falls within the ambit of § 922(g)(1), the district court should conclude that he or she is "subject to a firearm ban that is…'presumptively lawful.'" <u>Id.</u> at 348 (quoting <u>Heller</u>, 554 U.S. at 627 n.26). "Serious crimes" includes violent or nonviolent crimes. <u>Id.</u> at 348.

26.     A challenger can show that he is entitled to Second Amendment protection by showing that he did not commit a serious crime. <u>Id.</u> at 348-49. According to Judge Ambro, to

determine whether a crime is "serious" the court may consider, among other relevant factors: (a) whether the crime is a misdemeanor; (b) whether use of force is an element of the offense;[26] (c) the sentence actually imposed upon the challenger; and (d) whether there is consensus among the states about the seriousness of the offense. Id. at 351-53.

27.    Judge Ambro, joined by four other judges, instructed that with respect to the first prong of the Marzzarella framework the challenger must make a "**strong**" showing to rebut the "presumptive lawfulness" of his exclusion from Second Amendment protections. Binderup, 836 F.3d at 346 (emphasis added). This means the challenger cannot "prevail merely on his say-so[;]" rather, "Courts must find the facts to determine whether he has adequately distinguished his circumstances from those of persons historically excluded from Second Amendment protections." Id. "[E]vidence of a challenger's rehabilitation or his likelihood of recidivism is not relevant to the step-one analysis." Id. at 356.

**E.  Step one of the Marzzarella framework applied to Binderup and Suarez by Judge Ambro[27]**

28.    "Section 922(g)(1) bars the possession of firearms by anyone convicted of 'a crime punishable by imprisonment for a term exceeding one year.'" Id. 347-48. This includes all felonies and misdemeanors punishable by a term of imprisonment of more than two years. Id. at 348.

29.    Each of the crimes committed by Binderup and Suarez were state-law misdemeanors punishable by a term of imprisonment of more than two years. Binderup, 836

---

[26]    Judge Ambro explained that "the elements of the offense, the actual sentence, and the state of the law" are "objective indications of seriousness...well within the ambit of judgment exercised daily by judges." Binderup, 836 F.3d at 353 n.5.

[27]    As discussed above, only two other judges joined this portion of Judge Ambro's opinion in which he applied step one of the Marzzarella framework to the facts of Binderup and Suarez.

F.3d at 348. The § 922(g)(1) ban on their possession of firearms was, therefore, presumptively lawful. Id. Under those circumstances, Binderup and Suarez each had a burden to overcome the presumptive lawfulness of § 922(g)(1) by showing that their crimes were not serious crimes, i.e., to distinguish their circumstances from the historically barred class of unvirtuous citizens. Id.

30.     Judge Ambro found that Binderup and Suarez each satisfied their burden, explaining the states in which they were convicted classified their offenses as misdemeanors, which "traditionally have been…considered less serious than felonies." Id. at 350. He also noted that no element of either crime consisted of violence and each challenger received "a minor sentence by any measure[,]" which is a relevant consideration because "severe punishments are typically reserved for serious crimes," and the actual sentence reflects "the sentencing judges' assessment of how minor the violations were." Binderup, 836 F.3d at 352.

31.     Judge Ambro found relevant that there was "no cross-jurisdictional consensus regarding the seriousness of the Challengers' crimes." Id. at 351. The challengers showed that "many states consider their crimes to be non-serious[,]" which made "their showing at step one…that much more compelling." Id. Judge Ambro concluded:

> [T]he Challengers have carried their burden of showing that their misdemeanors were not serious offenses despite their maximum possible punishment. This leads us to conclude that Binderup and Suarez have distinguished their circumstances from those of persons historically excluded from the right to arms. That, in turn, requires the Government to meet some form of heightened scrutiny at the second step of the Marzzarella framework.

Id. at 353.

**F.  Step one of the Marzzarella framework applied to Brooks**

32.     At step one, the court must: (1) find facts about Brooks' disqualifying conviction, and (2) determine whether in light of those facts, the offense which resulted in the disqualifying conviction is a serious crime.

33.     Brooks' showing that his underlying predicate offense was not a serious crime must be "strong." The "strong" burden of proof requires something more than the preponderance of the evidence but something less than the clear and convincing standard requested by the government.[28]

34.     Brooks cannot rely upon his say-so to satisfy this burden. The court will consider the factors Judge Ambro found to be relevant to the analysis to determine whether Brooks satisfied his burden to distinguish himself from the class of persons historically barred from possessing firearms in accordance with the Second Amendment.

### a. Whether Brooks' Disqualifying Conviction is a Misdemeanor or Felony

35.     Judge Ambro in <u>Binderup</u> explained that the grading of an offense is a relevant consideration because "[m]isdemeanors are, and traditionally have been, considered less serious than felonies." <u>Id.</u> at 351.

36.     The parties in this case dispute whether the court should consider the offense with which Brooks was convicted a misdemeanor or felony. That distinction is important because Judge Ambro noted in <u>Binderup</u> that a challenger convicted of a felony would have a "extraordinarily high" burden, "perhaps even insurmountable" to show his or her crime was not serious. <u>Binderup</u>, 836 F.3d at 353 n.6; <u>United States v. Irving</u>, 316 F.Supp.3d. 879, 889 (E.D. Pa. 2018) ("Thus, although Judge Ambro acknowledged that some state misdemeanors can rise

---

[28]     The government argued to this court that the clear and convincing burden of proof applies to Brooks' burden at step one. The appellate court in <u>Binderup</u>, however, would have been familiar with the clear and convincing burden of proof but did not apply it; rather, the court explicitly stated that the showing must be "strong."

<u>Binderup</u> was a civil case, in which the preponderance of the evidence standard most commonly applies. Brooks' burden at step one, however, is to overcome the *presumptive lawfulness* of § 922(g)(1). That "not so easy" task requires something more than a preponderance of the evidence; indeed, it requires a *strong* showing that his underlying predicate offense was not a serious crime. <u>Binderup</u>, 836 F.3d at 366.

to the level of being 'serious,' conversely, his opinion all but foreclosed the possibility that a state felony could be non-serious.").

37.     The government argues that Brooks' underlying predicate offense, i.e., carrying a firearm without a license, is a serious offense because—despite the state court grading the offense as a misdemeanor at sentencing—the Pennsylvania legislature has determined that when an individual carries a firearm without a license under the circumstances present in this case[29] "the conduct, as a matter of law, should be considered serious and graded as a felony." (ECF No. 72 at 16.) The government explains that "based on the specific facts at issue here and…[Brooks'] criminal history," his underlying predicate offense "is a felony under Pennsylvania law." (ECF No. 72 at 6.)

