**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Crim. No. 17-250 |
| | ) | |
| JAMAL BROOKS, | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT AND CONCLUSION OF LAW

CONTI, Chief District Judge

## I.  INTRODUCTION

Pending before the court is a motion to suppress evidence and statements (ECF No. 38) filed by defendant Jamal Brooks ("Brooks"). Brooks is charged in a criminal indictment with possession of a firearm and ammunition by a convicted felon on August 22, 2017, in violation of 18 U.S.C. § 922(g)(1). The charge in the indictment is based upon three firearms and ammunition recovered from a search of Brooks' residence conducted pursuant to a search warrant on August 22, 2017. Brooks in the motion to suppress and supplemental submissions argues that law enforcement violated his rights guaranteed by the Fourth and Fifth Amendments to the United States Constitution and the evidence and statements obtained from those violations should be suppressed.

On February 12, 2018, the government filed a response in opposition to Brooks' motion to suppress. (ECF No. 43.) On February 23, 2018, Brooks filed a supplemental brief with respect to the motion to suppress. (ECF No. 44.) On March 19, 2018, the government filed a response in opposition to Brooks' supplemental brief.  (ECF No. 52.) On March 25, 2018, Brooks filed a reply brief with respect to the motion to suppress. (ECF No. 53.)[1]

---

[1]     The court considered a motion to dismiss the indictment, which if granted would have

On October 12, 2018, the court held a hearing with respect to Brooks' motion to suppress. The parties entered exhibits into evidence and the government presented the testimony of three witnesses. On November 15, 2018, the parties each filed proposed findings of fact and conclusions of law. (ECF Nos. 82, 83.)

On November 28, 2018, the court sua sponte raised the issue of inevitable discovery with respect to the search of the crashed gray sedan and requested the parties to brief the issue. The court inquired whether additional evidence was necessary. On November 30, 2018, the parties filed their supplemental briefs. (ECF Nos. 89, 90.) Brooks did not request the record be reopened for additional evidence. To the contrary, Brooks objected to reopening the record. (ECF No. 89.) The government requested an opportunity to reopen the record to present testimony by Howard Burton, the chief of police for the Penn Hills Police Department, about the Penn Hills Police Department's inventory policy. (ECF No. 90 ¶ 6.) The court denies the government's request because the record is sufficient without that additional evidence.

The motion to suppress having been fully briefed is now ripe to be decided by the court. The court makes the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT[2]

### A. Warrantless Search of the Gray Nissan Rental Car on July 23, 2017

---

mooted the instant motion to suppress. The motion to dismiss required multiple hearings and supplemental briefing. The motion was denied via findings of fact and conclusions of law dated September 19, 2018.

[2] For purposes of a motion to suppress, the court "may rely on hearsay and other evidence, even though that evidence would not be admissible at trial." United States v. Raddatz, 447 U.S. 667, 679 (1980); Brosius v. Warden, 278 F.3d 239, 246 (3d Cir. 2002) ("Hearsay may be considered in a suppression hearing in a federal court." (citing Raddatz, 447 U.S. at 679)).

1. On July 23, 2017, at 3:28 a.m., Adam Lawrence ("Lawrence"), a police officer with the Penn Hills Police Department, and other police officers were dispatched to a residence on Leechburg Road in Penn Hills, Pennsylvania, for a reported burglary in progress involving "possible kidnapping" and "reports of gunshots." (H.T. 7/10/2018 (ECF No. 67) at 18-19.)

2. Prior to being dispatched to the incident on Leechburg Road, Lawrence, who was in a police uniform, was at a gas station with other police officers. (Id.) Once the police officers received the call with respect to the incident on Leechburg Road, they drove with lights and sirens on toward that area. Lawrence's marked police car was the last in a line of police cars heading in the direction of the Leechburg Road. (Id. at 19.)

3. While the other police cars drove straight on Verona Road in Penn Hills, Pennsylvania, Lawrence took an alternate route via Shannon Road to "cover more area and maybe encounter suspects fleeing[.]" (Id. at 19-20.)

4. Once Lawrence turned onto Shannon Road, he saw a vehicle in his lane of travel, i.e., driving in the opposing lane of travel. (H.T. 7/10/2018 (ECF No. 67) at 20.) Lawrence explained:

> They just passed a vehicle coming to the end of the roadway which is a T intersection with the stop sign. The stop sign is on their end, and I had to lock up my brakes, stop to avoid a head-on collision with them, and they proceeded past me and ran the stop sign and turned left on to 2nd Street.

(Id.) The vehicle observed by Lawrence was a "newer" gray sedan, i.e., a 2016 Nissan Altima, with an Ohio registration plate and had two occupants, i.e., a driver and front seat passenger. (Id. at 20, 23; Gov't Ex. 3.) Lawrence described the driver as a "light skinned black male with black dreadlocks." (Id. at 23.) Lawrence could not describe the passenger of the vehicle. (Id.)

5. Brooks "is not a light skinned black male[.]" (H.T. 7/10/2018 (ECF No 67) at 49; H.T. 10/12/2018 (ECF No. 84) at 24.)

6.      Lawrence explained that the gray sedan, which almost struck his police vehicle, appeared to be "trying to quickly get away from a certain area" and was coming from the direction of Leechburg Road where the robbery had taken place. (H.T. 7/10/2018 (ECF No. 67) at 24.) He suspected that the vehicle was involved in the robbery that had taken place at the residence on Leechburg Road. (Id.) Lawrence, therefore, turned his police vehicle around and began to pursue the gray sedan. (Id.)

7.      Lawrence pursued the gray sedan as it drove down various streets in the area, and he observed several traffic violations[3] during the pursuit. (H.T. 7/10/2018 (ECF No. 67) at 25.) For example, the gray sedan did not have its lights on, which made it more difficult for the vehicle to be detected. (Id.) The gray sedan was travelling at a rate of approximately forty to fifty miles per hour on side streets and residential streets, which have speed limits of twenty-five miles per hour. (Id. at 26.)

8.      Lawrence attempted to conduct a traffic stop on the gray sedan. (Gov't Ex. 5 ¶ 18.)

9.      He eventually lost sight of the gray sedan because he could not see the vehicle's taillights. (H.T. 7/10/2018 (ECF No. 67) at 26.)

---

[3]      Lawrence explained:

Clearly they almost hit me head on. Passing a car on a portion of a roadway that was a no passing zone, approaching an intersection with the stop sign, blew the stop sign, speeding, blew the stop sign at Allegheny River Boulevard and Wildwood Road to turn left on to Allegheny River Boulevard, and there were several stop signs at intersections on Penn Street that they went through as well.

(H.T. 7/10/2018 (ECF No. 67) at 25-26.)

10.     A few moments after Lawrence[4] lost sight of the gray sedan, a police officer with the Verona Police Department located the vehicle crashed nearby at the intersection of Penn Street and Allegheny Avenue in Verona Borough, Pennsylvania. (H.T. 7/10/2018 (ECF No. 67) at 26-27; H.T. 10/12/2018 (ECF No. 84) at 29.) The vehicle was wrecked into a fence of a parking lot, there were no occupants inside the vehicle, the engine was running, and the vehicle was partially on the roadway. (H.T. 7/10/2018 (ECF No. 67) at 27-28; H.T. 10/12/2018 (ECF No. 84) at 30.)

11.     Lawrence did not see anyone exit the vehicle. (H.T. 10/12/2018 (ECF No. 84) at 26.) He believed, however, that the occupants ran away from the vehicle. (Id.) He explained:

> [G]iven the time that, you know, the distance that they were ahead of me until the time that I covered that distance, when they had turned right where they crashed and didn't negotiate the turn properly, it wasn't that long. So, there is no way that they were walking. They had to have got out and run. I mean, I was there within seconds passing by and I would have noticed people walking.

(Id.)

12.     Lawrence determined the vehicle was registered to Enterprise Rental Car, also known as "EAN Holdings." (H.T. 7/10/2018 (ECF No. 67) at 28; H.T. 10/12/2018 (ECF No. 84) at 15, 33.) The vehicle was rented from Enterprise Rental Car by Brooks. (H.T. 10/12/2018 (ECF No. 84) at 45.)

---

[4]     Lawrence explained:

> I actually drove past…[the crashed gray sedan] and didn't realize because the lights were out. As I was going by everything was going so quickly that I had passed it and didn't even realize that it had crashed and it was into the fence onto this property actually off of the roadway at that point in time.

(H.T. 10/12/2018 (ECF No. 84) at 26.)

13.    Lawrence and other police officers with the assistance of two police service dogs searched the area in which the gray sedan was crashed in an attempt to locate its occupants. (H.T. 7/10/2018 (ECF No. 67) at 28-29.) The police officers did not locate either occupant of the vehicle. (H.T. 10/12/2018 (ECF No. 84) at 32.)

14.    After Lawrence briefly participated in the search for the occupants of the vehicle, he[5] returned to the crashed gray sedan to conduct an inventory search of the vehicle.[6] (H.T. 7/10/2018 (ECF No. 67) at 29.)

15.    Lawrence testified that he conducted an inventory search of the crashed gray sedan because "[i]t was involved in a crash, after a vehicle pursuit[,]" and, therefore, it was subject to being impounded by the Penn Hills Police Department. (H.T. 10/12/2018 (ECF No. 84 at 8-9.) Lawrence explained: "The driver and the other occupant of the vehicle fled after crashing the vehicle and we were unable to locate them." (Id.)

16.    Lawrence conducted an inventory search of the vehicle at the scene of the crash, i.e., it was not towed to a separate location prior to Lawrence's inventory search. (H.T. 10/12/2018 (ECF No. 84) at 36.)

---

[5]    Lawrence testified that he inventoried the vehicle approximately forty minutes after he first received the call about the incident at the Collins' residence. (H.T. 10/12/2018 (ECF No. 84) at 36.)

[6]    When asked whether he or "any of the officers" took photographs of the crashed gray sedan prior to its search, Lawrence responded: "I don't believe we did….I personally didn't. I don't believe anyone else did." (H.T. 7/10/2018 (ECF No. 67) at 46.)
       The police officer with the Verona Police Department who found the crashed gray sedan stayed with the vehicle "the whole time" until Lawrence returned to inventory the vehicle. (H.T. 7/10/2018 (ECF No. 67) at 29.)

17.     On July 23, 2017, the Penn Hills Police Department had a policy in place with respect to the "Inventory of Impounded Vehicles" (the "inventory policy"). (H.T. 10/12/2018 (ECF No. 84) at 6; Gov't Ex. 2.)

18.     The inventory policy, in pertinent part, provided:

> It shall be the policy of the Penn Hills Police Department that all vehicles impounded by the authority and direction of the Department shall be examined and inventoried immediately upon acceptance into the custody and control of the Penn Hills Police Department or as soon after as is practical under the circumstances.

> A.  Officer Responsibility

> 1.  The Penn Hills Police Department Impounded Vehicle Information Sheet and an inventory of personal items of value in said vehicle will be completed and submitted by the officer who took custody or control of the vehicle or his designee.

> 2.  Containers found within the impounded vehicle shall be opened and inventoried, unless the contents can be easily ascertained from examining the exterior of the container. If the container is locked and cannot be opened without damaging [the] same, it shall not be forced open, but rather noted on the inventory sheet as a locked container.

> 3.  If the impounded vehicle is part of a crime and/or is suspected to contain evidence, and a search of it becomes necessary, the vehicle will be secured at the Penn Hills Police Department impound facility[7] until the proper search procedure can be carried out.

> 4.  After the aforementioned procedure has been carried out, the vehicle shall be secured in the Penn Hills Police Department impound area, or other areas utilized by the department for the storage of vehicles.

> 5.  If there is no need to retain the impounded vehicle, the officer who took control and custody of said vehicle, or his

---

[7]     The Penn Hills Police Department impound facility as of July 23, 2017, was a "secured facility at Don Kuhn." (H.T. 10/12/2018 (ECF No. 84) at 42.)

> designee, shall make arrangements to have said vehicle returned to the owner as soon as possible.

(H.T. 10/12/2018 (ECF No. 84) at 6-7; Gov't Ex. A at 1-2.)

19. On July 23, 2017, at 5:25 a.m., Lawrence completed a Vehicle Impound Record, which is a document used in the ordinary course of business by the Penn Hills Police Department. (H.T. 10/12/2018 (ECF No. 84) at 10-11; Gov't Ex. 3.) Lawrence completed the form immediately after the inventory search of the crashed gray sedan. (H.T. 10/12/2018 (ECF No. 84) at 12.)

20. Lawrence's search of the crashed gray sedan included a search inside a black backpack found in the backseat of the vehicle and a search inside a red duffel bag found inside the trunk of the vehicle. (H.T. 10/12/2018 (ECF No. 84) at 13.) According to Lawrence, the contents of the two bags could not be easily ascertained without opening them. (Id. at 13-14.)

21. The Vehicle Impound Record also included a "Vehicle Recovery/Tow Notification," which was a letter the Penn Hills Police Department used to notify the registered owner of the vehicle that the vehicle is being towed and to provide the registered owner of the vehicle contact information for the place to which the vehicle is being towed. (Id. at 14; Gov't Ex. 3 at 3.)

22. Lawrence was unable to contact Enterprise Rental Car, i.e., the registered owner of the crashed gray sedan, because it was in the middle of the night. (Id. at 14.) Lawrence, therefore, prepared the Vehicle Recovery/Tow Notification to be sent to Enterprise Rental Car. (Id.)

23. From inside a blue grocery store bag on the floorboard in front of the driver's seat of the crashed gray sedan the following items were recovered: (a) a "SIG Sauer 22 caliber pistol with the serial number of F309749" (H.T. 7/10/2018 (ECF No. 67) at 31-32), which was

registered to Tia Collins, who was one of the victims in the alleged robbery on Leechburg Road (id. at 32; Gov't Ex. 5 ¶ 17); and (b) a "Taurus 9 millimeter pistol" with serial number "TJN07656" and a corresponding magazine with eight, nine millimeter cartridges (H.T. 7/10/2018 (ECF No. 67) at 33-34).

24.     A magazine that corresponds to the "SIG Sauer 22 caliber pistol" that had ten, twenty-two caliber cartridges in it was also found in the crashed gray sedan. (H.T. 7/10/2018 (ECF No. 67) at 31.)

25.     From inside the red duffel bag[8] found in the trunk of the crashed gray sedan the following items were recovered: (a) a stainless steel "Taurus 357 caliber revolver" with serial number GY69526 and "five 357 cartridges…inside the cylinder on the revolver" (H.T. 7/10/2018 (ECF No. 67) at 32-33); (b) a "Mossberg 12 Gauge Shotgun" and four, twelve-gauge shotgun shells (id. at 34); and a cardboard box containing a 50-round capacity nine-millimeter drum-style magazine, (id. at 37.)