38.     The Pennsylvania state legislature in section 6106 grades the offense of carrying a firearm without a license a misdemeanor (as opposed to a felony) only if the defendant (a) "is

_____

[29]     Section 6106 grades the offense of carrying a firearm without a license a misdemeanor only if the defendant (a) "is otherwise eligible to possess a valid license[;]" and (b) "has not committed any other criminal violation" at the same time. 18 PA. CONS. STAT. § 6106(a)(2). The government is correct that Brooks committed a third-degree misdemeanor and two summary offenses at the time he violated section 6106 and he was not otherwise eligible to obtain a license to carry a concealed firearm because of his juvenile adjudication of delinquency on January 22, 2008.

Pursuant to 18 PA. CONS. STAT. 6109(e)(1)(iv), "[a] license shall not be issued to…an individual who, within the past ten years has been adjudicated delinquent for a crime enumerated in section 6105 or for an offense under The Controlled Substance, Drug, Device and Cosmetic Act." Id. On January 22, 2008, Brooks was adjudicated delinquent for possession of heroin, possession of ecstasy, and possession of a small amount of marijuana. (Ex. 1 at 1-2.) Less than seven years later, on May 15, 2015, Brooks carried a firearm without a license. He was not, therefore, otherwise eligible to possess a valid license.

All the evidence received by this court, however, shows that Brooks pleaded guilty to (was convicted of) and was sentenced for carrying a firearm without a license, a misdemeanor in the first degree. That Brooks could have or should have been convicted of a felony is not relevant to the court's inquiry under step one, which is to analyze the seriousness of a disqualifying conviction.

otherwise eligible to possess a valid license[;]" and (b) "has not committed any other criminal violation" at the same time. 18 PA. CONS. STAT. § 6106(a)(2).

39.     Here, Brooks pleaded guilty to committing three other crimes[30] at the time he violated section 6106, i.e., a third-degree misdemeanor and two summary offenses, and he was not otherwise eligible to obtain a license to carry a concealed firearm because of his juvenile adjudication of delinquency on January 22, 2008.[31]

40.     All the evidence received by this court, however, shows that Brooks pursuant a negotiated plea agreement pleaded guilty to violating section 6106(a)(2), and the court at sentencing graded the offense as a misdemeanor in the first degree. The "Order of Sentence"

---

[30]     The disqualifying conviction relied upon in the affidavit in support of the criminal complaint in this case is Brooks' conviction for carrying a firearm without a license. (ECF No. 1-1 ¶ 2.) Brooks in his motion to dismiss the indictment argues the offense of carrying a firearm without a license is not a serious offense, and he provided evidence to the court about how states view that offense, i.e., as serious or not serious.

"Section 922(g)(1) bars the possession of firearms by anyone convicted of 'a crime punishable by imprisonment for a term **exceeding** one year.'" Binderup, 836 F.3d at 347-48 (quoting § 922(g)(1)) (emphasis added). This includes all felonies and misdemeanors punishable by a term of imprisonment of more than two years. Id. at 348.

As discussed above, Brooks was also convicted of a third-degree misdemeanor for providing false identification to law enforcement, which is punishable by up to one year in prison. 18 PA. CONS. STAT. § 1104(3) ("A person who has been convicted of a misdemeanor may be sentenced to imprisonment for a definite term which shall be fixed by the court and shall be not more than…[o]ne year in the case of a misdemeanor of the third degree."). The other two offenses to which Brooks pleaded guilty were summary offenses, which do not constitute disqualifying convictions under § 922(g)(1). Under Pennsylvania law, "[a] person who has been convicted of a summary offense may be sentenced to imprisonment for a term which shall be fixed by the court at not more than 90 days." 18 PA. CONS. STAT. § 1105. 28

Based upon the foregoing, Brooks' convictions of the third-degree misdemeanor and two summary offenses are not disqualifying convictions under 922(g)(1). The court, therefore, does not analyze whether the third-degree misdemeanor or two summary offenses are serious offenses under step one of the Marzzarella analysis.

[31]     See note 29 supra.

provides that the felony in the third degree count was "[c]hanged" and Brooks was sentenced only at the count containing the misdemeanor in the first degree. (ECF No. 55-2.) "A determination of guilty without further penalty" was made at counts two through four. (Id. at 6.) That Brooks *could have* or *should have* been convicted of a felony or that the sentencing judge made a mistake is not relevant to the court's inquiry under step one, which is to analyze the seriousness of a *disqualifying conviction*[32] by assessing "objective indications of seriousness," such as, "the elements of the offense, the actual sentence, and the state of the law." Binderup, 836 F.3d at 353 n.5.

41.     The government cites to the Pennsylvania Supreme Court's decision in Commonwealth v. Bavusa, 832 A.2d 1042 (Pa. 2003), in support of its argument that the court should consider Brooks' underlying conviction as serious because in reality it was a felony offense.

42.     In Bavusa, the court held that the factors set forth in section 6106, which determine whether the offense will be graded as a felony or misdemeanor, are not elements of a crime or affirmative defense that must be proven beyond a reasonable doubt; rather, they are "sentencing factors" that affect "grading/sentencing." Id. at 1044. In other words, "[w]hether the offense should be graded as a felony or a misdemeanor is a matter to be decided at sentencing." Id. at 1056.

43.     In this case, Brooks, the Commonwealth, and the judge agreed that at sentencing that offense would be graded a misdemeanor in the first degree. Thus, Brooks was convicted of and sentenced for carrying a firearm without a license, a misdemeanor in the first degree. Bavusa

---

[32]     Binderup, 836 F.3d at 351 ("Here, upon close examination of the Challengers' apparently disqualifying convictions, we conclude that their offenses were not serious enough to strip them of their Second Amendment rights.").

does not provide this court authority to hear a collateral attack on the grading of Brooks'
disqualifying conviction or otherwise challenge the negotiated agreement of the parties.

44.     The government also relies upon Gurten v. Sessions, 295 F.Supp.3d 511 (E.D.
Pa. 2018), in support of its argument that the court should conclude Brooks' underlying
conviction was serious, i.e., a felony.

45.     In Gurten, the challenger who sought to restore his Second Amendment rights
was charged with "aggravated assault, carrying firearms without a license, carrying firearms in
public in Philadelphia, possessing instruments of crime, terroristic threats, simple assault, and
recklessly endangering another person." Id. at 518. The challenger pleaded guilty to carrying
firearms without a license, carrying firearms in public in Philadelphia, and simple assault. Id.

46.     Despite the challenger being charged with seven other crimes at the same time he
was convicted of carrying a firearm without a license in violation of section 6106, the judge at
sentencing graded the challenger's conviction for carrying a firearm without a license as a
misdemeanor in the first degree. Id. The judge graded the offense of carrying firearms in public
in Philadelphia as a misdemeanor in the first degree and the offense of simple assault as a
misdemeanor in the second degree. Id. at 517.

47.     The court in Gurten found that even without consideration of the challenger's use
of his handgun, he engaged in violent behavior "with the purpose of harming his domestic
partner and mother of his children" during the commission of his crimes. Gurten, 295 F.Supp.3d
at 518-19.