26.     A "Ruger 22 caliber pistol" with serial number 36521861 was found in the center console of the crashed gray sedan. (H.T. 7/10/2018 (ECF No. 67) at 33.) A magazine containing .22 caliber ammunition was located inside the "Ruger 22 caliber pistol" and one round was chambered in the firearm. (Id. at 34-35.)

27.     Another magazine containing .22 caliber ammunition was recovered from inside a red and black bag found in the backseat of the crashed gray sedan. (Id. at 35.)

28.     A nine-millimeter pistol extended magazine with thirty, nine-millimeter cartridges inside it was located in a black nylon backpack in the backseat of the crashed gray sedan. (H.T.

---

[8]     Lawrence could not remember whether he found the duffel bag closed or open. (H.T. 7/10/2018 (ECF No. 67) at 48.)

7/10/2018 (ECF No. 67) at 35-36.) A number of items were inside the black nylon backpack with the nine-millimeter extended magazine, including:

- a bag of plastic zip ties;
- a set of handcuffs;
- black gloves;
- a black face mask;
- a red knife;
- a silver flashlight;
- a black tossle cap; and
- a small black flashlight.

(Id. at 36.)

29. A "knotted plastic bag containing multiple cartridge casings" and one, nine-millimeter cartridge were inside a Taurus box that contained the Taurus .357 caliber firearm and was found in the trunk of the crashed gray sedan. (H.T. 7/10/2018 (ECF No. 67) at 36.) The cartridge casings were empty, meaning they were not live ammunition and did not contain a projectile. (Id. at 36-37.)

30. A "federal ammunition box" containing fifteen "22 caliber cartridges" was inside a black nylon small carrying bag located in the front section of the vehicle. (H.T. 7/10/2018 (ECF No. 67) at 37.) That ammunition could function with the "Ruger 22 Pistol" that was in the center console of the crashed gray sedan. (Id.)

31. Assorted ammunition and magazines for ammunition for firearms were found throughout the crashed gray sedan. (H.T. 7/10/2018 (ECF No. 67) at 34.)

32. Clothing items, including a black ski mask, black gloves, and blue latex gloves,[9] were also found in the crashed gray sedan. (Id. at 38-39.)

---

[9] Several pieces of torn blue latex gloves were found near the passenger seat of the crashed gray sedan. (H.T. 7/10/2018 (ECF No. 67) at 39.) A pair of blue latex gloves, which "were consistent" with the torn pieces of gloves found near the passenger seat, were "discarded just outside the driver door on the ground." (Id.)

33.     Three Pennsylvania State Police records of sale, a receipt from a gun purchase, and warranty cards for Taurus firearms listed in Brooks' name were found inside the crashed gray sedan. (H.T. 7/10/2018 (ECF No. 67) at 39.) A grocery store receipt was also found inside the crashed gray sedan. (Id.)

34.     The documentation for the Taurus firearms listed Brooks' name and address and was consistent with the Taurus .357 caliber firearm found in the crashed gray sedan. (Id. at 40.) The address provided for Brooks was "literally…down the road from where the vehicle was found crashed." (Id. at 40.)

35.     The following items were also found in the crashed gray sedan:

- Monroeville Dodge key chain;
- Chrysler key fob;
- handcuff key;
- house key;
- Giant Eagle card registered to Brooks' girlfriend R'Vaenita Squires ("Squires");
- Dick's Sporting Goods card registered to Squires;
- Louis Vuitton monogram wallet with the initials JMB embroidered on it, which contained a driver's license for "Jamal Brooks;"
- two credit cards in Brooks' name;
- Enterprise Rental Car business card;
- Anthony Arms membership card; and
- Crown Royal bag, which contained an e-cigarette and metal grinder.

(H.T. 7/10/2018 (ECF No. 67) at 40-41; Gov't Ex. 5 ¶¶ 23, 24.)

36.     At approximately 5:25 a.m., after Lawrence inventoried the contents of the crashed gray sedan, the vehicle was towed to "Don Kuhn in Penn Hills." (H.T. 10/12/2018 (ECF No. 84) at 36, 41.)

**B.  DuThinh's Surveillance of 1204 Wade Street, Aliquippa, Pennsylvania**

37.     In late July 2017, DuThinh spoke with a detective from the Penn Hills Police Department about the events of July 23, 2017, of which Brooks was a suspect. (H.T. 10/12/2018 (ECF No. 84) at 56-57.)

38.     DuThinh learned that Brooks rented the crashed gray sedan and the Penn Hills Police department found Brooks' property inside the vehicle. (H.T. 10/12/2018 (ECF No. 84) at 57.) DuThinh obtained Brooks' address at 1204 Wade Street, Aliquippa, Pennsylvania ("1204 Wade Street") from the driver's license found inside the crashed gray sedan. (Id.)

39.     In August 2017, DuThinh conducted surveillance of 1204 Wade Street on four separate days over a span of three weeks to determine whether Brooks lived at that residence. (H.T. 10/12/2018 (ECF No. 84) at 57-58; Gov't Ex. 5.)

40.     DuThinh obtained from the Penn Hills Police Department the Chrysler key fob found in the crashed gray sedan. (H.T. 10/12/2018 (ECF No. 84) at 47.) The key fob was a "one in-laid piece" comprised of a metal key and keyless entry system. (Id. at 48.)

41.     On August 17, 2017, DuThinh traveled to 1204 Wade Street. (H.T. 10/12/2018 (ECF No. 84) at 47.)

42.     Upon DuThinh's arrival at 1204 Wade Street, a "Chrysler was parked in the driveway. It was backed in." (H.T. 10/12/2018 (ECF No. 84 at 48.)

43.     The government entered into evidence a photograph taken by "Google Maps" of 1204 Wade Street, which depicted the Chrysler parked in the driveway of 1204 Wade Street. (H.T. 10/12/2018 (ECF No. 84) at 48-49; Gov't Ex. 4.)

44.     DuThinh testified that the photograph accurately depicted 1204 Wade Street on August 17, 2017, including the manner in which the Chrysler was positioned in the driveway. (H.T. 10/12/2018 (ECF No. 84) at 49.) DuThinh, however, retrieved the photograph from Google Maps after August 17, 2017, and did not know when Google Maps captured the image. (Id. at 61.)

45.     DuThinh was asked whether the location of the vehicle as depicted in the photograph was the "precise location as…[he] saw it on August 17[, 2017.]" (Id. at 61.) DuThinh

responded: "I can't say precise. It's oriented and parked in the driveway, whether it's slightly forward, slightly back. But it is in and around that area." (H.T. 10/12/2018 (ECF No. 84) at 61.) He confirmed that it was "possible that…[the] vehicle was not located precisely as it's depicted…[in the photograph]." (Id. at 62.)

46.     DuThinh walked onto the empty lot to the right of 1204 Wade Street. (H.T. 10/12/2018 (ECF No. 84) at 50.) DuThinh described the empty lot:

> It's distinctly an empty lot. It's all grass versus the driveway. I would have approached there because I was concerned being too close and being discovered. So, first, I am hitting the keyless entry and then I move towards the rear and peeked over.

(Id. at 61.)

47.     He stood approximately three to four feet from the Chrysler in the unkempt grassy area. (Id. at 50.) DuThinh was not "very close" to the short, white brick wall located behind the Chrysler. (Id.; Gov't Ex. 4.) DuThinh approached the vehicle from the front driver's side of the car. (H.T. 10/12/2018 (ECF No. 84) at 50.)

48.     DuThinh stood "on that little, the corner of the grass…[between] the sidewalk, and the driveway." (H.T. 10/12/2018 (ECF No. 84) at 51.)

49.     DuThinh did not enter the driveway of 1204 Wade Street; he did not enter the front yard of the residence; and he did not walk onto the front porch of the home. (H.T. 10/12/2018 (ECF No. 84) at 51-52.)

50.     DuThinh used the keyless entry on the Chrysler key fob and heard the doors lock. (H.T. 10/12/2018 (ECF Non. 84) at 51.) He did not physically touch the vehicle or use the metal key in the lock on the door of the vehicle. (Id. at 50, 52.)

51.     DuThinh walked parallel to the Chrysler toward the back of the house, stood at the back of the Chrysler, and "peeked to the rear of the vehicle, and identified the license plate."

(H.T. 10/12/2018 (ECF No. 84) at 54, 59.) It was from that "vantage point" that DuThinh was able to view the license place which read: "JYS2961." (Id. at 54-55.)

52.     DuThinh had to "bend…[his] body around to look at…[the] license plate." (H.T. 10/12/2018 (ECF No. 84) at 59.)

53.     DuThinh did not walk onto the driveway or back of the property located at 1204 Wade Street to view the license plate. (H.T. 10/12/2018 (ECF No. 84) at 55, 59.)

54.     DuThinh determined the Chrysler was registered to Roosevelt Reese ("Reese"). (H.T. 10/12/2018 (ECF No. 84) at 55.) DuThinh believed Reese was a relative of Squires. (Id. at 55-56.)

55.     On the same day, DuThinh spoke to an employee of the United States Postal Service at the post office. (H.T. 10/12/2018 (ECF No. 84) at 59-60.) The employee "stated that she recognized…[Brooks' name] or had seen someone matching that description at that residence." (Id. at 60.) DuThinh could not recall the employee's name or whether he showed her a photograph of Brooks. (Id.)

### C.  **DuThinh Obtained a Search Warrant for 1204 Wade Street**

56.     On August 21, 2017, DuThinh applied for a search warrant to search 1204 Wade Street.[10] (H.T. 10/12/2018 (ECF No. 84) at 63.) DuThinh authored the affidavit of probable cause (the "affidavit") attached to the application. (Id.)

57.     DuThinh in the affidavit relied upon the events of July 23, 2017, including the information received from the robbery victim, Tia Collins, and her husband, Cordell Collins, and

---

[10]     DuThinh in the same application sought permission to conduct a search of the "2013 GOLD/SILVER, CHRYSLER, SEDAN." (Gov't Ex. 4 at 4.) The signed search and seizure warrant presented to the court, however, was issued only with respect to 1204 Wade Street. (Id. at 1.)

information received from Lawrence about the subsequent police chase of the gray sedan. (H.T.

10/12/2018 (ECF No. 84) at 65; Gov't Ex. 5 ¶¶ 4, 17, 18.)

58. With respect to DuThinh's relevant training and experience, the affidavit of probable cause, in pertinent part, provided:

> As a Special Agent with the ATF, your affiant has experience with and is responsible for investigating violations of federal firearm laws. In the course of my training and experience, your affiant became familiar with the methods and techniques associated with the possession and distribution of firearms, the distribution of narcotics, and the organization of firearms.
>
> …
>
> [Y]our affiant has been involved in the use of…preparing and executing search warrants which have led to the seizure of firearms, narcotics, contraband, and evidence of criminal activity.
>
> …
>
> Through training and experience, your affiant is aware that often, home invaders possess firearms, ammunition, and other dangerous weapons in their residences, businesses, and automobiles to protect their profits from those who might attempt to forcibly take them. Typically home invaders maintain possession of the firearms for extended periods of time. In addition, based on your affiant's training and experience, your affiant is aware that home invaders maintain possession of their equipment and, "tools of the trade", such as masks, restraints (to include hand-cuffs, zip ties, rope) and gloves.
>
> …
>
> Your affiant is aware that home invaders often use their automobiles to transport themselves, as they require expeditious means of travel away from their victims and to elude police. Home invaders often use their vehicles to store their tools of the trade so they are readily available.
>
> …
>
> Your affiant is aware based on his training and experience and knowledge of this investigation in particular, that although home invaders that obtain firearms through straw purchasers tend to want to distance themselves from any connection to the acquisition of the firearms, often times they retain records and other information that provide evidence of the fact that the firearm(s) in question was purchased for them. Such records can include, but are not limited to, gun boxes (which often times have the serial number of the firearm purchased), receipts reflecting the purchase information, firearm accessories (such as extra magazines, sights, scopes, and back straps), and ammunition.

(Gov't Ex. 5 ¶¶ 2, 9, 10, 12.)

59.     The affidavit provided that DuThinh personally participated in the investigation of Brooks and received information from "other ATF Special Agents, Penn Hills Police Department…and witnesses." (Id. ¶ 6.)

60.     DuThinh alleged that he had "probable cause to believe that the firearms contained…[in 1204 Wade Street] will constitute and contain evidence that BROOKS possessed said firearms after having been convicted of a crime punishable by a term of imprisonment greater than a year." (Id. ¶ 7.)

61.     With respect to the events that occurred on July 23, 2017, the affidavit provided that: (a) Tia Collins dialed 9-1-1 and reported she was robbed by two persons wearing dark clothes and masks, she was struck in the back of her head, and her purse was stolen, which contained a pistol; and (b) her husband, Cordell Collins, arrived home and the two suspects fired shots at him before they drove away in an unknown vehicle. (Gov't Ex. 5 ¶ 17.)

62.     The affidavit explained that shortly after Tia Collins' telephone call to 9-1-1:

-   an officer with the Penn Hills Police Department "observed a vehicle driving erratically" (id. ¶ 18);

-   the officer attempted to conduct a traffic stop on the vehicle, which was a dark gray Nissan Altima rented from Enterprise Rental Car (id.);

-   the vehicle did not come to a stop, turned off its lights, eluded the officer, and "crashed" (id.);

-   the officer eventually located the dark gray vehicle but did not locate its occupants (id.); and

-   the officer "described the operator as a light-skinned, black male with braided hair." (Gov't Ex. 5 ¶ 18.)

63.     The affidavit provided that police officers recovered from the dark gray vehicle, among other things: five firearms, including a firearm purchased by Tia Collins and a firearm purchased by Brooks; "paperwork related to BROOKS's purchase of a firearm[;]" a wallet with

the monogram "JMB[;]" Brooks' driver's license with 1204 Wade Street listed as his address; a Giant Eagle Advantage Card and a Dick's Sporting Goods Card registered to Brooks' girlfriend, Squires; a cellular telephone with a telephone number belonging to Brooks and with an associated address of 1204 Wade Street; a Chrysler automobile key; drug paraphernalia; handcuffs; zip ties; gloves; masks; and clothing. (Gov't Ex. 5 ¶¶ 19, 20, 24, 25.)