48.     At step one of the Marzzarella analysis, the court found the challenger's violation
of section 6106 "a serious crime because it is classified as a felony of the third degree." Id. The
court explained:

Pennsylvania's General Assembly only allows a court to reclassify a violation of § 6106 as a misdemeanor if the defendant has "not committed any other criminal violations" and here, Mr. Gurten committed two other criminal violations rendering the exception unavailable to him as a matter of law regardless of how the individual judge classified his conviction.

Id. at 520.

49.    The approach championed by the government in this case and followed in Gurten, i.e., consideration of the predicate offense with which a challenger *should* have been charged at the state level instead of the *actual disqualifying conviction*, encourages federal district courts to second guess the actions of state court judges based upon differing interpretations of state legislation. While the government is correct that the court of appeals in Binderup was concerned with the state legislatures' grading of the challengers' offenses, the court did not make any inquiries into the offenses with which the challengers *could have* or *should have* been charged in accordance with the court of appeals' interpretation of state laws. That is what the government asks the court to do in this case.

50.    Criminal defendants often are permitted by prosecutors to plead to lesser included offenses, which in effect appears to be what happened in Brooks' case, and those defendants are not later treated as if they pleaded to the full offense. In any event, this court is not privy to the decision-making process of the prosecutor who negotiated Brooks' plea agreement or the judge who accepted it. The court is, therefore, without the proper basis or authority to second guess the grading of Brooks' disqualifying conviction or otherwise change it.

51.    Based upon the foregoing, Brooks' disqualifying conviction was carrying a firearm without a license, a misdemeanor in the first degree. The grading of the offense, i.e., a misdemeanor, weighs in favor of a finding that Brooks' disqualifying conviction was not a serious offense.

**b. Elements of the Offense**

52.     Judge Ambro in <u>Binderup</u> considered the elements of the underlying predicate offenses and whether "the use or attempted use of force is an element" of the offense of which the challenger was convicted. <u>Binderup</u>, 836 F.3d at 352.

53.     The Superior Court of Pennsylvania has explained:

> In order to convict a defendant for *carrying a firearm without a license*, the Commonwealth must prove: "(a) that the weapon was a firearm, (b) that the firearm was unlicensed, and (c) that where the firearm was concealed on or about the person, it was outside his home or place of business."

<u>Commonwealth v. Parker</u>, 847 A.2d 745, 750 (Pa. Super. Ct. 2004) (quoting <u>Commonwealth v. Bavusa</u>, 750 A.2d 855, 857 (Pa. Super. Ct. 2000)) (emphasis added).

54.     Based upon the foregoing, "use or attempted use of force" is not an element of Brooks' disqualifying conviction. <u>Binderup</u>, 836 F.3d at 352.[33] This factor weighs in favor of finding that Brooks' disqualifying conviction was not a serious offense.

**c. The Sentence Imposed Upon Brooks**

55.     Brooks was sentenced to probation for a term of one year for carrying a firearm without a license, a misdemeanor in the first degree. (ECF No. 55-2 at 6.)

56.     Like the conclusion Judge Ambro reached with respect to the challengers' sentences in <u>Binderup</u>, Brooks "received a minor sentence by any measure[.]" <u>Binderup</u>, 836 F.3d at 352.

---

[33]     The other offenses to which he pleaded guilty at the same time did not have as an element "use or attempted use of force." <u>See</u> 18 PA. CONS. STAT. § 4914 (defining the crime of "False identification to law enforcement authorities"); 18 PA. CONS. STAT. § 3929 (defining the crime of "Retail theft"); 18 PA. CONS. STAT. § 903 (defining "Criminal conspiracy").

57.     The government argues that the court should not place significant weight on this minor sentence because the sentencing judge did not have the benefit of a presentence investigation report prior to sentencing Brooks.[34]

58.     While the government may be correct, the record before this court shows that the Commonwealth did not object to proceeding to sentencing without the court's benefit of a presentence investigation report or otherwise advocate for a felony-grading or more severe sentence.

59.     It is impossible to reconcile the position of the Commonwealth during Brooks' state court proceeding with respect to his disqualifying conviction, i.e., its agreement to the misdemeanor grading and probationary sentence, and the government's position in this case, i.e., Brooks' underlying conviction was so serious that he should be stripped of his Second Amendment rights. See Hatfield v. Sessions, Civ. Action No. 16-383, 2018 WL 1963876, at *7 (S.D. Ill. April 26, 2018) ("It is absolutely impossible to reconcile the Government's positions here that (1) a specific felon is so harmless that the felon does not need to go to prison for their [sic] felony conviction, but also (2) the felon is so dangerous that they [sic] should be stripped of their [sic] right to own a gun and defend their [sic] home.").

---

[34]     In Gurten, the court did not place much emphasis on the challenger's minor sentence because the victim did not testify against the challenger at trial, and the court in Gurten did not have a copy of the transcript from the challenger's change of plea hearing, and, thus, did not know "what facts the sentencing judge heard, or whether the sentence is the product of negotiations between counsel or trial judge hearing facts and analyzing a pre-sentence report to truly assess" the challenger's conduct. Gurten, 295 F.Supp.3d at 527-28.

     Those facts are distinguishable from this case because the transcript of the change of plea and sentencing hearing was provided to this court and shows that the sentencing judge was apprised by the Commonwealth of its summary of the evidence of the offenses to which Brooks pleaded guilty. (Ex. H at 6.)

60. Under those circumstances, Brooks' minor sentence is significant in the court's determination that his disqualifying conviction was not a serious offense.[35]

**d. Whether There is Consensus Among the States About the Seriousness of the Offense**

61. Judge Ambro in <u>Binderup</u> considered whether there was consensus among the states about the seriousness of carrying a firearm without a license. He explained:

> [T]hough some states punish the unlicensed carrying of a concealed weapon as a serious crime, *see* Gov't *Suarez* Br. at 16-17 n.5, more than half prescribe a maximum sentence that does not meet the threshold of a traditional felony (more than one year in prison) and others do not even require a specific credential to carry a concealed weapon, *see* Thomson Reuters, *50 State Survey: Right to Carry a Concealed Weapon (Statutes)* (October 2015); U.S. Gov't Accountability Off., *States' Laws and Requirements for Concealed Carry Permits Vary Across Nation* 73–74 (2012), *available at* http://www.gao.gov/assets/600/592552.pdf (last visited Aug. 25, 2016); Law Ctr. to Prevent Gun Violence, *Concealed Weapons Permitting*, http://smartgunlaws.org/gun-laws/policy-areas/firearms-in-public-places/concealed-weapons-permitting/ (last visited Aug. 25, 2016).
>
> Were the Challengers unable to show that so many states consider their crimes to be non-serious, it would be difficult for them to carry their burden at step one. But because they have shown that there is no consensus regarding the seriousness of their crimes, their showing at step one is that much more compelling.