64. With respect to DuThinh's surveillance of 1204 Wade Street and the Chrysler parked in the driveway of that address, the affidavit provided:

> On two previous occasions your affiant observed a gold/silver Chrysler sedan (PA registration: JYS-2961) parked in the driveway of…[1204 Wade Street]. On August 17, 2017, your affiant and ATF SA Kevin Kauffman approached the Chrysler sedan with the Chrysler automobile key which was recovered from the…[dark gray vehicle]. Your affiant successfully activated the vehicle's keyless entry system with the key.

(Gov't Ex. 5 ¶ 26.)

65. According to the affidavit, DuThinh believed evidence that Brooks committed theft of a firearm, possession of a stolen firearm, and possession of a firearm and ammunition by a convicted felon, would be found at 1204 Wade Street and in the Chrysler. (Id. ¶ 30.)

66. With respect to the timeliness of the application for a search warrant, the affidavit explained:

> Your affiant submits to you that this application is not stale, in that based on your affiant's training, knowledge and experience, your affiant knows that individuals who own and possess firearms routinely retain them for extended periods of time and often store them in areas under their control, such as their personal residences in order to protect the weapons, which are valuable, and to use the weapons for personal protection.

(Gov't Ex. 5 ¶ 31.)

67.     Prior to authoring the affidavit, DuThinh conducted a criminal history search of the robbery victim Tia Collins, and her husband, Cordell Collins. (H.T. 10/12/2018 (ECF No. 84) at 65.)

68.     Tia Collins was previously arrested but had no record of conviction. (Id. at 67; Gov't Ex. 6.) At some point after DuThinh's investigation of Brooks concluded, he learned that Tia Collins was being investigated for Medicare fraud. (H.T. 10/12/2018 (ECF No. 84) at 73-74.)

69.     Cordell Collins had a record of arrests. He was arrested on felony drug charges in New York, Texas, and Pennsylvania, but the charges did not result in criminal convictions. (H.T. 10/12/2018 (ECF No. 84) at 67; Gov't Ex. 6.) In 1998, he sustained a felony drug conviction in Pennsylvania and was sentenced to a period of imprisonment. (Id. at 68; Gov't Ex. 6.)

70.     DuThinh did not include the criminal histories of Tia Collins or Cordell Collins in his affidavit of probable cause. (H.T. 10/12/2018 (ECF No. 84) at 68.) He did not "feel it had any bearing on their testimony as victims." (Id.)

71.     Prior to submitting the search warrant affidavit, DuThinh: met with a Penn Hills Police Department detective to discussed the incident involving Tia Collins and Cordell Collins on July 23, 2017; conducted two interviews of Tia Collins and Cordell Collins; reviewed the evidence; "did a record sale for the pistol that was recovered[;]" and determined the statements given by Tia Collins and Cordell Collins were corroborated by other evidence obtained by the Penn Hills Police Department. (H.T. 10/12/2018 (ECF No. 84) at 68-69.) Based upon the foregoing, DuThinh "believed…[Tia Collins and Cordell Collins] were being truthful and they gave a consistent account of what happened." (Id. at 69-70.)

72.     DuThinh had "suspicions," but not evidence, that the robbery of Tia Collins on July 23, 2018, was drug related. (H.T. 10/12/2018 (ECF No. 84) at 70.) Similarly, DuThinh

knew a nightclub owned by Tia Collins and Cordell Collins was "suspected to be" involved in criminal activity, but he did not have any evidence that it was involved in criminal activity. (Id. at 70-71.) DuThinh did not include in the affidavit of probable cause his suspicions that the robbery was drug related or that the nightclub was involved in criminal activity. (Id.)

73.    On August 21, 2017, a magistrate judge signed and approved DuThinh's application search warrant for 1204 Wade Street. (Gov't Ex. 5 at 1-2.)

**D.  Execution of the Search Warrant at 1204 Wade Street on August 22, 2017**

74.    On August 22, 2017, at approximately 6:00 a.m., a search warrant was executed at 1204 Wade Street. (H.T. 10/12/2018 (ECF No. 84) at 94.)

75.    DuThinh and Joseph Price[11] ("Price"), an agent of the Bureau of Alcohol, Tobacco, and Firearms, were present at the search of 1204 Wade Street on August 22, 2017. (H.T. 10/12/2018 (ECF No. 84) at 81, 94.) DuThinh advised Price that 1204 Wade Street was the target of the search warrant and that three occupants, including Brooks, might be inside the home. (Id. at 82.)

76.    DuThinh and "[n]o less than ten" law enforcement officers "approached the residence, called in, knocked and announced." (H.T. 10/12/2018 (ECF No. 84) at 94, 100.)

---

[11]    Price and DuThinh explained the various stages of the execution of a search warrant. (H.T. 10/12/2018 (ECF No. 84) at 84-85, 96-97.) At the tactical stage, law enforcement enters the house and identifies the occupants of the residence in "obvious areas." (Id. at 84, 96.) Law enforcement personnel call for the occupants of the residence and take them outside. (Id.) Then a "secondary search" is conducted, i.e., law enforcement searches for persons hiding in the residence. (Id. at 84-85.) Law enforcement then does a "pre-video and photography" of the residence. (Id. at 96-97.) Lastly, once it is determined there are no other persons in the residence, law enforcement will execute the official search warrant and begin, among other things, to collect evidence. (Id. at 85, 96-97.)

77.     Squires first came to the top of the stairs, and law enforcement called her down the stairs. (H.T. 10/12/2018 (ECF No. 84) at 94-95.) Brooks appeared at the top of the stairs and was called down by law enforcement. (Id.) Two children appeared and were also called downstairs by law enforcement. (Id.)

78.     Price was on the porch of 1204 Wade Street with Brooks during the tactical and secondary searches of 1204 Wade Street. (H.T. 10/12/2018 (ECF No. 84) at 83-85.) Other members of law enforcement were inside the residence at that time. (Id. at 83.) Brooks was handcuffed and seated when he was on the porch with Price. (Id. at 83-84, 91-92.)

79.     Squires' and Brooks' two children were also on the porch during the tactical and secondary searches of 1204 Wade Street. (Id. at 84.)

80.     At the time Brooks was with Price on the porch of 1204 Wade Street, Brooks had not been advised of his rights guaranteed by the Fifth Amendment to the United States as set forth in Miranda v. Arizona, 384 U.S. 436 (1966). (Id.)

81.     Price told Brooks that he was not the case agent, he did not know about the investigation of Brooks, and that he was concerned with law enforcement safety. (H.T. 10/12/2018 (ECF No. 84) at 85-86.) Price explained:

> I had to ask him, I said, look, is there anything in this house that could get anybody hurt to include, you know, fentanyl, carfentanil, weapons, anything like that.
> …
> When I pose the question, is there anything that could get anybody hurt, I just give some examples. I don't go through everything that could hurt somebody, but I don't specifically, you know, do you have this type, this type, this type. But those are the main ones over the last years maybe you got to ask them.
> …
> I say, are there any types of drugs in there, fentanyl, that type of stuff, weapons, firearms.

(Id. at 85, 92-93.)

82.     DuThinh was on the porch with Price and Brooks when Price asked Brooks about hazards in the home. (H.T. 10/12/2018 (ECF No. 84) at 97.) DuThinh explained:

> Special Agent Price asked Mr. Brooks if there's any dangerous, anything that could harm us or his family inside the home. He said there were two firearms, one pistol in the closet of his bedroom and then one rifle in the basement behind a curtain.

(Id. at 97-98.)

83. Price testified with respect to the timing of his question to Brooks:

> My interaction with him was when we brought him out on the porch. We had, the initial search had been done, then the secondary, bodies that hide. I had to ask him, I said, look, is there anything in this house that could get anybody hurt to include, you know, fentanyl, carfentanil, weapons, anything like that.

(Id. at 85.)

84.     DuThinh testified that Price questioned Brooks before the "full-on, thorough search of the residence." (Id. at 98.) He explained:

> It was probably possibly between the first search and the secondary search. But definitely before the full-on, thorough search of the residence.

(Id.)

85.     Price explained the reason he asked Brooks about hazards in the house:

> We have to be more careful with the fentanyl, carfentanil, stuff like that. I mean, I always ask that question, because as the on-scene commander, the safety and security of the people that I'm in charge of is one of my duties. It's one that I ask all the time, if I have the opportunity to ask.

(H.T. 10/12/2018 (ECF No. 84) at 87.) DuThinh explained that Price asked about hazards in the home "for our safety as we search and for when we bring in Ms. Squires and the two children into an area." (Id. at 98.)

86.     Price explained that he questioned Brooks about hazards in the home because he knew Squires and the children were going to be given permission to enter the home during the search. (Id. at 87.) Price explained:

Eventually, we were going to allow, once we cleared the living room, we were going…[to] allow them to go back to the living room, the…[girlfriend], and the children, once we had a place for them to go to.

…

Normally, we don't let them free run of the house. They were not under arrest or detained. If memory serves me,…they had school that day, which I think they were still in their pajamas. We gave them an opportunity to go to their room. We…would escort them to get clothing, stuff like that, go to the bathroom. But they weren't free to go throughout the house by themselves.

(Id. at 85-87.)

87.     Price believed law enforcement was at 1204 Wade street for firearms. (Id. at 93.)

88.     Brooks "offered up knowledge of two guns in the house[,]" but did not claim ownership in the firearms. (H.T. 10/12/2018 (ECF No. 84) at 86.)

89.     Squires and the two children were permitted to reenter the residence during the execution of the search warrant. (Id. at 86-87, 96.) They could move about the house with law enforcement watching them. (Id. at 86-87, 98-99.)

90.     Brooks was escorted to the backyard of the residence during the search for evidence in the residence. (Id. at 99.) According to DuThinh, he read Brooks his Miranda rights at that time, and Brooks verbally acknowledged his rights but refused to sign a waiver. (Id. at 99, 104-05; Def. Ex. D.)

91.     As this court explained in its Findings of Fact and Conclusions of Law dated September 19, 2018, law enforcement seized from 1204 Wade Street three firearms, various caliber ammunition, a quantity of marijuana, two digital scales, and gun boxes. (H.T. 7/10/2018 (ECF No. 67) at 61-62.) Law enforcement also seized "large duffel bags containing dark colored clothes, tools [they]…believe to be involved in home invasions, for instance, like saws, picks, hammers." (Id. at 68.) "[A] bandana, propane tanks, hammer, screwdriver, and bolt cutters in additional to ammunition" were found in one backpack inside the home. (Id. at 69.)

III.    **CONCLUSIONS OF LAW**

A.    **The warrantless search of the crashed gray sedan**

**Standing**

1.    Brooks argues the evidence recovered from Lawrence's warrantless search of the crashed gray sedan should be suppressed and any reference to it excised from DuThinh's affidavit of probable cause in support of his application to search 1204 Wade Street because the evidence was obtained in violation of Brooks' rights guaranteed by the Fourth Amendment. (ECF No. 83 ¶ 52.)

2.    The court will first[12] consider whether Brooks has standing to challenge the search of the crashed gray sedan.

3.    The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause…." U.S. CONST. amend. IV.

4.    "The touchstone of the Fourth Amendment is reasonableness." Florida v. Jimeno, 500 U.S. 248, 250 (1991); United States v. Price, 558 F.3d 270, 277 (3d Cir. 2009) ("[T]he Fourth Amendment does not prohibit all searches—only those that are unreasonable." (citing Illinois v. Rodriguez, 497 U.S. 177, 183 (1990))).

---

[12]    The court acknowledges, however, that "standing to challenge a search is not a threshold issue that must be decided before reaching the question of whether a search was or was not constitutional." United States v. Kennedy, 638 F.3d 159, 163 (3d Cir. 2011), abrogated on other grounds by Byrd v. United States, 138 S. Ct. 1518 (2018).

5.      Evidence obtained from an unreasonable search must be suppressed as "'fruit of the poisonous tree.'" United States v. Brown, 448 F.3d 239, 244 (3d Cir. 2006) (quoting Wong Sun v. United States, 371 U.S. 471, 487–88 (1963)).

6.      "As a general rule, the burden of proof is on the defendant who seeks to suppress evidence." United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995). Once the defendant establishes a basis for his motion, the "burden shifts to the government to show that the search or seizure was reasonable." Id. The government must prove by a preponderance of the evidence that "each individual act constituting a search or seizure under the Fourth Amendment was reasonable." United States v. Ritter, 416 F.3d 256, 261 (3d Cir. 2005).

7.      Here, the government argues that Brooks—who rented the gray sedan from Enterprise Rental Car[13]— does not have standing to challenge the search of the crashed gray sedan because he *abandoned* the vehicle by fleeing from the vehicle once it was crashed into the fence. (ECF No. 82 ¶¶ 13-31.)

8.      The Third Circuit Court of Appeals has explained:

A warrantless search of property is permissible under the Fourth Amendment where the owner has abandoned his reasonable expectation of privacy in that property. United States v. Fulani, 368 F.3d 351, 354 (3d Cir.2004) (citing Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960)). This determination must be made from an objective viewpoint, and proof of intent to abandon must be established by clear and unequivocal evidence. Id. We look at the totality of the facts and circumstances in making such a determination. See id.; McKenney v. Harrison, 635 F.3d 354, 359 (8th Cir.2011). In most cases, disclaiming ownership or physically relinquishing the property is sufficient to establish abandonment. United States v. Liu, 180 F.3d 957, 960 (8th Cir.1999).

---

[13]     "[A] person who lawfully borrows a car from another and exercises substantial control over it may well have a legitimate expectation of privacy." United States v. Kennedy, 638 F.3d 159, 165 (3d Cir. 2011) (citing United States v. Baker, 221 F.3 438, 442-43 (2000)); United States v. Showell, Crim. Action No. 12-58, 2013 WL 6328089, at *2 n.2 (M.D. Pa. Dec. 5, 2013) (recognizing that the defendant had standing to challenge the search of an automobile because he was an authorized user of the vehicle).

United States v. Harrison, 689 F.3d 301, 306 (3d Cir. 2012).

9.      In <u>United States v. Moody</u>, 485 F.2d 531 (3d Cir. 1973), federal agents, who were all Caucasian, received tips that the vehicle of the defendant, who was African-American, was being used to make deliveries of "nontaxpaid whiskey." <u>Id.</u> at 533. The federal agents conducted surveillance on the defendant, his home, and his vehicle. <u>Id.</u> at 532-33. On one occasion while the federal agents were conducting surveillance, the defendant saw two of the federal agents approach his car. <u>Id.</u> at 532. On the same day, the federal agents, who were not wearing any kind of identification, began to follow the defendant in unmarked police vehicles. <u>Id.</u>

10.     The court described the next series of events as follows:

> As the defendant stopped at a traffic light, one of the agents pulled alongside his car and stared at him for several seconds. The defendant, seeing the agent, sped away and a chase ensued. After several turns, the defendant stopped his car in the traffic lane and successfully escaped on foot. Thereafter, one of the agents moved the vacant car to the side of the road, and using the keys left in the ignition, opened the car's trunk and discovered the illegal whiskey.