<u>Binderup</u>, 836 F.3d at 352–53.

62. Defendant relies upon similar evidence in this case to show that there is no consensus about the seriousness of carrying a firearm without a license. Defendant adds that since the court's decision <u>Binderup</u>, "a growing number of states[, i.e., three additional states] do not even require a specific credential to carry a concealed weapon." (ECF No. 73 at 17.)

---

[35] Even considering the other offenses to which he pleaded guilty, there clearly was a minor sentence imposed at each of those counts because in effect no sentence for those offenses was imposed. (ECF No. 55-2 at 6 (noting at counts two, three, and four, "[a] determination of guilty without further penalty").)

63.     Brooks' showing that (a) there is no consensus about whether carrying a firearm without a license is a serious offense, and (b) a growing number of states find that conduct does not constitute any crime makes his showing at step one "that much more compelling." Binderup, 836 F.3d at 353.

**e. <u>Conclusion with respect to Step One</u>**

64.     Brooks satisfied his burden to make a strong showing that his disqualifying conviction was not for a serious crime. He was convicted of a misdemeanor, the offense was not violent, he received a minor penalty, and there is a growing consensus among a number of states that carrying a firearm without a license is not an illegal activity. In other words, Brooks satisfied his burden to show that based upon his conviction of a state misdemeanor offense, he is not an unvirtuous citizen, and therefore, § 922(g)(1) burdens his Second Amendment rights.

65.     The burden, therefore, shifts to the government to show that § 922(g)(1)—as applied to people like Brooks—satisfies intermediate scrutiny.

**G.  Step two of the <u>Marzzarella</u> framework explained by Judge Ambro[36]**

66.     If the challenger satisfies his burden under the first prong, "the burden shifts to the Government to demonstrate that the regulation satisfies some form of heightened scrutiny." Binderup, 836 F.3d at 347.

---

[36]     While Judge Fuentes, joined by six other judges, agreed with Judge Ambro that the Marzzarella framework is the correct framework to as-applied constitutional challenges asserted under the Second Amendment, "Judge Fuentes departs from Judge Ambro's opinion…stating that 'Heller itself tells us that felons are disqualified from exercising their Second Amendment rights' and 'there is no principled basis, at least in this context, for distinguishing' the challengers' misdemeanor convictions from the statute's scope." Keyes, 282 F.Supp.3d at 869 (quoting Binderup, 836 F.3d at 388 (J. Fuentes, concurring in part, dissenting in part, and dissenting from the judgments)).  In other words, Judge Fuentes takes a more restrictive view and would overrule Burton because he does not believe that means-end scrutiny is required, i.e., "the challengers' misdemeanors are categorically outside of the scope of historical Second Amendment rights." Id.

67.     The court must determine "whether the Government has made a strong enough case for disarming a person found after step one to be eligible to assert an as-applied challenge. This analysis will turn in part on the likelihood that the Challengers will commit crimes in the future." Id. at 354 n.7. Judge Ambro explained that intermediate scrutiny applies to this analysis. Id. at 353.

68.     Section 922(g)(1) "is intended to further the government interest of promoting public safety by 'preventing armed mayhem[.]'" Id. (quoting United States v. Skoien, 614 F.3d 638, 650 (7th Cir. 2010) (en banc)). Against that important government interest the district court must consider whether banning the challenger from possessing firearms and ammunition is *substantially* related to that purpose. Binderup, 836 F.3d at 341, 353.

69.     In other words, the district court should analyze the "fit between the Challengers' total disarmament and the promotion of public safety." Id. at 355.

70.     The government must "'present some meaningful evidence, not mere assertions, to justify its predictive…judgments" about the likelihood that the challenger will commit crimes in the future. Id. at 354. "Parties may use statistics to show that people who commit certain crimes have a high (or low) likelihood of recidivism that warrants (or does not warrant) disarmament, even decades after a conviction." Id. at 355.

## H. Step two of the Marzzarella framework applied to Binderup and Suarez by Judge Ambro[37]

---

[37]     Two judges joined this portion of Judge Ambro's opinion in which he applied step two of the Marzzarella framework to the facts of Binderup and Suarez. Judges Fuentes and three other judges reject the application of step two of the Marzzarella framework to the facts of Binderup and Suarez because the misdemeanors at issue were categorically felonies for the purpose of applying § 922(g)(1).

Judge Hardiman, joined by four other judges, authored an opinion concurring in part and concurring in judgment, explaining that "Barton alone provides the standard for an as-applied Second Amendment challenge to a presumptively lawful regulatory measure (like § 922(g)(1)) that denies a core Second Amendment right to a certain class of persons." Binderup, 836 F.3d at

71.     The government in <u>Binderup</u> relied upon statistical studies to show that it was reasonable to disarm Binderup and Suarez because of their convictions. <u>Id.</u> at 354. Judge Ambro joined by two other judges, however, referred to those studies as being "off-point[.]" <u>Binderup</u>, 836 F.3d at 354.

72.     Some of the government's studies concerned the risk of recidivism of incarcerated felons but neither Binderup nor Suarez were incarcerated because of their crimes. <u>Id.</u>

73.     The government also relied upon a study that showed that criminal defendants who are placed on probation have an increased risk of recidivism in their first year on probation. <u>Id.</u> Judge Ambro declined to rely upon that study because Binderup's disqualifying conviction was 20 years old and Suarez's disqualifying conviction was 26 years old. <u>Id.</u>

74.     Although the government's empirical studies in <u>Binderup</u> did not demonstrate the appropriate fit between the disarmament of Binderup and Suarez and the promotion of public safety, Judge Ambro explained:

> Parties may use statistics to show that people who commit certain crimes have a high (or low) likelihood of recidivism that warrants (or does not warrant) disarmament, even decades after a conviction. In these cases, empirical studies could have demonstrated an appropriate fit between the Challengers' total disarmament and the promotion of public safety if they contained reliable

365-66 (J. Hardiman, concurring in part and concurring in the judgments). In other words, "Judge Hardiman and the supporting judges would do away with the second step of the <u>Marzzarella</u> framework altogether[,]" and would find in favor of the challengers on the first step alone. <u>Keyes</u>, 282 F.Supp.3d at 868. Judge Hardiman explained:

> But when, as in these appeals, it comes to an as-applied challenge to a presumptively lawful regulation that entirely bars the challenger from exercising the core Second Amendment right, any resort to means-end scrutiny is inappropriate once it has been determined that the challenger's circumstances distinguish him from the historical justifications supporting the regulation. This is because such laws are categorically invalid as applied to persons entitled to Second Amendment protection—a matter of scope.