<u>Moody</u>, 485 F.2d at 533.

11.     The defendant challenged the search of his vehicle. <u>Id.</u> The government argued that the defendant abandoned his vehicle, and, therefore, he lacked standing to challenge its search. <u>Id.</u>

12.     The court of appeals affirmed the district court's decision that the government did not satisfy its burden to show by clear and unequivocal evidence that the defendant intended to abandon his vehicle. <u>Id.</u> The court explained:

> The only facts from which one can infer intent indicate that the defendant, a black man, was aware that his vehicle was being followed by several unidentified white men and that earlier two men (again white) had approached his car. On these facts one could reasonably reach two conclusions: that he knew he was being followed by law enforcement agents and was seeking both to avoid arrest and abandon the incriminating evidence in the trunk of his car; or, that he believed he was being pursued by private citizens who intended to do him harm, and that he only left his car temporarily in order to escape this danger. Since only the former state of mind

would constitute an abandonment, the evidence on the issue is ambiguous and cannot support a finding that the car and its contents were abandoned.

Moody, 485 F.2d at 533.

13.　　Similarly, in this case, the government failed to adduce clear and unequivocal evidence that Brooks intended to abandon the gray sedan.

14.　　This court in its findings of fact and conclusions of law dated September 19, 2018, found that the government proved by a preponderance of the evidence that Brooks was the passenger in the gray sedan that led Lawrence on a police chase and crashed into a fence.

15.　　The government did not present any evidence at the hearing with respect to the motion to suppress that anyone witnessed the circumstances in which Brooks exited the vehicle once it crashed into the fence. Lawrence's testimony that "no way that they were walking…[t]hey had to have got out and run" does not rise to the level of clear and convincing evidence of Brooks' intent to abandon the vehicle. (H.T. 10/12/2018 (ECF No. 84) at 26.)

16.　　There was circumstantial evidence adduced to show that Brooks may have known that the gray sedan was being chased by a police officer, i.e., Lawrence was in a marked vehicle, he had his lights and sirens on, the gray sedan turned its headlights off and was being driven erratically, and Lawrence attempted to conduct a traffic stop on the vehicle.

17.　　Under the circumstances presented in this case, however, the evidence does not ***clearly and unequivocally*** show that Brooks intended to abandon the crashed gray sedan.

18.　　Having concluded that Brooks has standing to challenge the search of the crashed gray sedan, the court will consider whether the search was reasonable under the Fourth Amendment.

**Inevitable Discovery**

19.　　In determining whether reasonableness exists in the context of a *warrantless* search,

the Court of Appeals for the Third Circuit in <u>United States v. Mundy</u>, 621 F.3d 283, 287 (3d Cir. 2010), explained:

> Warrantless searches and seizures are presumptively unreasonable and are therefore prohibited under the Fourth Amendment, unless an exception applies. <u>California v. Acevedo</u>, 500 U.S. 565, 580, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991) ("It remains a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions." (quotation marks omitted)); <u>see also</u> <u>Katz v. United States,</u> 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). "Such exceptions are based on the Supreme Court's determination that a particular search is reasonable, that is, that the government's legitimate interests in the search outweigh the individual's legitimate expectation of privacy in the object of the search." <u>United States v. Salmon</u>, 944 F.2d 1106, 1120 (3d Cir.1991).

<u>Id.</u>

20. An exception to the warrant requirement for a search is the inevitable discovery doctrine. <u>Nix v. Williams</u>, 467 U.S. 431, 449 (1984).

21. The parties did not raise or address the inevitable discovery exception to the warrant requirement. Upon review of their proposed findings of fact and conclusions of law, however, it became apparent to the court that inevitable discovery may apply to Lawrence's warrantless search of the crashed gray sedan.

22. The Third Circuit Court of Appeals in <u>United States v. Sinkler</u>, 267 F. App'x 171 (3d Cir. 2008), has explained that a district court may deny a motion to suppress "on a ground it raised sua sponte as long as it does not deprive…[the defendant] of the 'opportunity to adduce evidence in his favor.'" <u>Id.</u> at 174 (quoting <u>United States v. Salazar</u>, 805 F.2d 1394, 1400 (9th Cir. 1986)).

23. The court, therefore, ordered the parties each to file a supplemental brief addressing whether the inevitable discovery exception applied to Lawrence's inventory search of the crashed gray sedan. The parties were permitted to cite to evidence of record and request a reopening of the

record to introduce additional evidence in support of their submissions.

24.     Brooks in his supplemental brief did not request to reopen the record and objected to reopening the record for the government to present evidence. (ECF No. 89 ¶ 4.) Brooks argued that: (a) the government waived any argument about the inevitable discovery doctrine by failing to raise it, and (b) in any event, the government did not satisfy its burden to show the inevitable discovery doctrine applies in this case. (Id. ¶¶ 2-3, 5-7.)

25.     The government, which does not concede that Lawrence's inventory search was improper, argues that the evidence seized from the crashed gray sedan should not be suppressed because it would have been inevitably discovered by a proper inventory search. The government also requests the court to reopen the record to present evidence about the Penn Hills Police Department's inventory policy. (ECF No. 90.)

26.     The court having provided the parties an opportunity to be heard and for Brooks to present evidence with respect to the inevitable discovery exception will consider its application to the facts of this case.

27.     First, the court rejects Brooks' arguments about waiver. As discussed above, a district court may decide a suppression motion on an issue raised sua sponte by the court so long as the defendant has an opportunity to present evidence on the issue. See Sinkler, 267 F. App'x at 174.

28.     In Sinkler, the doctrine of inevitable discovery was first raised on appeal by the Third Circuit Court of Appeals. The court of appeals remanded the case to the district court "for further factual findings" about, among other things, whether evidence in issue would have been discovered "as part of a properly conducted inventory search pursuant to established police department procedures." Id. at 173.

29. On remand, the district court decided the suppression motion based upon the inevitable discovery doctrine. The defendant on appeal of that decision by the district court argued that "when the District Court raised the doctrine sua sponte in its opinion, it violated his constitutional Due Process rights by denying him the opportunity to respond." Id.

30. The court of appeals rejected the defendant's argument. It explained:

> While the government may not have expressly used the words 'inevitable discovery' during the remand proceedings, it was not a legal theory snatched out of thin air by the District Court. This Court's prior opinion clearly made inevitable discovery an issue to be considered by the trial court on remand.

Id. at 175. The court of appeals affirmed the decision of the district court, which denied the defendant's suppression motion based upon the doctrine of inevitable discovery. Id. at 175-76.

31. In other words, the Third Circuit Court of Appeals in Sinkler considered the doctrine of inevitable discovery and ruled in the government's favor on the issue even though the court of appeals—and not the government—first raised the issue. The court of appeals determined the defendant had an opportunity to present evidence on the issue, and, therefore, his due process rights were not violated by the courts consideration of the issue.

32. Similarly, here, the court—having given defendant an opportunity to present evidence and argument on the doctrine of inevitable discovery—may consider the issue without offending defendant's due process rights. The court need not reopen the record for the government to present additional evidence because the record is sufficient for the court to rule upon the issue of inevitable discovery.

33. Where "the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means…the deterrence rationale has so little basis that the evidence should be received." Nix, 467 at 444.

34. In United States v. Bansal, 663 F.3d 634 (3d Cir. 2011), federal agents were

conducting surveillance of the defendant on the day they intended to execute a search warrant at his apartment. The agents learned that the defendant was going to flee the county, and, therefore, stopped his vehicle and arrested him. Id. at 664. The federal agents knew that the defendant's "vehicle was under a forfeiture order, and this subject to impoundment" pursuant to an indictment that was issued against him. Id. The federal agents, therefore, conducted an inventory search of the defendant's vehicle and recovered various pieces of evidence that were later introduced into evidence at the defendant's trial. Id. The defendant filed a motion to suppress the evidence, which the district court denied. Id.

35.     The Third Circuit Court of Appeals held that the inventory search was proper "because the forfeiture order authorized agents to take custody of the car[,]" and, "[a]fter taking custody of property, officers may make a warrantless inventory search so long as the search is conducted pursuant to standardized procedures." Bansal, 663 F.3d at 664.

36.     The court of appeals also noted that: "[E]ven if the search did violate [the relevant]…procedures in some way, any evidence obtained from…[the defendant's] car at the scene eventually would have been discovered pursuant to impoundment under the forfeiture order. This places this case squarely within the 'inevitable discovery rule.'" Id. (citing Nix, 467 U.S. at 443-44).

37.     In United States v. McMillan, 227 F.Supp.3d 432 (W.D. Pa. 2017), police officers conducted a lawful arrest of the defendant for possessing a firearm in his vehicle without a license. Id. at 441. The officers began to search the defendant's vehicle after they arrested him and found heroin in the vehicle. Id. The defendant filed a motion to suppress the evidence. Id. The court held that the search was not a valid search incident to arrest. Id. The court agreed with the government, however, that the heroin should not be suppressed because of the inevitable discovery doctrine.

McMillan, 227 F.Supp.3d at 441.

38. The court explained:

In this case, Defendant's car (a rental car) was to be towed, and was towed, from the scene, ECF No. 32–3, and the "Towing and Tow Pound Procedures: Inventories" of the Pittsburgh Bureau of Police indicate that "towing officer[s]" have a duty to inventory cars that are being towed. U.S. Ex. 2 at 1. Additionally, at the Hearing, one of the officers (Officer Obsenica) explicitly testified that an inventory search was conducted in this case pursuant to the relevant policy, and there is no evidence in the record to contradict that testimony. ECF No. 30 at 27:5–27:9, 88:18–21. The Court concludes that the United States has established by a preponderance of the evidence that the heroin would inevitably have been discovered via the inventory search conducted pursuant to, and consistent with, the "Towing and Tow Pound Procedures: Inventories." On this ground, the Court holds that the heroin should not be suppressed.

Id. at 443 (footnotes omitted).

39. Here, the government proved that the Penn Hills Police Department had a policy with respect to the "Inventory of Impounded Vehicles" due to "either a crime or an accident." (Gov't Ex. 2.) The gray sedan was in an accident, its occupants were not at the scene of the crash when it was discovered by law enforcement, and law enforcement could not locate the occupants. The vehicle, therefore, was subject to be impounded pursuant to the inventory policy.

40. Brooks argues that the government failed to satisfy its burden to show the inventory search exception to the warrant requirement applies to Lawrence's search of the crashed gray sedan because "the warrantless search conducted did not comply with the stated policy." (ECF No. 83 ¶ 46.) Brooks explained:

Specifically, Officer Lawrence clearly suspected that the Nissan had been involved in a crime – the Leechburg incident for which he had received a dispatch call while on patrol that night. Pursuant to the Penn Hills Police Department inventory policy, when an "impounded vehicle is part of a crime and/or is suspected to contain evidence, and a search of it becomes necessary, the vehicle will be secured at the Penn Hills Police Department impound facility until the proper search procedure can be carried out." Gov't Exhibit 2 at ¶ A.3. Here, Officer Lawrence deviated from the stated policy because he conducted the search right on scene, rather than first securing the car at the Penn Hills Police Department impound facility.

(Id.)

41.     Brooks also argues that Lawrence conducted the search of the crashed gray sedan because of his "suspicion" that the crashed gray sedan was the car used by the suspects to flee the incident on Leechburg Road. (Id. ¶ 47.) According to Brooks:

> The inventory was not conducted for purposes of protecting the property in the car against claims of loss, but was rather an extensive and complete search for evidence of criminality. Indeed, Officer Lawrence began immediately seizing items that he thought were evidence of the Leechburg incident while conducting the "inventory search." Officer Lawrence's motivation in conducting the search defeats application of the inventory search exception to the warrant requirement.

Id.

42.     Brooks' arguments are unavailing because a lawful inventory search of the crashed gray sedan at the Penn Hills Police Department impound facility would have resulted in Lawrence inevitably discovering the same evidence that he obtained from his search at the scene of the crash.

43.     The evidence shows that but-for the location of the inventory search,[14] Lawrence complied with the inventory policy.

44.     He accepted "custody and control" of the crashed gray sedan as soon as was "practical under the circumstances," i.e., the police officer from Verona who found the crashed gray sedan stayed with the vehicle until Lawrence conducted the inventory search, which occurred within forty minutes of first receiving the telephone call about the incident on Leechburg Road. (Gov't Ex. 2; (H.T. 10/12/2018 (ECF No. 84) at 36.)

---

[14]     Lawrence did not have the crashed gray sedan towed to the impound lot prior to conducting the inventory search to comply with section A(3) of the inventory policy. If Lawrence had the vehicle towed to the impound facility and conducted a search there pursuant to the inventory policy, he would have recovered the same evidence that he recovered during his search on the scene of the crash.

45.     Lawrence completed "an inventory of personal items of value" in the crashed gray sedan. (Gov't Ex. 2 at A(1); Gov't Ex. 3.)

46.     Lawrence testified that opening the black backpack and red duffel bag[15] and identifying each item in the bags was necessary to ascertain the contents of the bags to inventory them. (Gov't Ex. 3 at A(2); H.T. 10/12/2018 (ECF No. 84) at 13-14.)[16]

47.     Based upon the foregoing, even if Lawrence first towed the crashed gray sedan to the impound facility, he would have inevitably discovered the same evidence found in the vehicle at the scene of the crash.

48.     The court gave the parties an opportunity to reopen the record and present evidence with respect to these issues. Brooks, however, did not request the court to reopen the record to present evidence about why a search conducted at the impound facility would have resulted in Lawrence recovering different or less evidence from the crashed gray sedan.[17]

49.     Based upon the foregoing, if Lawrence had the crashed gray sedan towed to the Penn Hills Police Department impound facility for a "lawful" inventory search, he would have inevitably discovered the same evidence found in the vehicle at the scene of the crash. The evidence recovered by Lawrence from the crashed gray sedan will not, therefore be suppressed.

50.     The motion to suppress with respect to this issue will be denied.

---

[15]     Whether the red duffel bag was opened or closed when Lawrence found it is not material because he testified that he could not ascertain each item in the red duffel bag without opening the bag and examining each item contained in the bag. (H.T. 10/12/2018 (ECF No. 84) at 14.)

[16]     If Lawrence complied with Sections A(4) and A(5) of the inventory policy he would have inevitably discovered the same evidence. (See Gov't Ex. 2 at A(4) and (5).)