<u>Binderup</u>, 836 F.3d at 363 (J. Hardiman, concurring in part and concurring in the judgments).

statistical evidence that people with the Challengers' backgrounds were more likely to misuse firearms or were otherwise irresponsible or dangerous.

Id.

75.     Judge Ambro concluded that the government did not satisfy its burden to show that disarming people like Binderup and Suarez promoted the responsible use of firearms and public safety, explaining:

> The Challengers' isolated, decades-old, non-violent misdemeanors do not permit the inference that disarming people like them will promote the responsible use of firearms. **Nor is there any evidence in the record to show why people like them remain potentially irresponsible after many years of apparently responsible behavior.** Without more, there is not a substantial fit between the continuing disarmament of the Challengers and an important government interest. Thus, § 922(g)(1) is unconstitutional as applied to them.

Binderup, 836 F.3d at 356 (emphasis added).

**I.     Step two of the Marzzarella framework applied to Brooks**

76.     If Brooks makes a strong showing that his underlying predicate offense is not a serious crime, "the burden shifts to the Government to demonstrate that the…[law] satisfies" intermediate scrutiny. Binderup, 836 F.3d at 347, 356.

77.     The court understands its task at this step of the Marzzarella framework is twofold:[38] (a) the court—as in the first step of the framework—must make factual determinations

---

[38]     The Ninth Circuit Court of Appeals described the two-parts of a means-end scrutiny analysis in Smith v. University of Washington, 392 F.3d 367, 371 (9th Cir. 2004).  The district court must first make findings of fact, and then make "conclusions regarding the sufficiency of the facts" to determine whether the appropriate level of scrutiny is satisfied. Id.

     In other words, whether the government's means to accomplish its interest satisfies the appropriate level of scrutiny in a case is a mixed question of law and fact. Hunter ex rel. Brandt v. Regents of Univ. of California, 190 F.3d 1061, 1063 (9th Cir. 1999) ("The district court's conclusions regarding the sufficiency of those facts in meeting strict scrutiny is a mixed question of law and fact which we review de novo."); Lamprecht v. F.C.C., 958 F.2d 382, 392 n.3 (D.C. Cir. 1992) ("Of course, the point about which we disagree with our colleague and with Congress—whether sex-based preferences will advance 'substantially' the goal of increased

based upon the evidence presented by the government; and (b) consider that evidence to determine whether the government has made a "strong enough" showing to satisfy intermediate scrutiny. <u>Binderup</u>, 836 F.3d at 354 n.7.

78.    Intermediate scrutiny in this context requires the government to show that § 922(g)(1), i.e., the prohibition on "people like" Brooks being able to exercise the Second Amendment right to bear firearms, is *substantially related* to its "important and compelling interest" "of promoting public safety by 'preventing armed mayhem[.]'" <u>Id.</u> at 353 (quoting <u>Skoein</u>, 614 F.3d at 642).

79.    The Third Circuit Court of Appeals in <u>Marzzarella</u> relied upon the application of intermediate scrutiny under the First Amendment to articulate how intermediate scrutiny applies under the Second Amendment. <u>Marzzarella</u>, 614 F.3d at 97-98. The court explained that although "intermediate scrutiny is articulated in several different forms…[the terminology used shares] the same substantive requirements." <u>Id.</u> Intermediate scrutiny "require[s] the asserted governmental end to be more than just legitimate, either 'significant,' 'substantial,' or 'important.'" <u>Id.</u> (citing <u>Turner Broad. Sys., Inc. v. F.C.C.</u>, 512 U.S. 622, 627 (1994); <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 785 (1989)).

80.    "[T]he fit between the challenged regulation and the asserted objective…[must] be reasonable, not perfect." <u>Id.</u> (citing <u>Lorillard Tobacco Co. v. Reilly</u>, 533 U.S. 525, 556 (2001); <u>Bd. of Trs. Of State Univ. of N.Y. v. Fox</u>, 492 U.S. 469. 480 (1989)).  "The regulation need not be the least restrictive means of serving the interest[.]" <u>Id.</u> (citing <u>Turner Broad. Sys.</u>, 512 U.S. at 662; <u>Ward</u>, 491 U.S. at 798). The regulation, however, "may not burden [protected

---

programming diversity for intermediate scrutiny purposes—is a mixed question of law and fact, neither purely constitutional nor purely empirical.").

conduct]…more than is reasonably necessary." Id. (citing Turner Broad. Sys., 512 U.S. at 662; Ward, 491 U.S. at 800).

81.     As Judge Ambro and the two other judges acknowledged in Binderup, the government's "interest of promoting public safety by 'preventing armed mayhem,'…is both important and compelling." Binderup, 836 F.3d at 353 (quoting Skoien, 614 F.3d at 642).

82.     In this as applied challenged, the government must show that banning "people like" Brooks from possessing a firearm promotes public safety. Id. at 353-54.

83.     The parties dispute what "people like" Brooks means in the context of intermediate scrutiny.

84.     The government argues that the court should consider evidence of conduct for which Brooks was not convicted to show that he should be disarmed, i.e., disarming Brooks pursuant to § 922(g)(1) is substantially related to its important interest of promoting public safety and preventing armed mayhem.

85.     Brooks on the other hand argues that "[m]eans-end scrutiny is not an individualized assessment," i.e., "'the validity of the regulation depends on the relation the statute bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interest in an individual case[.]'" (ECF No. 73 at 23 (citing Ward, 491 U.S. at 801).) Under those circumstances, he asserts that intermediate scrutiny "does [not] involve a broad, searching inquiry into a challenger's past beyond any prior criminal conviction(s) to determine his worthiness to possess a firearm[,]" and the class of "people like" Brooks that should be considered at step two is "people who were convicted of misdemeanor unlicensed firearm charges and sentenced to probation[.]" (Id. at 25, 28.)

86.     "A successful as-applied challenge bars a law's enforcement against a *particular*

plaintiff[.]" Bruni v. City of Pittsburgh, 824 F.3d 353, 362 (3d Cir. 2016) (emphasis added).

When the applicable level of means-end scrutiny in an as-applied challenge is "intermediate

scrutiny," however, "substantial relation to each *individual plaintiff*" is not required;[39] rather,

"the proper question is whether the regulation is substantially related to the *type of case*

exemplified by the" challenger's claim. Bonidy v. U.S. Postal Serv., 790 F.3d 1121, 1134 (10th

Cir. 2015) (J. Tymkovich, dissenting) (emphasis in the original); Hatfield, 2018 WL 1963876, at

*7 (noting "the 'class' of as-applied challengers here should be more specific to…[the

challenger's] specific circumstances: non-violent felons who received no prison time and a small

monetary fine for their offense"). "By definition, substantial relation allows some

generalization[,]" and, therefore, an as-applied challenge utilizing intermediate scrutiny "asks

whether it is unconstitutional to apply the law to a particular category of persons." Id. at 1134,

1139.