[17]     The court recognizes the burden is on the government to show the evidence would have been inevitably discovered. Having found the government satisfied that burden, the court notes that Brooks did not present any testimony or evidence to the contrary.

## B.    DuThinh's surveillance of 1204 Wade Street and the Chrysler

51.    Brooks argues that DuThinh—without a warrant—invaded the curtilage of 1204 Wade Street during his investigation of the Chrysler parked in the driveway of the home, and, therefore, any evidence seized as a result of that search should be suppressed and excised from DuThinh's affidavit of probable cause. (ECF No. 83 ¶ ¶ 53-68.) Brooks cites Collins v. Virginia, 138 S. Ct. 1663, 1670 (2018), in support of his argument.

52.    In Collins, a driver of an orange and black motorcycle committed a traffic infraction and eluded the police on two separate occasions. Id. at 1668. The police officers learned the motorcycle "likely was stolen" and was possessed by the petitioner, Collins. Id. One of the police officers, Officer Rhodes, learned the address of a residence at which the motorcycle was parked, drove to the home, and parked on the street. Id. Rhodes saw "what appeared to be a motorcycle with an extended frame covered with a white tarp" in the driveway of the residence. Id.

53.    The Court in Collins described the relevant portion of the residence and driveway as follows:

> [T]he driveway runs alongside the front lawn and up a few yards past the front perimeter of the house. The top portion of the driveway that sits behind the front perimeter of the house is enclosed on two sides by a brick wall about the height of a car and on a third side by the house. A side door provides direct access between this partially enclosed section of the driveway and the house. A visitor endeavoring to reach the front door of the house would have to walk partway up the driveway, but would turn off before entering the enclosure and instead proceed up a set of steps leading to the front porch. When Officer Rhodes searched the motorcycle, it was parked inside this partially enclosed top portion of the driveway that abuts the house.

Collins, 138 S.Ct. at 1670-71.

54.    Rhodes, "who did not have a warrant," exited his vehicle and walked onto the residential property and "up to the top of the driveway to where the motorcycle was parked." Id.

at 1668. Rhodes lifted the tarp to reveal a motorcycle that matched the description of the motorcycle that committed the traffic infractions. Id. Rhodes ran a search of the license plate of the motorcycle, which revealed the motorcycle was marked as stolen. Id.

55.    Rhodes arrested Collins upon his arrival at the residence. Id. at 1668-69. Collins was indicted in the state of Virginia for receiving stolen property. Collins, 138 S.Ct at 1669. Collins challenged Rhodes' warrantless search of the motorcycle arguing that "Rhodes had trespassed on the curtilage of the house to conduct an investigation in violation of the Fourth Amendment." Id. at 1669. The trial court denied the motion, and Collins was convicted. Id. The trial court's decision was affirmed on Collins' appeals in the state court system. Id. He appealed to the Supreme Court of the United States, which granted certiorari to decide "whether the automobile exception to the Fourth Amendment permits a police officer, uninvited and without a warrant, to enter the curtilage of a home in order to search a vehicle parked therein." Id.

56. The Court explained:

> Like the automobile exception, the Fourth Amendment's protection of curtilage has long been black letter law. "[W]hen it comes to the Fourth Amendment, the home is first among equals." Florida v. Jardines, 569 U.S. 1, 6, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013). "At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' " Ibid. (quoting Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)). To give full practical effect to that right, the Court considers curtilage—"the area 'immediately surrounding and associated with the home' "—to be " 'part of the home itself for Fourth Amendment purposes.' " Jardines, 569 U.S., at 6, 133 S.Ct. 1409 (quoting Oliver v. United States, 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984)). "The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened." California v. Ciraolo, 476 U.S. 207, 212–213, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986).
>
> When a law enforcement officer physically intrudes on the curtilage to gather evidence, a search within the meaning of the Fourth Amendment has occurred. Jardines, 569 U.S., at 11, 133 S.Ct. 1409. Such conduct thus is presumptively unreasonable absent a warrant.

<u>Collins</u>, 138 S. Ct. at 1670.

57.     The Court recognized that "[t]he " 'conception defining the curtilage' is familiar enough that it is 'easily understood from our daily experience.' " <u>Id.</u> (quoting <u>Florida v. Jardines</u>, 569 U.S. 1, 7 (2013)). "Just like the front porch, side garden, or area 'outside the front window,"…the driveway enclosure where Officer Rhodes searched the motorcycle constitutes 'an area adjacent to the home and 'to which the activity of home life extends,' " and so is properly considered curtilage…" <u>Id.</u> (quoting <u>Jardines</u>, 569 U.S. at 6-7).

58.     The Court considered whether the automobile exception justified Officer Rhodes' warrantless invasion of the curtilage of the residence at which the motorcycle was parked. <u>Collins</u>, 138 S.Ct. at 1671. The Court held the automobile exception "extends no further than he automobile itself[,]" i.e., the automobile exception does not give "an officer the right to enter a home or its curtilage to access a vehicle without a warrant." <u>Id.</u>

59.      Brooks argues that the "salient facts of <u>Collins</u> are strikingly similar to this case" because DuThinh entered a portion of the driveway that abutted the home and "was not accessible to visitors walking from the street to the driveway to the front entrance of the home."  (ECF No. 83 ¶ 67.) According to Brooks, the area invaded by DuThinh was, therefore, curtilage and entitled to Fourth Amendment protection. (<u>Id.</u>)

60.     Brooks' reliance on <u>Collins</u>, however, is misplaced. In <u>Collins</u>, Rhodes "walked onto the residential property and up to the top of the driveway" and lifted the tarp off the motorcycle to examine it. <u>Collins</u>, 138 S.Ct. at 1668. In other words, Rhodes invaded the driveway, which abutted the home. The Court concluded on those facts that the area in which Officer Rhodes stood while he examined the motorcycle was curtilage entitled to Fourth Amendment protection. <u>Id.</u> at 1671.

61.     The Supreme Court has explained:

That the area is within the curtilage does not itself bar all police observation. The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares. Nor does the mere fact that an individual has taken measures to restrict some views of his activities preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible. E.g., United States v. Knotts, 460 U.S. 276, 282, 103 S.Ct. 1081, 1085-1086, 75 L.Ed.2d 55 (1983). "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." Katz, supra, 389 U.S., at 351, 88 S.Ct., at 511.

California v. Ciraolo, 476 U.S. 207, 213 (1986).

62.     Here, even if the court concludes the driveway and the wall abutting the driveway are curtilage entitled to protection under the Fourth Amendment, the evidence presented by the government shows that DuThinh did not enter the driveway or the area on the property of 1204 Wade Street in and around the wall abutting the driveway; rather, DuThinh remained in the empty lot, which was grassy and unkempt,[18] while testing the keyless entry system on the Chrysler and viewing the license plate on the vehicle.[19]

---

[18]     The Supreme Court of the United States has explained the court should consider the following four factors to determine whether an area shall be regarded as curtilage:

the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

United States v. Dunn, 480 U.S. 294, 301 (1987). The driveway of 1204 Wade Street was positioned between the home and the empty lot, i.e., it was within a reasonable proximity to the home. The empty lot, however, was not within an enclosure surrounding the home, and there was no evidence presented about the nature of the uses to which the empty lot was put or that Brooks took any steps to protect the area from observation by people passing by. Government exhibit 4 showed the area was grassy and unkempt. (Gov't Ex. 4.) Based upon the foregoing, the empty lot on which DuThinh stood was not curtilage entitled to protection under the Fourth Amendment.

[19]     Brooks in his proposed findings of fact and conclusions of law does not argue that he had an expectation of privacy in the empty lot or that the empty lot constituted curtilage entitled to Fourth Amendment protection. See (ECF No. 83 ¶ 59.)

63. Brooks attempted to attack the credibility of DuThinh "given the positioning of the car in the driveway [in government exhibit 4] and the fact that he was able to read the license plate from where he was standing." (ECF No. 83 ¶ 59.) DuThinh, however, clearly and directly testified that he could see the Chrysler's license plate from his position in the empty lot and without invading any protected portion of 1204 Wade Street. DuThinh marked on a government's exhibit 4a the exact locations on which he stood during his observations of the Chrysler.

64. DuThinh testified that *after* he conducted surveillance on 1204 Wade Street, he obtained government exhibit 4 from Google Maps and did not know on which date Google Maps captured the image of 1204 Wade Street. DuThinh explained that while government exhibit 4 depicted the correct orientation of the Chrysler in the driveway, i.e., the direction in which the vehicle was facing, he could not confirm that government exhibit 4 showed the "precise location" of the vehicle; rather, the vehicle could have been parked either closer to the road or closer to the residence. (H.T. 10/12/2018 (ECF No. 84) at 61-62.) Under those circumstances, DuThinh's sworn testimony that he did not invade the curtilage is credible.

65. Based upon the foregoing, DuThinh did not violate Brooks' Fourth Amendment rights when he stood in the empty lot next to Brooks' home to test the keyless entry system[20] and

---

[20]    In Brooks' proposed findings of fact and conclusions of law, he does not specifically argue that even if DuThinh stood in the empty lot, his use of the keyless entry system was an unreasonable, warrantless search of the Chrysler. In any event, that argument would fail. "Several courts have found no intrusion upon constitutionally protected privacy in inserting a key into a lock." § 4:2 The concept of privacy in post—Katz— Fourth Amendment analysis, 1 Constitutional Rights of the Accused 3d § 4:2 (3d ed.).
       The Third Circuit Court of Appeals recently explained that its "sister Courts of Appeals who have addressed the issue under the reasonable expectation of privacy theory have concluded that inserting a key into a lock is either not a search at all, or else so minimal an invasion of privacy that a warrant is not needed." United States v. Wheeler, Action No. 16-3780, 2018 WL 3409991, at * (3d Cir. Jul. 12, 2018) (collecting cases).
       The use of a keyless entry system, which does not require the user to touch the vehicle is less intrusive than the use of an actual key in the lock. Thus, the use of the keyless entry system

view the license plate of the Chrysler.

66.     Brooks' motion to suppress the evidence obtained from DuThinh's surveillance of 1204 Wade Street will, therefore, be denied.[21]

### C.     DuThinh's affidavit of probable cause

67.     "A magistrate's 'determination of probable cause should be paid *great deference* by reviewing courts.'" United States v. Conley, 4 F.3d 1200, 1205 (3d Cir. 1993) (quoting Illinois v. Gates, 462 U.S. 213, 236 (1983) (emphasis in original)). The district court's review of the magistrate judge's determination of probable cause is *not* de novo. Id.

68.     A district court must be satisfied that the magistrate had a "'substantial basis'" upon which to conclude that there was "a fair probability" that evidence would be found in the place to be searched. Id. (quoting Gates, 462 U.S. at 236).  In other words, "[e]ven if a reviewing court would not have found probable cause in a particular case, it must nevertheless uphold a warrant so long as the issuing magistrate's determination was made consistent with the minimal substantial basis standard." Id.

69.     The applicable standard, however, "'does not mean that reviewing courts should simply rubber stamp a magistrate's conclusions.'" Id. (quoting United States v. Tehfe, 722 F.2d 1114, 1117 (3d Cir. 1983)).

70.     "Nevertheless, the role of the reviewing court is quite limited[,]" and "the resolution

---

was "so minimal an invasion of privacy" that a warrant was not needed. Id.

[21]     The court notes, however, that even if DuThinh stood on the curtilage of 1204 Wade Street to observe the license plate of the Chrysler, and, the evidence obtained from that surveillance, i.e., the license plate number, was excised from the affidavit of probable cause, the affidavit would still establish probable cause to search Brooks' residence. In other words, the license plate number of the vehicle was not material to the magistrate judge's determination of probable cause.

of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.'" Conley, 4 F.3d at 1205 (quoting United States v. Ventresca, 380 U.S. 102, 109 (1965)).

71.     "Probable cause exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Grubbs, 547 U.S. 90, 96 (2006) (quoting Gates, 462 U.S. at 238). Probable cause determinations require the magistrate judge to make a "practical, common-sense decision." Gates, 462 U.S. at 238. "The supporting affidavit must be read in its entirety and in a common sense and nontechnical manner." Conley, 4 F.3d at 1206 (citing Gates, 462 U.S. at 230–31).

72.     "[A]ll an investigator must do to avoid exclusion is comply with the well-known duty to spell out the complete factual basis for a finding of probable cause within the affidavit's four corners." Virgin Islands v. John, 654 F.3d 412, 420 (3d Cir. 2011).

73.     "[A] magistrate may infer probable cause to search…[a defendant's] home so long as the affidavit establishes a nexus between the…[defendant's] home and the crime under investigation." United States v. Stearn, 597 F.3d 540, 560 (3d Cir. 2010).

74.     Here, Brooks argues that "[t]he warrant in this case was invalid because it was not supported by probable cause to believe that the place to be searched would contain evidence of a crime." (ECF No. 83 ¶ 78.) Brooks explains that "[t]he search warrant failed to supply the necessary nexus to search the Wade Street home for evidence of the alleged federal firearms offenses…[because] police had obtained the evidence and instruments of the alleged offenses from the Nissan." (Id. at 23, ¶ 81.)

75.     The court disagrees. The magistrate judge had a substantial basis upon which to conclude there was a fair probability that Brooks—a convicted felon—had a firearm and

ammunition in his home in violation of federal gun laws, e.g., 18 U.S.C. §§ 922(g)(1) (possession of a firearm by a convicted felon), 922(j) (receiving or possessing a stolen firearm or ammunition), and 924(l) (theft of a firearm).

76. The affidavit of probable cause provided, among other things, that:

- Brooks was previously convicted of carrying a firearm without a license (Gov't Ex. 5 ¶ 5);

- two suspects wearing dark clothing and masks committed a home invasion robbery at the home of Tia Collins and Cordell Collins, during which they struck Tia Collins on the back of the head, stole her purse, and fired two shots at Cordell Collins before fleeing the scene in an "unknown vehicle" (id. ¶ 17);

- a "dark gray Nissan Altima" was being driven "erratically" and engaged a police officer responding to the home invasion robbery at the Collins' residence in a police chase, during which the vehicle "failed to stop, turned off its lights, eluded…[the police] and crashed" (id. ¶ 18);

- the two occupants of the dark gray Nissan Altima fled the crashed vehicle (id.);

- police officers recovered from the dark gray Nissan Altima handcuffs, large zip-ties, gloves, masks, paperwork with respect to Brooks' purchase of a firearm, a wallet baring Brooks' monogram ("JMB"), Brooks' driver's license, a key chain including a key to a Chrysler automobile, membership cards assigned to Brooks' girlfriend, a receipt identifying Brooks as the purchaser of one of the firearms found in the vehicle, and a cellular telephone with a telephone number assigned to Brooks (id. ¶¶ 19, 22, 23, 24, 25);

- police officers recovered from the dark gray Nissan Altima five firearms, including Tia Collins' stolen firearm and one firearm registered to Brooks (Gov't Ex. 5 ¶¶ 20, 21, 22);

- DuThinh "[o]n two previous occasions" observed a Chrysler sedan parked in the driveway of 1204 Wade Street, i.e., the address provided for on Brooks' driver's license (id. ¶¶ 19, 26);

- a Beaver County Sheriff Deputy reported to DuThinh that he observed a male in the residence at 1204 Wade Street that "bore a strong resemblance" to Brooks as he appeared in a photograph showed to him by DuThinh (id. ¶ 28); and

- DuThinh successfully used the Chrysler keyless entry system found in the dark gray Nissan Altima to unlock the doors of the Chrysler parked in the driveway of 1204 Wade Street (id. ¶ 26.)