---

[39]     Requiring the government to prove substantial relation to a particular plaintiff "transform[s]…[the] inquiry into something like a strict scrutiny narrow-tailoring regime." Bonidy v. U.S. Postal Serv., 790 F.3d 1121, 1134 (10th Cir. 2015) (J. Tymkovich, dissenting). Judge Tymkovich explained:

> True, substantial relation to…[the challenger] himself is not required, and "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." Doe v. City of Albuquerque, 667 F.3d 1111, 1124 (10th Cir.2012). Nevertheless, the distinction does mean something. We must examine substantial relation to some subcategory of the entire class of potential violators of a regulation. Otherwise, we would transform this "as-applied" challenge into a facial challenge, because the government's preferred subcategory overlaps entirely with the universe of potential violators.

Id. at 1137 n.9.

87.     This court must define the relevant "particular category of persons" and decide whether disarming them is substantially related to the government's interest in promoting public safety and preventing armed mayhem, i.e., whether § 922(g)(1) is unconstitutional as applied to "people like" Brooks.

88.     In order to define the relevant category of persons, the court must consider the evidence presented by the government about Brooks; indeed, Judge Tymkovich in <u>Bonidy</u> explained:

> Unsurprisingly…the characteristics of the individual bringing the as-applied challenge—the "who"—carry great weight, both in defining the relevant category and in determining whether the government may apply the regulation in these circumstances.

<u>Id.</u>

89.     The court agrees with Brooks that the relevant category of persons includes "people [like Brooks] who were convicted of misdemeanor unlicensed firearm charges and sentenced to probation." (ECF No. 73 at 28.) Brooks' definition of the relevant category, however, is too limited. The category must include the relevant general characteristics of Brooks for the court to conduct a meaningful application of intermediate scrutiny in his case.[40]

---

[40]     Brooks relies upon <u>Hatfield</u> to argue that a "wholly individualized inquiry" is not appropriate to determine the particular relevant category of persons. (ECF No. 73 at 24.) The court in <u>Hatfield</u>, however, recognized that the particular category of persons "should be more specific to…[the challenger's] general circumstances." <u>Hatfield</u>, 2018 WL 1963876, at * 7. The court in <u>Hatfield</u> defined the relevant particular category as "non-violent felons who received no prison time and a small monetary fine for their offense." <u>Id.</u> The challenger in that case had a driving while intoxicated charge in the decade before his disqualifying conviction and "maintained a spotless record [since his disqualifying conviction,]" which was for making a false statement in violation of 18 U.S.C. § 1001(a). <u>Id.</u> at *1.

Unlike Brooks, the challenger in <u>Hatfield</u> did not have a history before and after his disqualifying conviction of engaging in violence with firearms. Thus, the court included in its definition of the relevant category of persons only information about the challengers' disqualifying conviction and sentence. The challenger had no other conduct for the court to consider to define the particular category of persons applicable in that case. <u>Hatfield</u>, therefore, is

90.     Judges Ambro and Fuentes disagreed about the level of specificity to be applied at

step two in their opinions in <u>Binderup</u>. The court in <u>Keyes</u> explained:

> Both [Judges Ambro and Fuentes] agreed on the general premise of intermediate scrutiny—the Government bears the burden of proof to demonstrate that the challenged law involves an important government interest and that there is a "reasonable fit" between that interest and the challenged law. <u>Binderup</u>, 836 F.3d at 354, 399. Judge Ambro interprets this to require the Government to adduce evidence explaining why banning people in the Plaintiff's position from firearm possession is a reasonable means to further its governmental interest. <u>Id.</u>, at 354–355. To this end, Judge Ambro found that the Government's reliance on general statistical studies that felons are more likely to commit violent crimes was misplaced. <u>Id.</u> Instead, the Government needed to present reliable evidence "that people with the Challengers' backgrounds were more likely to misuse firearms or were otherwise irresponsible or dangerous." <u>Id.</u>, at 355.

> Judge Fuentes takes issue with this analysis, stating that "Judge Ambro's level of specificity is problematic." <u>Id.</u>, at 396. Judge Fuentes concludes that the Government satisfied its burden that the law is a "reasonable fit" to its important interest in public safety because it pointed to studies that explore the link between past criminal conduct and future gun violence, even without any link to the challenger's specific characteristics. <u>Id.</u>, at 400.

<u>Keyes</u>, 282 F.Supp.3d at 876.

91.     The court in <u>Keyes</u>—which was considering an as-applied attack to 18 U.S.C. §

922(g)(4) prohibiting the possession of a firearm by anyone previously committed to a mental

institution—determined that Judge Ambro's approach was the better approach. <u>Id.</u> The court

explained that Judge Fuentes' "high level analysis of intermediate scrutiny[,]" which did not take

into account specific characteristics of the challengers, is problematic because "it would

effectively foreclose all as-applied challenges." <u>Id.</u>  The court explained:

> [G]enerally, the Government does have an important interest at play and that the dispossession of certain groups of people are reasonable to pursue that interest. To allow the Government to defeat an as-applied challenge by demonstrating that the statute was a reasonable fit to its important interest in general would mean that the

---

distinguishable from this case. To adopt the limited definition of the relevant particular category presented by Brooks would in effect eliminate the need to address step two.

challengers' efforts to distinguish themselves from the overall class are rendered futile. In essence, without considering the challengers' specific characteristics, the second step of the <u>Marzzarella</u> framework is the same in both facial and as-applied challenge, rendering the first prong in as-applied challenges superfluous and done in vain.

<u>Keyes</u>, 282 F. Supp. 3d at 876–77.

92.     Judge Fuentes—and three other judges—concluded that as-applied challenges to § 922(g)(1) were not permissible. <u>Id.</u> at 877 (citing <u>Binderup</u>, 836 F.3d at 401 (J. Fuentes, concurring in part, dissenting in part, and dissenting from the judgments)). He explained that Congress previously had a procedure under 18 U.S.C. § 925(c) by which felons barred from possessing firearms could apply to the Attorney General to restore their Second Amendment rights because their circumstances showed they were not likely to pose a danger to public safety. <u>Binderup</u>, 836 F.3d at 402. Congress defunded the "unworkable" program because a determination about whether a particular felon posed a danger to public safety "was *too prone to error*." <u>Id.</u> (emphasis in original).

93.     Judge Fuentes argued that the § 925(c) procedure, which considered the circumstances of a particular felon, was an in effect an as-applied challenge to § 922(g)(1), which Congress found to be unworkable. According to Judge Fuentes, that determination by Congress to foreclose the § 925(c) as-applied challenges to § 922(g)(1) should have a "profound impact" on the court's consideration of the as-applied challenges of Binderup and Suarez. <u>Id.</u>

94.     Judge Fuentes countered any overbreadth arguments by recognizing the "numerous safety valves" available to disarmed felons, i.e., petitioning the state legislature to amend the law on the underlying predicate offense, having the underlying predicate offense expunged, set aside, or pardoned, petitioning Congress for redress, and the "offense-specific carve-outs from § 922(g)(1)." <u>Id.</u>

95.	Judge Fuentes found that consideration of the particular circumstances of a challenger is "administratively unworkable." Id. at 407. He explained that consideration of a challenger's specific circumstances invites a collateral attack on the underlying predicate offense, "places an extraordinary administrative burden on district courts handling criminal prosecutions under § 922(g)(1)[,]" and creates potential for other constitutional issues. Id.