77.     Based upon the foregoing, the magistrate judge had a substantial basis upon which to conclude that there was a fair probability that Brooks, who was previously convicted of carrying a firearm without a license, was one of the two actors who committed the home invasion robbery at the Collins' residence, possessed a firearm during the commission of that crime, fled in the dark gray Nissan Altima, which contained five firearms, and lived at 1204 Wade Street.

78.     The nexus between Brooks' alleged violations of 18 U.S.C. §§ 922 and 924 and his residence is based upon DuThinh's training and experience with respect to firearm violations and home invasions.

79. The affidavit of probable cause, in pertinent part, provides DuThinh:

- "has experience with and is responsible for investigating violations of federal firearms laws" (Gov't Ex. 5 ¶ 2);

- is "familiar with the methods and techniques associated with the possession…of firearms" (id.);

- "[t]hrough his training and experience…is aware that often, home invaders possess firearms, ammunition, and other dangerous weapons in their residences…to protect their profits from those who might attempt to forcibly take them" (id. ¶ 9);[22]

- is aware from his training and experience that "[t]ypically home invaders maintain possession of firearms for extended periods of time…[and] that home invaders maintain possession of their equipment and, 'tools of the trade', such as masks, restraints (to include hand-cuffs, zip ties, rope) and gloves" (id. ¶ 9);

- is aware from his training and experience that "those that are not lawfully able to purchase firearms…will sometimes use individuals referred to as 'straw purchasers' to obtain firearms on their behalf" (id. ¶ 11); and

- is aware from his training and experience that home invaders "often…retain records and other information that provide evidence of the fact that the

---

[22]     See United States v. Jones, 994 F.3d 1051, 1055-56 (3d Cir. 1993) (recognizing that "firearms…are…evidence likely to be kept in a suspect's residence") (citing United States v. Anderson, 851 F.2d 727, 729 (4th Cir. 1988)).

firearm(s) in question was purchased for them" (Gov't Ex. 5 ¶ 12.)

80.     Brooks argues that the foregoing statements by DuThinh constitute "unsupported beliefs" and do not provide the nexus between Brooks' home and the crimes under investigation because DuThinh's training and experience "was not in robberies or home invasions." (ECF No. 83 ¶ 88.) As explained above, however, DuThinh's affidavit provides that he received training and has experience about firearm violations and home invasions. (Id. ¶¶ 2, 9, 11, 12.)

81.     Based upon the foregoing, the magistrate judge had a substantial basis upon which to find that there was a fair probability that Brooks carried a firearm to commit a home invasion robbery at the Collins' residence and persons who commit home invasion robberies often store in their homes firearms for protection, tools for committing home invasions, and records about firearms purchased for them. The affidavit of probable cause, therefore, established a nexus between the firearm offenses under investigation and Brooks' residence.[23]

82.     Brooks argues, however, that the affidavit did not establish probable cause to show that evidence of the home invasion would be found in his home because the "instruments" used to commit the home invasion were found in the crashed gray sedan and the affidavit did not provide probable cause to show that additional evidence existed in Brooks' residence. (ECF No. 83 ¶ 81.)

---

[23]     The government argues that items other than Tia Collins' pistol were stolen during the home invasion robbery and were unrecovered, and the recovery of those "items would be of probative value in the prosecution of Brooks for the July 23rd robbery." (ECF No. 82 ¶ 85.) As Brooks argues, however, the cellular telephones were not addressed in the affidavit of probable cause, and, therefore, could not serve as a basis for the search warrant.

    With respect to Tia Collins' purse, the magistrate judge did not have a substantial basis on which to conclude that the purse would still be in Brooks' home almost one month after he committed the home invasion robbery. United States v. Steeves, 525 F.2d 33, 38 (8th Cir. 1975) ("Obviously, a highly incriminating or consumable item of personal property is less likely to remain in one place as long as an item of property which is not consumable or which is innocuous in itself or not particularly incriminating.").

83.     Brooks' argument misses the mark. While he is correct that a nexus must be established between his residence and the crime under investigation, his argument is based upon DuThinh's failure to establish a nexus between Brooks' residence and a specific home invasion robbery. DuThinh, however, provided in the affidavit of probable cause that home invaders possess firearms in their residences to protect their profits and it is listed in Attachment B to the search warrant that the crimes under investigation included violations of federal firearm laws, i.e., 18 U.S.C. §§ 922(g), 922(j), and 924(l). (Gov't Ex. 5, Attachment B.)

84.     DuThinh's application for a search warrant was made to obtain evidence that Brooks, for whom there was probable cause to believe was a home invader and convicted felon, possessed a firearm, stole a firearm, or possessed or received a stolen firearm. DuThinh also requested permission to search for evidence that Brooks committed home invasions, i.e., property belonging to Tia Collins and Cordell Collins and "physical evidence commonly used in home-invasion robberies." (Id.)

85.     DuThinh's investigation of Brooks and his wrongdoing was not limited to the evidence retrieved from the crashed gray sedan.

86.     In United States v. Rose, Crim. Action No. 05-101, 2005 WL 1279128, (E.D. Pa. May 25, 2005), the defendants, who were husband and wife, were charged with five counts of willful failure to file federal income tax returns under 26 U.S.C. § 7203. Id. at *1. They filed a motion to suppress evidence arguing the search warrant used to search their home was not based upon probable cause. Id. The court paraphrased the defendants' argument as follows:

> [T]he government knew a lot about the Defendants, in that the Defendant purportedly had admitted their disagreement with the tax laws, that they were not paying their taxes and therefore…there was no need for the government to seize additional evidence from their home.

Id. at *1. The court rejected the defendants' argument, explaining that the affidavit of probable cause established a fair probability that evidence of the crime charged would be found in the defendants' home and

> the government was entitled to, in this case as in any criminal investigation, to secure a search warrant based on probable cause to collect evidence which may be relevant at the trial. The government does not necessarily know all defenses or positions the defense will offer at trial and the government is entitled to secure evidence in the defendants [sic] possession, through the means of a search warrant with probable cause to gather evidence. Agent Pearlman testified that the search recovered a number of items of which the government did not previously have possession. The Court rejects Defendants' suggestion that the search was for an illegal purpose as unfounded.

Id.

87.     Similarly, in this case, the government's investigation of Brooks is not limited by the quantity of evidence found in the crashed gray sedan. The affidavit contained probable cause that Brooks was a home invader and possessed a firearm in the past, i.e., he was convicted of carrying a firearm without a license, and on the night of the home invasion robbery there were five firearms in the crashed gray sedan rented by Brooks. Based upon DuThinh's training and experience, home invaders often possess firearms in their residences to protect their profits. Thus, the magistrate judge had a substantial basis upon which to conclude that there was a fair probability that Brooks possessed an additional firearm and ammunition in his home for protection one month after he committed the home invasion robbery at the Collins' residence.[24]

88.     Brooks' motion to suppress will be denied with respect to this issue.

---

[24]     The government argues that in any event the good faith exception would apply to DuThinh's reliance on the search warrant. (ECF No. 82 ¶¶ 87-89.) Brooks argues that the good faith exception does not apply because the affidavit of probable cause so lacked indicia of probable cause that it was unreasonable for DuThinh to rely upon the search warrant to search 1204 Wade Street. (ECF No. 83 ¶¶ 90-93.) The court need not address this argument because it concludes the magistrate judge had a substantial basis upon which to issue the search warrant.

**D.** **The omission of the Collins' criminal histories from the affidavit of probable cause**

89.     Under <u>Franks v. Delaware</u>, 438 U.S. 154, 155–56 (1978), when a warrant is obtained based upon a false statement made in a supporting affidavit, the fruits of the search warrant must be excluded if the remaining material, following the excision of the falsity, is independently insufficient to support a finding of probable cause.

90.     If the falsity is based upon an omission rather than a misstatement of facts, the court must remove the falsehood by supplying the omitted information to the original affidavit, and subsequently determining if the affidavit with the added information contains sufficient probable cause. <u>Sherwood v. Mulvihill</u>, 113 F.3d 396, 401 (3d Cir.1997).

91.     In order to obtain a <u>Franks</u> hearing, the defendant must first make a "substantial preliminary showing" that (a) the affidavit contained a false statement, which was made knowingly or with reckless disregard for the truth, and (b) the false statement is material to the finding of probable cause. <u>United States v. Yusuf</u>, 461 F.3d 374, 383 (3d Cir.2006).

92.     If that showing is made, and a hearing is granted, defendant must prove by a preponderance of the evidence that: (a) the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (b) such statements or omissions were material, or necessary, to the probable cause determination. <u>Id.</u>

93.     To determine whether deficiencies in the affidavit are "material," the court must follow the following procedure:

> When faced with an affirmative misrepresentation, the court is required to excise the false statement from the affidavit. In contrast, when faced with an omission, the court must remove the "falsehood created by an omission by supplying the omitted information to the original affidavit."

Id. at 384 (quoting Sherwood, 113 F.3d at 400). If probable cause still exists after the affidavit has been "corrected," then the deficiencies are not material. Id.

94.     To make a substantial preliminary showing, defendant must present more than conclusory statements or arguments. Yusuf, 461 F.3d at 383 n. 8 ("In order to make this preliminary showing, the defendant cannot rest on mere conclusory allegations or a 'mere desire to cross-examine,' but rather must present an offer of proof contradicting the affidavit, including materials such as sworn affidavits or otherwise reliable statements from witnesses."); United States v. Heilman, 377 F. App'x 157, 177 (3d Cir. 2010).

95.     In Heilman, the Court of Appeals for the Third Circuit explained:

> The challenger must specifically identify allegedly false statements or omissions in the affidavit and provide a statement of reasons supporting the argument. Franks, 438 U.S. at 171, 98 S.Ct. 2674. The challenger must also provide an offer of proof or give a satisfactory explanation for the absence of proof. Id. Sworn affidavits or reliable statements from witnesses are examples of offers of proof sufficient to satisfy the substantial preliminary showing. Id.; Yusuf, 461 F.3d at 383 n. 8. When demonstrating that the affiant omitted a material fact or included a false statement with the requisite mens rea, it is insufficient to prove the affiant acted with negligence or made an innocent mistake. Yusuf, 461 F.3d at 383. If the challenger provides sufficient proof and obtains a Franks hearing, the challenger must prove by a preponderance that (1) the affiant made false statements or omissions intentionally, knowingly, or with reckless disregard for the truth, and (2) such statements were material to the probable cause determination. Id. If the challenger satisfies this burden, we will excise the false statements and omissions from the affidavit and assess whether the corrected affidavit establishes probable cause.

Id.

96.     Any evidence obtained in connection with an illegal search must be suppressed as "'fruit of the poisonous tree.'" United States v. Brown, 448 F.3d 239, 244 (3d Cir.2006) (quoting Wong Sun v. United States, 371 U.S. 471, 487–88 (1963)).

97.     Here, Brooks argues that DuThinh "intentionally omitted information bearing

directly on the credibility of complainants, Tia and Cordell Collins, when he submitted the warrant affidavit to the magistrate." (ECF No. 83 ¶ 94.)

98.     DuThinh at the time he applied for a search warrant of 1204 Wade Street knew that Tia Collins had previously been arrested and that Cordell Collins had a record of arrests and sustained a felony drug conviction in Pennsylvania for which he was sentenced to a period of incarceration. (H.T. 10/12/2018 (ECF No. 84) at 65-68; Gov't Ex. 6.) DuThinh did not include that information in the affidavit of probable cause submitted to the magistrate judge. (Id. at 68; Gov't Ex. 5.) DuThinh explained that he did not "feel it had any bearing on their testimony as victims." (H.T. 10/12/2018 (ECF No. 84) at 68.)

99.     Under those circumstances, Brooks satisfied his burden to show that DuThinh *intentionally* omitted from his affidavit of probable cause information that Tia Collins was previously arrested[25] and Cordell Collins was previously arrested and sustained one felony conviction for which he was sentenced to a period of incarceration.

100.    Brooks, however, did not satisfy his burden to show that the omissions were

---

[25]     Brooks presented additional information with respect to Tia Collins being a target of a federal investigation at the time DuThinh applied for the search warrant. (Def. Ex. B.) DuThinh testified that he was not aware of that information at the time he drafted the affidavit of probable cause and did not include it in the affidavit of probable cause. (H.T. 10/12/2018 (ECF No. 84) at 77.)

DuThinh explained that at the time he drafted the affidavit of probable cause, he did not have any method by which to communicate with federal agencies other than the Drug Enforcement Agency about whether Tia Collins was the target of an investigation. (Id. at 76.) Under those circumstances, Brooks did not satisfy his burden to show that DuThinh's omission of the information that Tia Collins was the target of a federal investigation was intentional, knowing, or reckless.

The court also rejects any argument by Brooks about DuThinh's failure to further investigate Tia Collins' pending federal investigation and its relation to the home invasion robbery. (ECF No. 84 ¶ 100.) Brooks' argument is based entirely on speculation about what DuThinh would have done if he knew about the federal investigation at the time he drafted the affidavit and is not a basis to suppress evidence in this case.

*material* to the magistrate judge's determination of probable cause.

101.    First, the magistrate judge would have had a substantial basis upon which to issue the search warrant even if she was informed that Tia Collins was previously arrested. The Supreme Court of the United States has explained:

> Arrest without more does not, in law any more than in reason, impeach the integrity or impair the credibility of a witness. It happens to the innocent as well as the guilty.

Michelson v. United States, 335 U.S. 469, 482 (1948).  Under those circumstances, one prior arrest would not impeach the credibility of Tia Collins.