96.	This court, like the court in Keyes, is not able to follow Judge Fuentes' view on this issue and will consider evidence about Brooks' particular circumstances to determine the category into which he fits and whether barring people like him from possessing a firearm is substantially related to promoting public safety and preventing armed mayhem.

97.	First, a majority of the court agreed that as-applied challenges to § 922(g)(1) were permissible, and seven judges approved the two-step Marzzarella framework for as-applied challenges to § 922(g)(1). Following Judge Fuentes' approach would essentially foreclose as applied challenges to § 922(g)(1), which would be contrary to the "law of our Circuit." Binderup, 836 F.3d at 356.

98.	Second, with respect to the burden placed on the district courts to predict the danger a challenger poses to the public, that prediction is often made by district courts. United States v. Perry, 788 F.2d 100, 114 (3d Cir. 1986) (explaining that under 18 U.S.C. § 3142 the district court must make a "dangerousness determination" involving "a prediction of the detainee's likely future behavior").

99.	As Brooks noted in his submissions to this court, Judge Ambro in Binderup "[took] into account…[Binderup's and Suarez's] individual circumstances in determining whether the government's proffered evidence demonstrated a fit between the legislative aims and the constitutionally-overbroad application." (ECF No. 73 at 21 n.2.)

100. Judge Ambro considered that Binderup and Suarez were not incarcerated or felons under the law, they were "state law misdemeanants who spent no time in jail" and their offenses were respectively twenty and twenty-six years old. Binderup, 836 F.3d at 354. Judge Ambro determined, however, that evidence about their disqualifying convictions and the statistical evidence presented by the government did not help the court predict whether Binderup and Suarez were likely to commit crimes in the future, and thus, whether disarming them under § 922(g)(1) was constitutional. Id. at 354 n.7.

101. Judge Ambro also noted in the "Background" section of his opinion that Binderup's "criminal record show[ed] no subsequent offenses," and Suarez had "led a life free of run-ins with the law[,]" and held a "'Secret' federal government security clearance in connection with his job as a consultant for a government contractor." Binderup, 836 F.3d at 340.

102. Under those circumstances, this court will consider evidence about Brooks' which the government proved by *meaningful evidence*[41] even if the evidence concerns conduct that did

_____

[41] Brooks argues that if the court permits the government at step two to introduce extrinsic evidence of his wrongdoing, it must provide him the right to confront his accusers and require the elements of a crime be proven beyond a reasonable doubt. (ECF No. 58 at 15.)

With respect to providing Brooks the right to confront his accusers, the right of confrontation "pertains only to adverse witnesses offering testimony at trial." United States v. Soriano-Jarquin, 492 F.3d 495, 504 (4th Cir. 2007); United States v. Boyce, 797 F.3d 691, 693 (8th Cir. 1986) (explaining "the right of confrontation does not apply to the same extent at pretrial suppression hearings as it does at trial"). Any evidence introduced about Brooks' wrongdoing at step two is not being used by the court to convict him of a crime and the court may consider evidence that does not rise to the level of criminal activity. Under those circumstances, the government is not required to prove Brooks' wrongdoing "beyond a reasonable doubt" and his due process rights are not violated by the procedures employed by this court to decide his as-applied attack on § 922(g)(1).

Brooks argues that he must be afforded the opportunity to confront his accusers, the government must prove his wrongdoing beyond a reasonable doubt, and the Federal Rules of Evidence must apply if the court permits the government to introduce evidence particular to him at step two. (ECF No. 58 at 14-15.) To the extent Brooks argues that the procedures used by this court violate his procedural due process rights, the court does not agree. The court must weigh

not result in a criminal charge or conviction.[42] Cf. United States v. Irving, 316 F.Supp.3d 879,

892 (E.D. Pa. 2018) (noting in dicta but not explaining that "[i]n a typical case, charges that have

not resulted in a conviction would not be considered"). The evidence, however, must be related

to Brooks' disqualifying conviction for carrying a firearm without a license. See United States v.

Chovan, 735 U.S. 1127, 1141 (9th Cir. 2013) (in applying intermediate scrutiny to decide an as-

applied challenge to § 922(g)(2), which prohibits domestic violence misdemeanants from

possessing firearm, the court considered a subsequent domestic abuse call even though it did not

---

the following three factors to determine whether a hearing deprived a defendant of his procedural
due process rights:

> First, the private interest that will be affected by the official action; second, the
> risk of an erroneous deprivation of such interest through the procedures used, and
> the probable value, if any, of additional or substitute procedural safeguards; and
> finally, the Government's interest, including the function involved and the fiscal
> and administrative burdens that the additional or substitute procedural
> requirement would entail

Mathews v. Eldridge, 424 U.S. 319, 335 (1976). Here, although the outcome of the hearing has
the potential to be outcome determinative, Brooks' interest in the evidentiary hearing under
Marzzarella is of a lesser magnitude than a trial during which he is afforded the right to confront
his accusers, the government must prove its case beyond a reasonable doubt, and the Federal
Rules of Evidence apply. Raddatz, 447 U.S. at 679. The court is the finder of fact at other kinds
of pretrial hearings and, like the defendants in those proceedings, Brooks had the opportunity to
present evidence in support of his position at the hearing on his motion to dismiss the indictment.
Although the court did not strictly apply the Federal Rules of Evidence to the evidence presented
at those hearings, it gave whatever weight it deemed appropriate to hearsay evidence and took
into account the quality of evidence presented by the government, which must be meaningful
evidence. There is value to the safeguards proposed by Brooks, but those safeguards are
guaranteed at trial and not in pretrial hearings. Id. Lastly, granting Brooks' request to order those
safeguards would turn the hearing into a trial, which would burden the court and parties.
Weighing these factors, the court finds that the procedures are sufficient to provide Brooks
adequate due process.

[42]     Brooks argues that "giving courts nearly unfettered discretion to determine challengers'
fitness to possess a firearm on a case-by-case basis" "violates due process principles of notice
and fair warning." (ECF No. 73 at 29 n.3 (citing Lambert v. California, 355 U.S. 225, 228
(1957).) The Third Circuit Court of Appeals, however, has already held that § 922(g)(1) does not
violate the Due Process Clause of the Fifth Amendment, and, as explained in this opinion, the
court does not have "unfettered discretion" to analyze whether a challenger possesses rights
guaranteed by the Second Amendment.

result in a charge or arrest because, among other things, the conduct was probative to whether the challenger was likely to commit a firearm offense in the future).