102.    Similarly, the magistrate judge would have had a substantial basis upon which to issue the search warrant even if she was informed that Cordell Collins was arrested on three different occasions and sustained one felony conviction. As discussed above, the arrests would not impeach the credibility of Cordell Collins, and the felony conviction occurred in 1998, i.e., approximately nineteen years prior to the home invasion robbery in 2017, and, therefore, does not weigh heavily against Cordell Collins' credibility.[26]

103.    Information provided by Tia Collins and Cordell Collins and set forth in the affidavit of probable cause was also corroborated by the evidence obtained from the crashed gray sedan by law enforcement. Tia Collins' pistol, which she reported was stolen by the two actors was found in the crashed gray sedan. Tia Collins reported that the two actors wore masks. Masks, along with handcuffs, zip-ties, and gloves, were found in the crashed gray sedan. It was reported that two shots were fired at Cordell Collins, and five firearms were found in the crashed gray sedan. Under those circumstances, even if the magistrate judge was made aware of the arrest of Tia

---

[26]    The affidavit reflects that the majority of the information relayed to DuThinh by the detective was provided by Tia Collins.

Collins and the arrests and conviction of Cordell Collins, she would have had a substantial basis upon which to find there was probable cause to believe that the information provided by Tia Collins and Cordell Collins was accurate.

104.    Brooks also argues that DuThinh omitted that: (a) he had suspicions that the home invasion robbery was a drug-related crime, which contradicted the motive suggested by Tia Collins and Cordell Collins; and (b) he suspected the nightclub owned by Tia Collins and Cordell Collins was involved in criminal activity. (ECF No. 84 ¶¶ 97-98, 108-110.) According to Brooks, that information should have been included in the affidavit of probable cause. (Id.)

105.    DuThinh explained that while he had suspicions about the Collins, he did not have any evidence to support that the home invasion robbery was drug-related or that their nightclub was involved in nefarious activity. (H.T. 10/12/2018 (ECF No. 84) at 70.) The inclusion of DuThinh's suspicions in the affidavit would not, therefore, have a *material* impact on the magistrate judge's determination of probable cause.

106.    In any event, even if the home invasion robbery against Tia Collins and Cordell Collins was drug-related and the Collins' nightclub (where the Collins had been prior to the home invasion robbery) was involved in nefarious activities, the affidavit provided a substantial basis upon which the magistrate judge could conclude that the conduct of Brooks was criminal and corroborated by other evidence obtained from law enforcement.

107.    Based upon the foregoing, Brooks was not entitled to a Franks hearing because he failed to make a substantial preliminary showing that the omitted information was material to the determination of probable cause.[27] In other words, even if DuThinh included in his affidavit of

---

[27]    Even if Brooks satisfied his burden to make a substantial preliminary showing that the omissions were material, he did not prove their materiality by a preponderance of the evidence, and the motion to suppress this issue would be denied.

probable cause all the information suggested by Brooks, i.e., the criminal histories of Tia Collins and Cordell Collins, including the information about Tia Collins' federal investigation, and his suspicions about the home invasion robbery being drug-related and the Collins' nightclub being involved in nefarious activity, the magistrate judge still would have had a substantial basis upon which to conclude that there was a fair probability that evidence that Brooks unlawfully possessed a firearm would be found in 1204 Wade Street.

108.    The motion to suppress with respect to Brooks' <u>Franks</u> argument will be denied.

**E.    Brooks' statements to law enforcement during the execution of the search warrant at 1204 Wade Street**

109.    A defendant who has "been taken into custody or otherwise deprived of his freedom of action in any significant way" must be given the warnings prescribed in <u>Miranda v. Arizona</u>, 384 U.S. 436 (1967), i.e., "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney either retained or appointed." <u>Id.</u> at 444.

110.    <u>Miranda</u> warnings are required because custodial interrogation involves "inherently compelling pressures." <u>Id.</u> at 467.

111.    A valid waiver of <u>Miranda</u> rights is required to be voluntary, knowing, and intelligent. <u>Miranda</u>, 384 U.S. at 444.

112.    A defendant satisfies his burden to show that evidence should be suppressed if he alleges "that he was subjected to custodial questioning without the benefit of <u>Miranda</u> warnings,' at which point the government must 'prove by a preponderance of the evidence that there was no custodial interrogation implicating <u>Miranda</u>, there was some exception to the <u>Miranda</u> rule, or ... [the defendant] ... was properly <u>Mirandized</u> and waived his rights.' " <u>United States v. Valenta</u>, Crim. No. 15-161, 2017 WL 2131375, at *4 (W.D. Pa. May 17, 2017) (quoting <u>United States v.</u>

Tudoran, 476 F. Supp. 2d 205, 216 (N.D.N.Y. 2007) (citation omitted)).

113. When the police fail to give adequate Miranda warnings, or fail to give any Miranda warnings whatsoever, any statement made by an individual who is subject to custodial interrogation is inadmissible at trial. New York v. Quarles, 467 U.S. 649, 654 (1984).

114. Brooks argues that his "alleged statement to officers in response to Officer Price's question about whether the house contained any 'hazards' at the time of the execution of the search warrant must be suppressed because it was obtained in violation of…Brooks' Fifth Amendment right not to incriminate himself." (ECF No. 83 ¶ 132.)

115. The government does not dispute that Brooks was subject to a "custodial situation, which ordinarily triggers Miranda's requirements." (ECF No. 82 ¶¶ 111.)

116. The undisputed evidence presented shows that Brooks was in handcuffs and not informed of his Miranda rights at the time he was questioned by Price about hazards in the home. The burden is, therefore, on the government to show by a preponderance of the evidence that an exception to the Miranda rule applies in this case.

117. The government argues that the public safety exception to Miranda applies in this case, and, therefore, Brooks' "un-Mirandized" statements should not be suppressed. (ECF No. 82 ¶¶ 112-135.)

118. In New York v. Quarles, 467 U.S. 649 (1984), a plurality of the Supreme Court of the United States established a "public safety" exception to Miranda.

119. The facts of Quarles have been summarized as follows:

There, police were approached by a young woman who told them she had just been raped by a man whom she described, and that the man had just entered a nearby supermarket and was carrying a gun. Officers entered the supermarket and quickly spotted defendant, who matched the description, and he began to run when he saw them. One officer, chasing him with the officer's gun drawn, saw him turn the corner at the end of an aisle, then lost sight of him for several seconds. Upon

regaining sight of him, the officer ordered him to stop. That officer frisked him and discovered that he was wearing an empty shoulder holster. After handcuffing him, the officer asked him where the gun was. Defendant nodded in the direction of some empty cartons and responded, "the gun is over there." The officer retrieved a loaded revolver from one of the cartons, then formally placed him under arrest. Id. at 651–52, 104 S.Ct. 2626.

United States v. Fautz, 812 F. Supp. 2d 570, 620 (D.N.J. 2011) (citing Quarles, 467 U.S. at 651-52.)

120.    The Court in Quarles recognized that the defendant was in custody when he was questioned and was not read his Miranda rights prior to being asked the whereabouts of the firearm. Quarles, 467 U.S. at 655. The Court concluded, however, that the statement should not be suppressed under a newly recognized public safety exception to Miranda. The Court explained:

In a kaleidoscopic situation such as the one confronting these officers, where spontaneity rather than adherence to a police manual is necessarily the order of the day, the application of the exception which we recognize today should not be made to depend on post hoc findings at a suppression hearing concerning the subjective motivation of the arresting officer. Undoubtedly most police officers, if placed in Officer Kraft's position, would act out of a host of different, instinctive, and largely unverifiable motives—their own safety, the safety of others, and perhaps as well the desire to obtain incriminating evidence from the suspect.
…

The police in this case, in the very act of apprehending a suspect, were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket. So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it.

In such a situation, if the police are required to recite the familiar Miranda warnings before asking the whereabouts of the gun, suspects in Quarles' position might well be deterred from responding. Procedural safeguards which deter a suspect from responding were deemed acceptable in Miranda in order to protect the Fifth Amendment privilege; when the primary social cost of those added protections is the possibility of fewer convictions, the Miranda majority was willing to bear that cost. Here, had Miranda warnings deterred Quarles from responding to Officer Kraft's question about the whereabouts of the gun, the cost would have been something more than merely the failure to obtain evidence useful in convicting

Quarles. Officer Kraft needed an answer to his question not simply to make his case against Quarles but to insure that further danger to the public did not result from the concealment of the gun in a public area.

…

The exception will not be difficult for police officers to apply because in each case it will be circumscribed by the exigency which justifies it. We think police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect.

Id. at 655-58.

121.    The Third Circuit Court of Appeals has not addressed the public safety exception in a precedential opinion. The court of appeals has, however, affirmed its application in at least five decisions with varying facts.

122.    In United States v. Judge, 447 F. App'x 409 (3d Cir. 2011), the court of appeals held the public safety exception applied to the following set of facts:

A shooting had occurred in a dense urban area near a community center; a witness had told Officer Strang a man in a sweatshirt and a baseball cap fled from the shooting to a nearby field; Officer Strang found Judge hiding among a sweatshirt and cap in the indicated field; and upon seeing the officers, Judge volunteered he had been shot.

Id. at 414-15. The police officer, "Office Strang," asked the defendant whether the clothes he was sitting upon, i.e., the "sweatshirt and cap," were his, and the defendant responded in the affirmative. Id. at 412. The court of appeals held: "[u]nder the circumstances, the court was justified in construing…[the police officer's] questions as driven by an 'objectively reasonable need' to secure the public safety—namely, to locate the missing firearm and prevent further violence." Id. at 415.

123.    In United States v. Powell, 444 F. App'x 517 (3d Cir. 2011), the relevant law enforcement agencies conducted an investigation about two armed bank robberies, which led to the arrest of the defendant. Id. at 518-19. Law enforcement was also aware that the defendant

previously pleaded guilty to three counts of armed bank robbery. Id. at 519. Law enforcement executed an arrest and search warrant at the defendant's residence. Id. The court explained the pertinent facts as follows: "[w]hile being handcuffed, one of the agents asked…[the defendant] if he had any weapons in the apartment to which he responded 'yes, there is a loaded gun in the hallway closet.'" Id.

124.     The court of appeals affirmed the district court's decision to apply the public safety exception to Miranda in the case and explained: "[e]ven though the officers had control over…[the defendant] and no members of the public were present in…[the defendant's] apartment, the officers were aware that…[the defendant] had prior felony convictions involving use of a weapon and that he was suspected of involvement in armed robbery." Powell, 444 F. App'x at 520.

125.     The government cites Powell in support of its argument that the public safety exception should apply in this case. The court of appeals in Powell, however, relied upon United States v. Are, 590 F.3d 425, 428 (7th Cir. 2000), for the proposition that the "public safety exception applies where officers had prior knowledge of suspect's involvement with firearms." Powell, 444 F. App'x at 520. As the Seventh Circuit Court of Appeals noted in United States v. Hernandez, 751 F.3d 538, 541 (7th Cir. 2014), Are does not stand for that proposition because in Are "there was a risk of the suspect or others who were there obtaining any weapon that was hidden on the premises." Id.   The court, therefore, does not find Powell, which is nonprecedential, persuasive.

126.     In United States v. Duncan, 308 F. App'x 601 (3d Cir. 2009), the court of appeals held the public safety exception to Miranda applied in a case where police officers knew a shooting had taken place at an apartment complex, the police officers approached a man sitting in a parked vehicle near the apartment complex on the day after the shooting, and the defendant repeatedly

made furtive movements toward his right coat pocket where one of the officers saw the defendant place a "shiny silver object" that the police officer believed with a handgun. Id. at 602-03. One of the police officers asked the defendant whether the object in his right pocket was a handgun, to which the defendant responded "[y]es, but it's not mine." Id. at 603.

127.    The court of appeals affirmed the decision of the district court to deny the motion to suppress the defendant's statement to the police officers about the handgun and apply the public safety exception in the case. Id. at 605-06. The court of appeals explained:

> The dispositive question here is whether, considering all the circumstances, it was objectively reasonable for Detective Astbury to have thought that asking Duncan whether the object indeed was a gun was necessary to protect himself, his partner, or the public from immediate danger. While this is a close case given the narrowness of the exception, we conclude that we should answer in the affirmative in the fact pattern before us. Given Duncan's movement of his arms and reaching toward his pocket, and the perceived and obvious danger if the object was in fact a gun and were to go off, we find that the one question that was asked, clearly for reasons of safety, was permissible under the totality of the circumstances. Accordingly, the District Court properly refused to suppress Duncan's statement in response to the question.

Id. at 605-06 (footnote omitted).

128.    In United States v. Ball, 282 F. App'x 126 (3d Cir. 2008), the defendant's "parole officer arrested him because of a number of failed and doctored drug tests and the receipt of an anonymous tip indicating that…[the defendant] sold drugs out of his apartment." Id. at 127. "A resulting search of…[the defendant's] person, car, and residence led to the discovery of cocaine and marijuana, a number of firearms he could not possess legally because of his status as a prior felon, and counterfeit currency." Id.

129.    The district court described the questioning in issue, which took place during the search of his apartment, as follows:

> Upon finding ammunition, supervisor Hines asked the Defendant "where's the gun," to which the Defendant replied "there is no gun." Tr. at p. 62, ln. 11–19. Upon

recovering the gun cleaning kit the Agents again asked where the gun was, to which the Defendant denied there being a gun at all. Tr. at p. 62, ln. 20–25, p. 63, ln.1–2. Later Agent Martinez asked where the guns were located. The Defendant responded that they were in the Jeep. Tr. at p. 63, ln. 6–12.

United States v. Ball, Crim. Action No. 02-558-01, 2003 WL 22016793, at *4 (E.D. Pa. June 10, 2003), aff'd, 282 F. App'x 126 (3d Cir. 2008).

130.    The district court held the public safety exception applied. It reasoned:

In the instant case, the Agents found ammunition and a gun-cleaning kit in the apartment. Because the Agents were faced with "an objectively reasonable need to protect" themselves and Defendant's fiancée, the Quarles exception applies. Accordingly, the government may use Defendant's statements concerning guns in their case-in-chief.

Id. at *7.

131.    The court of appeals affirmed the decision of the district court and explained:

The District Court concluded that the officers were faced with an objectively reasonable need to protect themselves. Reasonable minds might differ on that point given the facts of this case, but we cannot say that the District Court committed clear error. We thus will not disturb its conclusion that the Quarles exception applies to the questions posed by the officers to Ball regarding the location of the firearms.

Ball, 282 F. App'x at 127.