103.    The evidence presented at the hearing with respect to the motion to dismiss the indictment showed that Brooks engaged in gun violence before and after sustaining his disqualifying conviction.

104.    On April 29, 2015—*less than one month prior to Brooks' committing the offense that lead to his disqualifying conviction*—Brooks confronted Johnson, his neighbor, with respect to a parking dispute. Brooks was unhappy with Johnson's response and pointed a gun at her head and fired multiple shots into the Ford Fusion. Johnson and Clark were hesitant to identify Brooks as the neighbor who shot the Ford Fusion, but the circumstantial, yet meaningful, evidence[43] proved that it is more likely than not that Brooks was the neighbor who pointed a firearm at Johnson and shot the Ford Fusion.

105.    On May, 5, 2015, Brooks robbed Hill after he finished performing at Club Taboo. Hill reported to police officers that a short black male wearing a ski mask pointed a silver pistol at him. A black firearm found near the scene of the crime was registered to Brooks. Rummel and Matson saw a man fitting the description provided by Hill near Club Taboo. A key to a Brooks'

---

[43]    Obsenica reported that Johnson identified Brooks at the scene as the actor; Brooks' girlfriend, Squires, told the officers Brooks fled in a white Chevy Tahoe; Johnson told the officers Brooks drove a large Chevy vehicle; Brooks' vehicle was recovered in the nearby area in which the shooting took place; and it was reported that—like the other instances of firearm violence in which Brooks was involved—a silver pistol was used in the commission of the offense.

Johnson at the hearing first testified that the neighbor who pointed a gun at her and shot the Ford Fusion on April 19, 2015 was Brooks. Counsel for the government asked Johnson the following question: "Do you see that individual here in the courtroom today?" (H.T. 6/25/2018 (ECF No. 65) at 46.) Johnson responded: "You are standing in front of him." (Id.) Johnson, however, went on to testify that she did not know if Brooks was the neighbor who pointed a gun at her and shot the Ford Fusion because Brooks' appearance had changed since that day. (H.T. 6/25/2018 (ECF No. 65) at 46-47.)

to a white Chevy Tahoe was found in the path on which the black male ran from Rummel. Brooks' white Chevy Tahoe was found near Club Taboo. The vehicle was registered to his girlfriend, Squires, but and contained Brooks' wallet and the license plate that was on the vehicle on April 29, 2015, during the shooting at Johnson's row house. Hill could not be located to testify at Brooks' trial with respect to this incident. The evidence presented shows that it was more likely than not Brooks who robbed Hill at gunpoint and ran from the police.

106. Ten days later, on May 15, 2015, Brooks engaged in the offense for which he sustained his disqualifying conviction by carrying a firearm without a license in a Wal-Mart.

107. On July 23, 2017, Brooks held a pistol to Tia Collins' head and then knocked her unconscious with the pistol. Two shots were fired after Cordell Collins arrived on scene. Shortly after the 9-1-1 call was placed, Lawrence witnessed a gray sedan with an Ohio license plate being driven erratically from the direction of the Collins' residence. Lawrence attempted to follow the vehicle, but lost sight of it because its taillights were not on. A few minutes later, the Verona police located a crashed gray sedan with an Ohio license plate. The following items, among others, were found inside the vehicle: two firearms registered to Brooks; Tia Collins' firearm (which she reported was stolen during the robbery); paperwork for firearms in Brooks' name and address; retail reward cards in Squires' name; Brooks' wallet, including his driver's license and credit cards; and a cellular telephone registered to Brooks. The evidence provided by the government circumstantially establishes that the actors in the gray sedan with a Ohio license plate were driving away from the Collins' residence, where they engaged in gun violence and a robbery, and Brooks was one of the actors in the vehicle.

108. Based upon the foregoing, the particular category of persons relevant to the intermediate scrutiny analysis in this case is "***people who have a history of engaging in gun***

*violence, were convicted of a misdemeanor for carrying a firearm without a license, received a sentence of probation, and continued to engage in gun violence*."

109.    The court must now determine whether the government satisfied its burden to show that barring firearm possession by that particular category of individuals, which includes Brooks, is substantially related to its interest in promoting public safety and preventing armed mayhem.

110.    According to Brooks, the government cannot satisfy that burden because it did not present any empirical evidence about the risk of recidivism with respect to that category of people. (ECF No. 73 at 19-20.)

111.    This case, however, is unlike any other decision applying the <u>Marzzarella</u> two-part framework. The government showed that the challenger in this case, i.e., Brooks, engaged in gun violence prior to his disqualifying conviction and continued to engage in gun violence after the disqualifying conviction. Brooks, however, was not criminally convicted of those acts of gun violence.  <u>See e.g.</u>, <u>Binderup</u>, 836 F.3d at 340 (noting neither Binderup nor Suarez had sustained any other convictions since their disqualifying convictions, specifically Suarez had "led a life free of run-ins with the law"); <u>Holloway v. Sessions</u>, 275 F.Supp.3d 505, 507 (M.D. Pa. 2017) (noting that the disqualifying conviction was the only offense on the challenger's criminal record); <u>Gurten</u>, 295 F.Supp.3d at 529 (the court considered that the challenger had no other criminal violations and was a law abiding citizen for twelve years).

112.    Under those circumstances, empirical evidence is not required to show that people like Brooks will likely recidivate and threaten public safety with armed mayhem. <u>See</u> <u>Gurten</u>, 295 F.Supp.3d at 528 (noting that "in the absence of violent conduct or subsequent criminal history of…Binderup or Suarez, the United States" had to rely upon empirical evidence to make

its case at step two). The court has an ample basis on which to conclude that the government satisfied its burden to show that it is more likely than not that people like Brooks are likely to recidivate and engage in violent activities with firearms in the future, and, therefore, barring people like them from possessing a firearm under § 922(g)(1) is substantially related to the government's important interest of promoting public safety and preventing armed mayhem.

## V.      Conclusion

The unique facts of this case and the lack of clarity resulting from the varying opinions in Binderup raised many difficult and important issues in this case. While Brooks satisfied his burden to show that his disqualifying conviction was not serious, the government satisfied its burden to show that disarming people like Brooks, i.e., people who have a history of engaging in gun violence, were convicted of a misdemeanor for carrying a firearm without a license, and continued to engage in gun violence, is substantially related to the government's interest of promoting public safety and preventing armed mayhem.

The motion to dismiss the indictment (ECF No. 39) will be DENIED with respect to Brooks' argument[44] that § 922(g)(1) is unconstitutional as applied to him.

An appropriate order will be entered.

BY THE COURT,

Dated: September 19, 2018

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
Chief United States District Judge

---

[44]      See note 1 supra.