132.    Neither the district court nor the court of appeals provided a detailed explanation about why the agents in Ball had an "objectively reasonable need to protect themselves" when the defendant was a supervised parolee in their custody during the search. Id.; Ball, 2003 WL 22016793, at *7. The court cannot decipher from the district court's opinion where the defendant was located or if he was handcuffed when the agents first found ammunition in his bedroom or later questioned him about the firearm. The district court found, however, that the agents had reasonable suspicion to believe the defendant was engaged in illegal drug activity, and that the defendant's fiancé was in the home during the search. She was not handcuffed until after the agents

questioned the defendant about the location of firearms in the home. Id. at *3-4.

133.    In United States v. Johnson, 95 F. App'x 448 (3d Cir. 2004), a 9-1-1 caller detailed

a "road rage" incident during which he alleged the defendant, a man in a Range Rover, threatened

him and pointed a gun at him, and identified the current whereabouts of the vehicle. Id. at 449.

Three police officers responded to the call and with firearms drawn approached the Range Rover.

Id. The court of appeals explained:

> They asked…[the defendant] to show his hands….[The defendant] rolled down the
> window. They asked…[the defendant] to get out of the vehicle, which he did. The
> officers then frisked…[the defendant]. Either immediately before or during this
> initial frisk of…[the defendant], the officers asked if…[the defendant] had a gun,
> and…[the defendant] replied that he did. Officer O'Malley then found a loaded nine
> millimeter semiautomatic pistol in…[the defendant's] rear waistband.

Id. at 449-50.

134.    The court of appeals affirmed the decision of the district court that the officers'

questioning and the defendant's response was subject to the public safety exception to Miranda.

Johnson, 95 F. App'x at 452. The court of appeals explained: "Here, we think…[the defendant's]

statement was properly admitted because the question was clearly intended to secure the officers'

safety and the safety of the public, and not to obtain evidence useful in convicting [the defendant]."

Id.

135.    In United States v. Fautz, 812 F.Supp.2d 570 (D.N.J. 2011), the court conducted a

thorough review of the application of the public safety exception by federal appellate courts in

cases involving "police questions that elicited answers about firearms" in an "attempt…to follow

the teachings of Quarles" in that case.  Id. at 621.

136.    First, the court explained that the appellate courts were not in consensus about

whether principles or a test implementing Quarles was warranted or appropriate. The court

described its approach to understanding Quarles as follows:

We have taken a different tack in attempting to follow the teachings of Quarles in this particular case. Although we have certainly looked at the rationales employed by the appellate courts that have interpreted Quarles, we have actually broken the cases down into fact patterns, to see what the courts did, along with what they *said*. Viewing the legal landscape that way, it seems to us that most of the appeals decisions we have studied are consistent in their outcomes, and faithful to Quarles, based upon the facts found by the trial courts.

Id.

137.    The court divided the decisions into two groupings: (1) multiple occupant cases, "in which in addition to the person who makes the challenged statement, there are other individuals present when police ask their questions, or the police do not yet know whether there are other individuals present or likely to arrive while police are on-site[;]" and (2) sole occupant cases, in which "the police make entry and are able to determine that only one individual is there, and police have the location secured from others entering when they ask their questions." Id. at 624.

138.    In all the *multiple occupant cases*, the appellate courts held the public safety exception applied to police officers' questioning. The courts of appeals in those decisions relied upon "the presence or reasonably feared presence of other occupants on the premises, who might injure themselves or the officers or others if they gained access to a weapon[.]" Id. (collecting cases).

139.    The court explained that in the *sole occupant cases*, the appellate courts applied the public safety exception if the defendant retained some freedom of movement. The public safety exception was not applied in cases in which "the defendant was firmly under the control of the officers when the question was asked, such that there was no reasonable fear that he could reach a weapon, whether that control was achieved by handcuffing or any equivalent exercise of police authority[.]" Id. at 627.

140.     In its analysis, the court recognized that there was a circuit split with respect to the issue presented by the facts of the case before it, i.e.:

> [W]hether, if there are no other circumstances indicating immediate or impending danger to the police or the public at the time the questioning is conducted, a reasonable suspicion that the premises or vehicle where the encounter takes place contains firearms that the officers may encounter or mishandle is sufficient to justify custodial interrogation of an unmirandized suspect on the limited issue as to whether there are firearms present.

Fautz, 812 F. Supp. 2d at 622.  The court explained that the Eighth Circuit Court of Appeals was the only appellate court that answered the issue in the affirmative. Id. (citing United States v. Liddell, 517 F.3d 1007 (8th Cir. 2008) (explaining "the risk of police officers being injured by the mishandling of unknown firearms or drug paraphernalia provides a sufficient public safety basis to ask a suspect who has been arrested and secured whether there are weapons or contraband in a car or apartment that the police are about to search").

141.     On the other hand, the Sixth Circuit Court of Appeals in United States v. Williams, 483 F.3d 425 (6th Cir. 2007), explained:

> For an officer to have a reasonable belief that he is in danger, at minimum, he must have reason to believe (1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to that weapon and inflict harm with it. The public safety exception applies if and only if both of those two conditions are satisfied and no other context-specific evidence rebuts the inference that the officer reasonably could have perceived a threat to public safety.

Id. at 428; see United States v. Mobley, 40 F.3d 688 (4th Cir.1994); United States v. Lim, 897 F.3d 673 (5th Cir. 2018) ("We refused to apply the exception where the police had already swept the house twice, the occupants were secure, the 'immediacy of the situation had passed,' and '[t]he public did not have access to [the defendant's] private residence.'") (quoting United States v. Brathwaite, 458 F.3d 376, 382 n.8 (5th Cir. 2006)).

142.     Based upon the foregoing, the court in Fautz concluded that if faced with the

decision, the Third Circuit Court of Appeals, which had consistently recognized the public safety exception as "narrow," would adopt a "narrow approach" to Quarles and hold:

> [T]he danger of officers encountering or mishandling a weapon, during an encounter on private premises, will not alone support application of the public safety exception. Thus, if the premises have been determined by the officers to have a sole occupant, or even if there is more than one occupant, but the police have achieved complete physical control over all occupants and can foreseeably maintain that control as long as necessary, any "safety" questioning of the occupants does not fit within the public safety exception even if police have reasonable grounds to fear that they will encounter a weapon while performing their functions at the premises.

Id.

143.    Applying the foregoing to the facts of the case before it, the court in Fautz held:

> [D]efendant's pre-arrest statements must be suppressed. We have found that those statements were obtained by custodial interrogation without Miranda warnings. We now find that although the questions he was asked about weapons in the apartment were narrowly limited to that subject, and although the officers had reasonable suspicion that there were weapons on the premises, those questions were not justified by the public safety exception because when the questions were asked, the police had determined that he was the sole occupant and they had him firmly in their control and could foreseeably prevent him from accessing any weapons while they conducted their warrant search.

Id.

144.    Although the Fautz decision is seven years old, its analysis and prediction remain relevant.

145.    More recently, the Seventh Circuit Court of Appeals in United States v. Hernandez, 751 F.3d 538 (7th Cir. 2014), described the circuit split recognized by the court in Fautz as a distinction between a *broad* approach to Quarles and a *narrow* approach to Quarles. The court explained:

> [I]f there is a perceived risk that, when searching a vehicle or a residence, the officer might inadvertently bump or otherwise mishandle a hidden firearm (or other dangerous object) the broad approach would permit the officer to first ask whether any such danger is present. The narrow approach would not.

Id. at 541. The court recognized, however, the issue is different if there is "a risk of the suspect or others who were there obtaining any weapon that was hidden on the premises." Id.

146.    The court of appeals in Hernandez also explained that "even among circuits that otherwise take a narrow approach, questions designed to prevent officers from hurting themselves during a search of the suspect's person are permitted." Id.[28]

147.    Based upon the foregoing, this court will join in the prediction made by the court in Fautz. If faced with the issue, the Third Circuit Court of Appeals would hold that if the place to be search is determined to have more than one occupant, "but the police have achieved complete physical control over all occupants and can foreseeably maintain that control as long as necessary, any 'safety' questioning of the occupants does not fit within the public safety exception even if police have reasonable grounds to fear that they will encounter a weapon while performing their functions at the premises." Fautz, 812 F. Supp. 2d at 622.

148.    Here, the first issue the court must address is whether it was objectively reasonable for Price to conclude that law enforcement had complete physical control over *all* occupants of the house. The evidence showed that at the time Price questioned Brooks about the dangers in the home there were multiple *known* occupants of 1204 Wade Street who were detained on the front porch, i.e., Brooks, Squires, and their two children.

---

[28]    If Price's question to Brooks had been limited to fentanyl the result may be different. Fentanyl is dangerous, and there may be harm to a law enforcement officer if he or she did not know a substance was fentanyl and came in close proximity to it. See United States v. West, Crim. Action No. 17-189, 2018 WL 6191082, at *7 (explaining that "[t]here is no doubt that fentanyl is extremely dangerous, and law enforcement officers must be cautious in their handling of fentanyl"); United States v. Alvarad-Tizoc, 656 F.3d 740, 744 (7th Cir. 2011) (explaining that "[f]entanyl is more dangerous because it's stronger—gram for gram" than heroin, and, thus, the United States Sentencing Guidelines "treat the sale of fentanyl more harshly than the sale of heroin").

149. The court, however, cannot discern from the evidence of record whether it was objectively reasonable for Price to conclude that his questioning was necessary because there may be *other persons* with access to firearms[29] hiding in the home.

150. The issue is one of timing. If the secondary search of 1204 Wade Street had been completed and it was determined that there was no one hiding in the home, Price could not have an objectively reasonable belief that he had to question Brooks about the dangers in his home to preserve the safety of the officers conducting the search. Any exigency created by other persons hiding in the home with access to firearms ended once law enforcement determined there was no one else hiding in the home. See United States v. Are, 590 F.3d 499, 505-07 (7th Cir. 2009); United States v. Newsome, 475 F.3d 1221, 1225 (11th Cir. 2007); United States v. Young, 58 F. App'x 980, 981-82 (4th Cir. 2003) (per curiam); United States v. DeSantis, 870 F.2d 536 (9th Cir. 1989).

151. On the other hand, if the secondary search had not started or was ongoing at the time of questioning, it may be objectively reasonable for Price to believe that questioning Brooks about known dangers in the home, i.e., hiding persons with access to firearms, was necessary to preserve the safety of the law enforcement officers conducting the secondary search inside the home. See United States v. Kelley, 268 F. App'x 304, 305 (5th Cir. 2008) (per curiam).

152. The government did not prove by a preponderance of the evidence that Price questioned Brooks prior to or during the secondary search for hiding persons. The testimony presented by Price and DuThinh was unclear with respect to this issue.

153. Price testified:

---

[29]   Price testified that he knew they were at 1204 Wade Street home for firearms. Thus, it was reasonable for him to believe that there were firearms in the residence.

My interaction with him was when we brought him out on the porch. We had, the initial search had been done, then the secondary, bodies that hide. I had to ask him, I said, look, is there anything in this house that could get anybody hurt to include, you know, fentanyl, carfentanil, weapons, anything like that.

(H.T. 10/12/2019 (ECF No. 84) at 85.)

154.     DuThinh when asked about *when* Price questioned Brooks about the dangers in the home testified:

It was probably possibly between the first search and the secondary search. But definitely before the full-on, thorough search of the residence.

(Id. at 98.)

155.     As discussed above, the evidence shows that it was objectively reasonable for Price to believe that at the time he questioned Brooks he had physical control of all *known* occupants of the home, i.e., Brooks, Squires, and the two children. The court, however, cannot conclude that it is more likely than not that the questioning was done prior to or during the secondary search. In other words, the government did not satisfy its burden to show that it was objectively reasonable for Price to believe that other, *unknown* persons with access to firearms could have been present in the home.

156.     The court must also decide whether Price's questioning of Brooks falls within the public safety exception to Miranda because law enforcement intended to permit Squires and the children inside the home to prepare for school during the "full-on" search of the house.

157.     The Supreme Court of the United States has held that that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." Michigan v. Summers, 452 U.S. 693 (1981). Thus, law enforcement had authority to detain Squires and the children during the "full-on" search of 1204 Wade Street.

158.     Price was not in the position of the questioning police officer in <u>Quarles</u>, who was faced with a matter of exigency and urgency with respect to a missing firearm in a public grocery store. The Supreme Court in <u>Quarles</u> explained:

> We decline to place officers such as Officer Kraft in the untenable position of having to consider, **often in a matter of seconds**, whether it best serves society for them to ask the necessary questions without the <u>Miranda</u> warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and **neutralize the volatile situation confronting them**.

<u>Quarles</u>, 467 U.S. at 657-58 (emphasis added).

159.     At the time Price questioned Brooks, law enforcement had achieved complete physical control over the *known* occupants of the home and could foreseeably maintain that control as long as necessary. There was a need for the search for hidden persons, but the evidence adduced was not sufficient for the court to conclude it is more likely than not that the questioning was prior to or during the secondary search. On the record presented, it is just as likely that the secondary search was completed at the time Price questioned Brooks about dangers in the home.

160.     The court must, therefore, conclude that Price would have had time to read Brooks his <u>Miranda</u> rights prior to questioning him and permitting Squires and the children back inside the home. The decision to permit Squires and the children back inside the home to prepare for the school day, while commendable, was at the discretion of law enforcement.

161.     To the extent Brooks was <u>Mirandized</u> and refused to answer Price's questions, there is no reason to believe law enforcement could not continue to detain Squires and the children on the porch until the "full-on" search was completed and he was satisfied that the home was safe for reentry.[30]

---

[30]     Although Squires and the children may have been on the front porch in their pajamas, the

162.    The government, therefore, did not satisfy its burden to show it was objectively reasonable for Price to believe that asking Brooks about dangers in his home was *necessary* to protect himself, the law enforcement on scene, Squires and the children, or the public from *immediate* danger. See <u>Duncan</u> 308 F. App'x at 605-06.

163.    Applying the public safety exception under the facts of this case would run afoul of the Supreme Court's teachings that the public safety exception is *narrow*.

164.    Brooks' statements to Price about the location of the firearms in 1204 Wade Street will, therefore, be suppressed under <u>Miranda</u>.

165.    Brooks' motion to suppress will be granted with respect to this issue.

**V.    <u>C</u>ONCLUSION**

For the reasons set forth in this opinion, the court will grant Brooks' motion to suppress (ECF No. 38) with respect to the statements he made to Price about the location of firearms in 1204 Wade Street. The motion to suppress will be denied in all other respects.

An appropriate order will be entered.

<u>D</u>ATED:        December 14, 2018            **/s/ J**OY **F**LOWERS **C**ONTI
                                              Joy Flowers Conti
                                              Senior United States District Judge

---

search was conducted in late August.